**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| _____ | : | MDL Docket No. 1663 |
| **IN RE INSURANCE BROKERAGE** | : | |
| **ANTITRUST LITIGATION** | : | Civ. No. 04-5184 (GEB) |
| _____ | : | |
| | : | |
| **IN RE EMPLOYEE-BENEFIT** | : | |
| **INSURANCE BROKERAGE** | : | Civ. No. 05-1079 (GEB) |
| **ANTITRUST LITIGATION** | : | |
| _____ | : | |
| | : | |
| **This Document Relates To:** | : | **OPINION** |
| | : | |
| **ALL ACTIONS** | : | |
| _____ | : | |

**BROWN, Chief Judge**

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

LEGAL FRAMEWORK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      I.      Breadth and Limitations of RICO statutory mandate.. . . . . . . . . . . . . . . . . . . . . . . 8

      II.     Pleading a RICO Claim Under Subsection 1962(c).. . . . . . . . . . . . . . . . . . . . . . . 10

            A.     Pleading the "Enterprise" Element. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            B.     Pleading the "Structure" Aspect of the "Enterprise" Element. . . . . . . . . . 21

                1.    *Permissive Pleadings*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                2.    *Invalid Pleadings*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            C.     Pleading the "Conduct or Participate" Element. . . . . . . . . . . . . . . . . . . . 26

III.    Pleading a RICO Claim Under Subsection 1962(d). . . . . . . . . . . . . . . . . . . . . . 28

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

I.    Factual Allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

II.    CIAB as a RICO Enterprise. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

III.    Broker-centered Enterprises as RICO Enterprises. . . . . . . . . . . . . . . . . . . . . 36

IV.    Strategic Partnership as a RICO Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . 44

V.    Leave to Amend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

## INTRODUCTION

This matter is before the Court on motions (hereinafter, collectively, "Motions") submitted by defendants consisting of various insurance carriers and insurance brokerages (hereinafter, respectively, "Insurer Defendants" and "Broker Defendants," and, collectively, "Defendants") seeking to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' claims alleging Defendants' violations of the Racketeering Influence and Corrupt Organization Act (hereinafter "RICO"), 18 U.S.C. §§ 1962(c), (d), as set forth in Plaintiffs' First Consolidated Commercial Class Action Amended Complaint and First Consolidated Employee Benefits Class Action Amended Complaint (hereinafter, collectively, "Complaints"), and as amended by Plaintiffs' Amended RICO Case Statements (hereinafter, collectively, "RICO Case Statement"). The instant opinion addresses solely Plaintiffs and Defendants' arguments that pertain to Plaintiffs' RICO claims. For the reasons discussed below, Defendants' Motions are GRANTED, and Plaintiffs' claims alleging Defendants' RICO violations under 18 U.S.C. §§ 1962(c), (d) are DISMISSED WITHOUT PREJUDICE.

## PROCEDURAL BACKGROUND

Plaintiffs in these actions include businesses, public entities and private individuals who, seeking to purchase commercial and/or property insurance coverage and/or group insurance coverage for their employees, or primary insurance coverages through their employers' benefits plans, or supplemental insurance coverages, contracted the Insurer Defendants through the Broker Defendants. See In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at * 36 (D.N.J. Oct. 3, 2006) (detailing the parties to this action). The relationship between Plaintiffs and Defendants stemmed from the fact that

> [t]he Broker Defendants, together with their affiliates, provide[d Plaintiffs] with risk management and insurance brokerage services, including, inter alia, analysis of risk and insurance options, procurement and renewal of insurance, interpretation of insurance policies, monitoring the insurance industry on [Plaintiffs'] behalf . . . and assisting [Plaintiffs] with the filing and processing of claims against the policies they place. The Insurer Defendants and their subsidiaries, [operating through the Broker Defendants,] develop[ed], market[ed] and [sold to Plaintiffs] a variety of insurance and reinsurance products for individual[] and business [uses].
>
> . . . .
>
> [After the] New York State Attorney General . . . filed a civil complaint . . . against [one of the Broker Defendants in this action alleging that this defendant] had solicited rigged bids for insurance contracts and . . . received improper contingent commission payments in exchange for steering its clients to a select group of [insurance carriers, Plaintiffs began filing, in various federal districts,] actions based on allegations similar to those raised in the complaint [of the New York State Attorney General.] On February 17, 2005, the Judicial Panel on Multidistrict Litigation transferred these cases to [the District Court for the District of New Jersey] for coordinated or consolidated pretrial proceedings pursuant to . . . procedures set forth in 28 U.S.C. § 1407. . . . Since that time, [numerous] "tag-along" actions have been conditionally transferred to [the District of New Jersey and processed together with this matter].

See id. at 37-39 (citations and quotation marks omitted).

All initial and later-filed complaints alleged that

Defendants . . . misled [Plaintiffs] into thinking that [Plaintiffs were] receiving the most economical and appropriate insurance products, while in fact, the Broker [Defendants were] steering [Plaintiffs] towards products that . . . maximize[d] the profit of . . . Defendants.

See id. at 41-42 (citations and quotation marks omitted).  Plaintiffs further alleged that the Broker [Defendants] and the Insurers [Defendants aimed to create and] created the illusion of a competitive market for insurance . . . . [In order to create such illusion,] the Broker Defendants and Insurer Defendants engaged in a combination and conspiracy to suppress and eliminate competition in the sale of insurance by coordinating and rigging bids for insurance policies, allocating insurance markets and customers and raising, or maintaining or stabilizing premium prices . . . .

See id. at 41 (citations and quotation marks omitted).

The complaints asserted six causes of action: (1) RICO violations; (2) violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 (hereinafter "Sherman Act"); (3) violation of the antitrust laws of forty eight states and the District of Columbia; (4) breaches of statutory and common-law-based fiduciary duties; (5) aiding and abetting breach of fiduciary duty; and (6) unjust enrichment.  See id. at 53-54.  After these causes of action were aligned along and severed into two types of matters (one involving commercial property and casualty insurance coverages (hereinafter "Commercial Case") and the other involving employee benefits insurance plans (hereinafter "Employee-Benefit Case")), the Court consolidated all actions into two accordingly aligned consolidated dockets.  See In re Ins. Brokerage Antitrust Litig., 04-5184 (FSH), Docket Entry No. 118 (D.N.J. May 25, 2005);  In re Employee-Benefit Ins. Brokerage Antitrust Litig., 05-1079 (FSH), Docket Entry No. 20 (D.N.J. Aug. 8, 2005).  Consequently, Plaintiffs filed one consolidated amended complaint per each respective docket, and then altered these two submissions by filing two Plaintiffs' corrected amended complaints, one of 153 pages, see In re Ins. Brokerage Antitrust Litig., 04-5184 (FSH), Docket Entry

No. 201 (D.N.J. May 25, 2005), and another of 173 pages, both setting forth the same six causes of action.  See  In re Employee-Benefit Ins. Brokerage Antitrust Litig., 05-1079 (FSH), Docket Entry No. 21 (D.N.J. Aug. 8, 2005).  These two corrected amended complaints constitute the Complaints currently before this Court.  In addition, pursuant to two orders  of the Court and accompanying opinion, see In re Ins. Brokerage Antitrust Litig., 04-5184 (FSH), Docket Entries Nos. 123, 720-21 (D.N.J. May 25, 2005, and Oct. 3, 2006) (finding, inter alia, that Plaintiffs' allegations set forth in the Complaints "failed to [sufficiently] plead [the] 'enterprise'" element of Plaintiffs' RICO claim), Plaintiffs filed their RICO Case Statement and Plaintiffs' statements of particularity supplementing Plaintiffs' Complaints.   See, e.g., In re Ins. Brokerage Antitrust Litig., 04-5184 (FSH), Docket Entries Nos. 843, 844, 845.  After Plaintiffs filed their RICO Case Statement and statements of particularity, Defendants (who had previously moved to dismiss Plaintiffs' Complaints) renewed Defendants' motions to dismiss the Complaints, as amended by Plaintiffs' RICO Case Statement and statements of particularity, by filing the Motions currently before this Court.  See, e.g., In re Ins. Brokerage Antitrust Litig., 04-5184 (FSH), Docket Entries Nos. 814-23; In re Employee-Benefit Ins. Brokerage Antitrust Litig., 05-1079 (FSH), Docket Entries Nos. 466-70.  The matter In re Ins. Brokerage Antitrust Litig., 04-5184 (GEB), was transferred to the undersigned on February 16, 2007. See Docket Entry No. 1009.  The matter In re Employee-Benefit Ins. Brokerage Antitrust Litig., 05-1079 (GEB), was transferred to the undersigned on February 22, 2007.  See Docket Entry No. 544. On March 1, 2007, this Court heard oral arguments of Plaintiffs and Defendants' designated representative counsel addressing those RICO and Sherman Act issues that were raised in submissions filed in support of--or in opposition to--the instant Motions. See In re Ins. Brokerage Antitrust Litig., 04-5184 (GEB) (unnumbered entry reading "Minute Entry for proceedings held

before Judge Garrett E. Brown, Jr.: Motion Hearing held on 3/1/2007").

## STANDARD OF REVIEW

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief may be granted. See Fed. R. Civ. P. 12(b)(6). Since the purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case, see Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993), the court considering a motion to dismiss brought under Rule 12(b)(6) accepts all facts and allegations listed in the complaint as true and draws all reasonable factual inferences in the light most favorable to the plaintiff. See H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249 (1989); Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989); D.P. Enter. v. Bucks County Community College, 725 F.2d 943, 944 (3d Cir. 1984). Therefore, a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief. See Oran v. Stafford, 226 F.3d 275, 279 (3d Cir. 2000); Langford v. City of Atlantic City, 235 F.3d 845, 850 (3d Cir. 2000); Turbe v. Government of the Virgin Islands, 938 F.3d 427, 428 (3d Cir. 1991) (citing Unger v. Nat'l Residents Matching Program, 928 F.2d 1392, 1394-95 (3d Cir. 1991)); Bartholomew v. Fischl, 782 F.2d 1148, 1152 (3d Cir. 1986); see also Langford, 235 F.3d at 850; Dykes v. Southeastern Pa. Transp. Auth., 68 F.3d 1564, 1565 n.1 (3d Cir. 1995), cert. denied, 517 U.S. 1142 (1996); Piecknick v. Commonwealth of Pennsylvania, 36 F.2d 1250, 1255 (3d Cir. 1994); Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). The Court may not dismiss a complaint unless plaintiff can prove no set of facts that would entitle him to relief, see Conley v. Gibson, 355

U.S. 41, 45-46 (1957); Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir.), cert. denied, 474 U.S. 935 (1985), and it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the . . . claim . . . ." Ransom v. Marazzo, 848 F.2d 398, 401 (3d Cir. 1988). A complaint may be dismissed for failure to state a claim only where it appears beyond any doubt "that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) (citation omitted). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (citation omitted); see also Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997) (stating that "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss") (citations omitted), and the court should reject "unsupported allegations," "bald assertions," or "legal conclusions." See In re Burlington Coat Factory Securities Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997) (quoting Glassman v. Computervision Corp., 90 F.3d 617, 628 (1st Cir. 1996)); Amiot v. Kemper Ins. Co., 122 Fed. Appx. 577, 579 (3d Cir. 2004); Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1998); Mitchell v. Duval County Sch. Bd., 107 F.3d 837, 839-40 (11th Cir. 1997); Johnson v. Dallas Indep. Sch. Dist., 38 F.3d 198 (5th Cir. 1994), cert. denied, 514 U.S. 1017 (1995); see also Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1997) (noting that courts, when examining 12(b)(6) motions, have rejected "legal conclusions," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law," or "sweeping legal conclusions cast in the form of factual allegations"); Leeds

v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996) ("[W]hile the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice"); Fernandez-Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1993) ("Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss").  The principal reasons for Rule 12's balance are to promote prompt and simultaneous presentation both of defenses and objections available to a party, to avoid delay incident to successive motions prolonging final disposition of case, and to eliminate frivolous claims expeditiously.  See Neifeld v. Steinberg, 438 F.2d 423, 427 (3d Cir. 1971); see also Sadler v. Penn. Refining Co., 33 F. Supp. 414, 415 (D.S.C. 1940); accord Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1347.


## LEGAL FRAMEWORK

### I.    Breadth and Limitations of RICO statutory mandate

Congress enacted the RICO statute in 1970, as part of the Organized Crime Control Act of 1970.[1]  See Pub. L. No. 91-452, 84 Stat. 922 (1970).  In view of congressional findings that organized crime was using its influence "to infiltrate and corrupt legitimate business enterprises,"

---

[1]

Senator John McClellan introduced the Organized Crime Control Act on January 15, 1969 as Senate Bill 30, but that bill did not initially include the provisions that would later become RICO. See 115 Cong. Rec. 827, 827-29 (1969).  Instead, the RICO provisions were drawn from two other bills, Senate Bill 1623, see the Criminal Activities Profits Act, 91st Cong. (1969) (introduced by Senator Roman Hruska on March 20, 1969), and Senate Bill 1861, see Corrupt Organizations Act of 1969, 91st Cong. (1969) (jointly introduced by Senators McClellan and Hruska on April 18, 1969).

According to Professor G. Robert Blakey, drafter of RICO, the provision was modeled after the regimes set forth by securities regulation and antitrust statutory schemes. See Blakey, In Antitrust, Tort and RICO Reform, Obvious Goals Cover Up Deep Issues, Nat'l L. J., Oct. 13, 1986, at 26, col. 4; accord Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 151 (1987) (tracing the similarities between RICO and the antitrust laws).

RICO's stated purpose was "to seek the eradication of organized crime in the United States."  See id. at 922-23.  RICO also has broad application beyond the organized crime context because Congress mandated that RICO "be liberally construed to effectuate its remedial purposes."[2]  See id. at 942.  Whilst such liberal construction caused the provision to be labeled as "arcane," "tormented" and "complicated," see Tafflin, 493 U.S. at 465 (stating that RICO is "one of the most complex statutes ever enacted by Congress"); Macy's E., Inc. v. Emergency Envtl. Servs., Inc., 925 F. Supp. 191, 193 (S.D.N.Y. 1996) (noting "arcane eccentricities of RICO jurisprudence"), Combs v. Bakker, 886 F.2d 673, 677 (4th Cir. 1989) (characterizing RICO as a "tormented statute"), the Supreme Court has generally held that RICO must be liberally applied, and that its reach includes legitimate businesses and enterprises, operating with and without a profit motive.  See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499 (1985) (holding legitimate enterprises "enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences"); Nat'l Org. for Women v. Scheidler, 510 U.S. 249, 261 (1994) (holding abortion clinics could maintain a RICO action against anti-abortion groups although the groups operated without a profit motive); but see Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991, 2004-05 (2006) (Thomas, J., dissenting) ("Judicial sentiment

---

2

    With the enactment of the RICO statute, Congress "intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots" by offering "enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Russello v. United States, 464 U.S. 16, 26-27 (1983) (citing Pub. L. No. 91-452, 84 Stat. at 923).  Thus, in addition to criminal actions and severe criminal penalties such as fines, imprisonment, and asset forfeiture, see 18 U.S.C. § 1963(a), RICO permits private plaintiffs and the government to seek redress in civil actions in either state or federal court, see 18 U.S.C. § 1964(b); Tafflin v. Levitt, 493 U.S. 455, 458 (1990) (holding state and federal courts have concurrent jurisdiction over claims arising under § 1964(c)) to obtain treble damages, as well as equitable relief through divestiture of the defendant's interest in the enterprise, restrictions on future activities or investments, and dissolution or reorganization of the enterprise.  See 18 U.S.C. § 1964(a).

that civil RICO's evolution is undesirable is widespread.  Numerous justices have expressed

dissatisfaction with the breadth of RICO's application. . . . [T]here is no indication that Congress

even considered, much less approved, the scheme that the Court today defines") (quoting, inter alia,

Sedima, 473 U.S. at 501, and citing Rehnquist, Remarks of the Chief Justice, 21 St. Mary's L. J. 5,

13 (1989)) (other citations and quotation marks omitted).  Thus, while the Supreme Court has

reaffirmed its reliance on the "liberal construction" clause of RICO, see Reves v. Ernst & Young,

507 U.S. 170, 183 (1993), the Court has also acknowledged that the operation of the "liberal

construction" clause is not without limits, and lower courts have followed suit.  See id.  (noting that

the "liberal construction" clause was "not an invitation to apply RICO to new purposes that Congress

never intended"); see also University of Md. v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1538-39

(3d Cir. 1993) (plaintiff's factual allegations were insufficient because plaintiff's interpretation of

RICO unduly extended the statutory reach); Durant v. ServiceMaster Co., 159 F. Supp. 2d 977, 981

( E.D. Mich. 2001) ("When deciding whether a complaint sets forth a claim under § 1962(c), the

Court must construe liberally the allegations. Because of the opprobrium that a RICO claim brings

to a defendant, however, courts should eliminate frivolous RICO claims at the earliest stage of

litigation"), aff'd in relevant part, remanded on other grounds, 109 Fed. Appx. 27, 2004 U.S. App.

LEXIS 16728 (6th Cir. 2004).


## II.   Pleading a RICO Claim Under Subsection 1962(c)

Subsection 1962(c) of the RICO statutes provides, in relevant part, that
it shall be unlawful for any person employed by or associated with any enterprise
engaged in, or the activities of which affect, interstate or foreign commerce, to
conduct or participate, directly or indirectly, in the conduct of such enterprise's
affairs through a pattern of racketeering activity . . . .

18 U.S.C. § 1962(c).

Thus, "[t]o allege a RICO claim, the plaintiff must plead [the following four elements:] (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, [plus an] injury to property or business."[3] Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir.) (quoting Sedima, 473 U.S. at 496) (citations and quotation marks omitted), cert. denied, 543 U.S. 918 (2004).  The term "racketeering activity" refers to the list of enumerated federal and state crimes provided in § 1961(1) of the RICO statute and includes, inter alia, mail fraud and wire fraud.  See 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud) and § 1346 (scheme or artifice to defraud).  Because of availability of fraud as a predicate offense, plaintiff's pleading requirements might be different with respect to different elements of the plaintiff's claim.

Where a RICO plaintiff relies on mail and wire fraud as a basis for RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Thus, the plaintiff must absolutely allege who made a misrepresentation to whom and sufficiently set forth the general content of the misrepresentation. See Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 658-59 (3d Cir. 1998); Klein v. General Nutrition Cos., 186 F.3d 338, 345 (3d Cir. 1999).  In addition, to satisfy Rule 9(b), the

---

[3]

While "Defendants challenge the sufficiency of Plaintiffs' RICO pleadings as to each [of these] element[s]," In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at *85, this Court limits the instant Opinion to discussion of pleading requirements associated with the "enterprise" and "conduct or participate" elements, since Plaintiffs' RICO Case Statement, the ensuing Defendants' Motions and the RICO aspect of the underlying Court's opinion concentrated on these particular issues.  See In re Ins. Brokerage Antitrust Litig., 04-5184 (FSH), Docket Entry No. 720, at *30-38.

plaintiff must plead with particularity "the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984), cert. denied, 469 U.S. 1211 (1985); accord Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (discussing the working of Rule 9(b) in context of a securities fraud claim and noting that "fraud claims must specify the who, what, when, where, and how: the first paragraph of any newspaper story") (citation and quotation marks omitted). However, the Court of Appeals clarified that, while one method a RICO plaintiff could employ to properly plead the "when and where" of the alleged fraud is by stating the date, place and time of fraudulent activity, see Seville, 742 F.2d at 791 ("It is certainly true that allegations of 'date, place or time' fulfill these functions"), "nothing in the rule requires [plaintiffs to allege these particular factors, and] plaintiffs are free to use alternative means of injecting precision . . . into their allegations of fraud." Id.; accord Rockefeller Ctr. Props. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (discussing the working of Rule 9(b) in context of a securities fraud claim and stating that, "[a]lthough Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use alternative means of injecting precision and some measure of substantiation into their allegations of fraud") (citation and quotation marks omitted).

By contrast, the heightened pleading requirement of Rule 9(b) appears to be inapplicable to RICO elements other than a fraudulent predicate offense.[4] In that case, "[t]he Federal Rules of Civil

---

[4]

    Of course, if a plaintiff's claims as to any element other than the predicate offense interrelates with a fraudulent conduct that the plaintiff asserts to be the predicate offense--e.g., if the "how" aspect of the fraud is based on defendant's use of an enterprise structure--it would indeed be anomalous for the plaintiff not to plead the structure aspect of the enterprise element with

Procedure [merely] require that a complaint contain "a short and plain statement of the claim

showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that each averment be

"concise, and direct," Fed. R. Civ. P. 8 (e)(1).  Scibelli v. Leb. County, 2007 U.S. App. LEXIS 5481,

at *2 (3d Cir. Pa. Mar. 7, 2007); see Richmond v. Nationwide Cassel L.P., 52 F.3d 640, 645 (7th Cir.

1995) (Rule 8(a) rather than Rule 9(b) applies to the enterprise element of a RICO claim); Towers

Financial Corp. v. Solomon, 126 F.R.D. 531, 536 (N.D. Ill. 1989)("Rule 9(b) applies to plaintiffs'

RICO claim only to the extent that the claim is based on racketeering acts involving fraud.  In all

other respects, the liberal notice pleading philosophy . . . applies to plaintiffs' RICO claim").

> But, even so, the "short and plain statement" must provide the defendant with "fair
> notice of what the plaintiff's claim is and the grounds upon which it rests."  Conley
> v. Gibson, 355 U.S. 41, 47  (1957). [The Court recognizes] that ordinary pleading
> rules are not meant to impose a great burden upon a plaintiff.  [See] Swierkiewicz v.
> Sorema N. A., 534 U.S. 506, 513-15 (2002).  But it should not prove burdensome for
> a plaintiff . . . to provide a defendant with some indication of the [pertinent facts] that
> the plaintiff has in mind. . . . [A]llowing a plaintiff to forgo giving any indication of
> the [facts] that the plaintiff has in mind would bring about harm of the very sort the
> [limiting aspects of legal provisions] seek to avoid.  Cf. H. R. Conf. Rep. No.
> 104-369, p 31 (1995) (criticizing "abusive" practices including "the routine filing of
> lawsuits . . . with only a faint hope that the discovery process might lead eventually
> to some plausible cause of action").  It would permit a plaintiff "with a largely
> groundless claim to simply take up the time of a number of other people, with the
> right to do so representing an in terrorem increment of the settlement value, rather
> than a reasonably founded hope that the [discovery] process will reveal relevant
> evidence." Blue Chip Stamps[ v. Manor Drug Stores, 421 U.S. 723] at 741 [(2006)].

Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2006).[5]

---

particularity while setting forth plaintiff's claims as to the enterprise but to plead the very same
structure aspect with particularity while setting forth plaintiff's claims as to the predicate offense.
It appears that Plaintiffs in this action recognize the effect that such an overlap might raise Plaintiffs'
pleading burden as to elements of Plaintiffs' RICO claim other than the predicate offense to the
requirements set forth in Rule 9(b).  See In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry
No. 850, at 11-14.

> [5]

The Supreme Court's guidance in Dura is particularly valuable for the purposes of the instant

A.      Pleading the "Enterprise" Element

Subsection 1962(c) prohibits a person associated with an enterprise from conducting the affairs of that enterprise through a pattern of racketeering activity. See 18 U.S.C. § 1962(c).  RICO defines the term "enterprise" to "include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  This broad definition includes both legitimate and illegitimate, formal and informal organizations, see United States v. Turkette, 452 U.S. 576, 587 (1981); United States v. Tocco, 200 F.3d 401, 425 (6th Cir. 2000) (holding organized crime family to be enterprise), and it is immaterial whether the defendant has a stake in the operation of the enterprise because individuals outside of a business may assist the business in attaining its illegal goals.  See, e.g., United States v. Mokol, 957 F.2d 1410, 1417 (7th Cir. 1992) (for purposes of RICO, a deputy sheriff was "associated with" an amusement company distributing illegal video poker machines because the owner of company paid bribes to the deputy to provide police protection to its poker machines and to drive other vendors out of business, even though the deputy was not associated with the

_____

case in view of (1) the analogs between the "mixed" pleading burden scenarios germane to RICO and securities regulations regimes, each requiring Rule 9(b) pleadings of the alleged fraudulent conduct but providing for Rule 8(a) "notice" pleading with respect to all other elements, see also note 1, supra, discussing the statements of RICO drafter as to the intended similarities between the regimes; and (2) the fact that the Supreme Court's express focus in Dura was on the burden associated with pleading the elements that remained wholly within the province of Rule 8(a) and were entirely unaffected by the Private Litigation Securities Reform Act, Pub. L. No. 104-67, 109 Stat. 737 (1995), a limiting legislative provision that introduced pleading requirements similar to those of Rule 9(b).  See 15 U.S.C. § 78u-4(b)(1) and (b)(2).  Since it would indeed be anomalous to presume that the working of the very same procedural rule within the realms of two nearly identical "mixed-pleading-burden" schemes could be qualitatively different, this Court adopts the Supreme Court's detailed guidance set forth in Dura, 544 U.S. at 347, for the purposes of conducting the inquiry at bar.

company's legitimate amusement business).  A combination of different entities, including a group

of corporations or partnerships,  can constitute an enterprise within the meaning of RICO.  See, e.g.,

MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc., 62 F.3d 967, 978-79 (7th Cir. 1995)

(treating corporation and union as an enterprise); United States v. Stolfi, 889 F.2d 378, 380 (2d Cir.

1989) (finding local union and its welfare benefit fund a RICO enterprise); United States v. London,

66 F.3d 1227, 1243 (1st Cir. 1995) (holding bar and check-cashing business comprise

association-in-fact enterprise under RICO).

Since an enterprise must have a common purpose, the enterprise must have at least some

fixed system of arrangement, as well as some continuity of personnel to effectuate that purpose.

Such an umbrella mechanism for directing the affairs of the entire group on an ongoing basis is

commonly referred to as "structure," accord Merriam-Webster Online Dictionary <<http://www.

m-w.com/ dictionary/structure>> (defining "structure" as "the aggregate of elements of an entity in

their relationships to each other" or "organization of parts as dominated by the general character of

the whole"), and courts have universally held that, in order to be qualified as a RICO enterprise, a

group must have some structure for conducting its affairs.  See, e.g., Simon v. Value Behavior Health

Inc., 208 F.3d 1073, 1083 (9th Cir. 2000) (health plans and insurance companies that allegedly

collaborated in scheme to defraud plan beneficiaries did not constitute enterprise for purposes of

RICO, where plaintiff proved no structure to alleged collusion); VanDenBroeck v. Commonpoint

Mortgage, 210 F.3d 696, 699 (6th Cir. 2000) (a sub-prime mortgage lender working with various

secondary lenders to which it sold customers' loans does not constitute an enterprise because there

was no minimal level of organizational structure between the entities); United States v. Morales, 185

F.3d 74, 80 (2d Cir. 1999) (holding evidence insufficient to prove enterprise continued to exist while

its members were incarcerated); <u>United States v. Gray</u>, 137 F.3d 765, 772 (4th Cir. 1998) (stating

that "earmarks" of association are "continuity, unity, shared purpose, and identifiable structure");

<u>Bonner v. Henderson</u>, 147 F.3d 457, 459 (5th Cir. 1998) ("An association-in-fact consists of

personnel who . . . collectively form a decision making structure"); <u>Richmond</u>, 52 F.3d at 645 ("The

hallmark of an enterprise is a structure").  Therefore, to establish a RICO enterprise, a plaintiff must

plead "evidence that the various associates function as a . . . unit."  <u>Turkette</u>, 452 U.S. at 583.

       When a plaintiff identifies a legitimate business or organization as the relevant enterprise,

the need to allege and prove the existence of enterprise structure can be met without great difficulty,

since all aspects of the enterprise element, including the structure aspect, are satisfied by the mere

proof that the entity does in fact have a legal existence.  <u>See</u>, <u>e.g.</u>, <u>Webster v. Omnitrition Intern.,</u>

<u>Inc.</u>, 79 F.3d 776, 786 (9th Cir. 1996) ("[C]orporate entities have a legal existence . . . , and the very

existence of a corporation meets the requirement for a separate structure"); <u>Jaguar Cars, Inc. v. Royal</u>

<u>Oaks Motor Car Co.</u>, 46 F.3d 258, 268 (3d Cir. 1995) ("A corporation is an entity legally distinct

from its officers or employees, which satisfies the 'enterprise' definition").  The existence of an

association-in-fact, however, is more difficult to assert. <u>See</u> <u>United States v. Riccobene</u>, 709 F.2d

214, 221 (3d Cir. 1983) ("[J]udges and commentators [are] concern[ed] that the concept of 'illegal

enterprise' could be construed [unduly] broadly [and] concluded that, without further refinement of

the term, the statute could be extended to situations far removed from those actually contemplated

by Congress, and that [plaintiffs] could use the law to invoke an additional penalty whenever they

had a case involving the commission of two offenses that, coincidentally, were among those listed

as racketeering activities") (citations and quotation marks omitted).

       Since a court ruling on defendant's Rule 12(b)(6) motion challenging plaintiff's pleading of

an element subject to Rule 8(a) pleading requirement should reject "unsupported allegations," "bald assertions," or "legal conclusions," see In re Burlington Coat Factory Securities Litig., 114 F.3d at 1429-30, courts should reject association-in-fact enterprise allegations which are imprecise, vague, conclusory, and lack both clarity and any degree of specificity.  See, e.g., Richmond, 52 F.3d at 646 (upholding dismissal of a RICO complaint for failure to allege a sufficient link between the various legal entities which were alleged to form the enterprise and pointing out that the "naming of a string of entities does not allege adequately an enterprise").

Recognizing the issue, the Supreme Court articulated, in United States v. Turkette, certain criteria that might be applied by the courts in assessing the sufficiency of plaintiff's pleading of an association-in-fact type of enterprise. See Turkette, 452 U.S. at 583.  The criteria, commonly known as "Turkette factors," have been described differently by various courts, but generally include the following inquiries: (1) whether the association has an ascertainable structure, (2) whether the association is continuous, and (3) whether the association is distinct from the alleged underlying pattern of racketeering.  In Riccobene, 709 F.2d 214, the Court of Appeals for the Third Circuit expressly adopted the Turkette factors, stating as follows:

> Each of the elements enumerated by the Supreme Court [in Turkette decision] describes a separate aspect of the life of the enterprise.  The ongoing organization requirement relates to the superstructure or framework of the group.   The second necessary element for an enterprise under RICO is that the various associates function as a continuing unit. . . .   The third and final element in establishing the enterprise is that the organization must be an entity separate and apart from the pattern of activity in which it engages.

Riccobene, 709 F.2d at 222-24 (citations and quotation marks omitted).

In Chang v. Chen, 80 F.3d 1293 (9th Cir. 1996), the Court of Appeals for the Ninth Circuit expressly adopted the Riccobene approach and just as expressly clarified that a RICO complaint

must plead "the existence of a system of authority that guided the operation of the alleged enterprise." Id. at 1297-1300; see Montesano v. Seafirst Commercial Corp., 818 F.2d 423 (5th Cir. 1987) (a RICO complainant's failure to plead facts indicating that the associated individuals of the alleged enterprise operated as a structured ongoing continuing unit rendered the claim legally insufficient); accord Richmond, 52 F.3d at 644-645 (same); Old Time Enter., Inc., v. International Coffee Corp., 852 F.2d 1213, 1217 (5th Cir. 1989) (same); Moore v. Fidelity Fin. Servs., Inc., 897 F. Supp. 378 (N.D. Ill. 1995) (same); Moll v. United States Life Title Ins. Co. of N.Y., 654 F. Supp. 1012, 1032 (S.D.N.Y. 1987) (same); Wichita Sav. & Loan Ass'n v. Landmark Group, 657 F. Supp. 1182, 1190 (D. Kan. 1987) (same). However, the fact that the Court of Appeals in Riccobene adopted the Turkette factors indicates nothing more and nothing less than the Court of Appeals' conclusion that allegations of facts corresponding to the Turkette factors would, per se, meet plaintiff's pleading burden. Nothing in the language of Riccobene indicates that a RICO plaintiff cannot meet plaintiff's Rule 8(a) pleading burden with respect to the enterprise element by stating facts other than those corresponding to the Turkette factors, so long as the plaintiff sufficiently alleges facts indicating "that the various associates function[ed] as a . . . unit," Turkette, 452 U.S. at 583, instead of relying on "unsupported allegations," "bald assertions," or "legal conclusions" dressed as facts. See In re Burlington Coat Factory Securities Litig., 114 F.3d at 1429-30; accord Dura, 544 U.S. at 347; Riccobene, 709 F.2d at 221 ("To avoid [the] danger [of statutory misinterpretations], the Turkette Court provided a [guiding] definition of 'illegal enterprise' for RICO purposes"). The Court of Appeals made this point clear in Seville, 742 F.2d at 789-790, observing that

> In Riccobene[,] this [C]ourt stated that[,] in order to establish the existence of an enterprise, the [plaintiff] must demonstrate [the three Turkette factors]. The [district]

court [erroneously]  ruled that [plaintiff's] fail[ure] to plead these three attributes [indicates that the complaint did] not state a  cause of action under RICO and must be dismissed.  In so ruling, the district court confused what must be pleaded with what must be proved. [While] <u>Riccobene</u> and <u>Turkette</u> certainly stand for the proposition that [the] plaintiff, to recover, must prove that an alleged enterprise possesses the three described attributes[,] . . . neither case speaks to what [particular facts] must be pleaded in order to [sufficiently] state a cause of action [to meet the requirements set forth in Rule 8(a)].

<u>Id.</u>

Moreover, the Court of Appeals reiterated the very same observation in its recent decision

<u>Hollis-Arrington v. PHH Mortg. Corp.</u>, 2006 U.S. App. LEXIS 27021 (3d Cir. Oct. 31, 2006)

("[A]lthough a plaintiff is required to allege the existence of an 'enterprise,' [the plaintiff] need not

plead [facts corresponding to the <u>Turkette</u> factors in order] to establish the existence of a RICO

'enterprise' in [plaintiff's] complaint").  The Court of Appeals' guidance in <u>Seville</u> and <u>Hollis-

Arrington</u> with respect to evaluation of Rule 8(a) pleadings is perfectly in accord with the Court of

Appeals' consistent guidance with respect to evaluation of all types of pleadings.  <u>See</u> <u>Seville</u>, 742

F.2d at 791 (While "[i]t is certainly true that allegations of [the facts corresponding to the] 'date,

place and time' [factors meet the requirements of Rule 9(b)] nothing in the rule requires [plaintiffs

to allege the facts corresponding to these particular factors, and] plaintiffs are free to use alternative

means of injecting precision . . . into their allegations of fraud"); <u>accord</u> <u>Rockefeller Ctr. Props. Sec.

Litig.</u>, 311 F.3d at 216 (Since "Rule 9(b) [does not expressly require the plaintiff to plead the facts

corresponding to the] date, location, and time [factors], plaintiffs [are free to]  use alternative means

of injecting precision and some measure of substantiation into their allegations of fraud").

All of these cases indicate that (1) while plaintiff's pleading of facts corresponding to the

<u>Turkette</u> factors would necessarily satisfy Rule 8(a) requirements with respect to the enterprise

element of RICO (as plaintiff's pleading of facts stating "date, place and time" of fraud would

necessarily satisfy Rule 9(b) requirements), (2) plaintiff's complaint containing alternative allegations might or might not satisfy the pleading requirements, leaving it to the court to determine the sufficiency of plaintiff's assertions on a case-by-case basis.  However, nothing in these Court of Appeals' decisions indicates that a RICO plaintiff is fully relieved from plaintiff's obligation to sufficiently plead actual facts in support of plaintiff's enterprise element allegations.  Similarly, nothing in the Court of Appeals' decisions indicates that the plaintiff can substitute "unsupported allegations," "bald assertions," or "legal conclusions" for actual facts.  Accord In re Burlington Coat Factory Securities Litig., 114 F.3d at 1429-30; Elliott v. Foufas, 867 F.2d 877, 881 (5th Cir. 1989) ("a plaintiff must plead specific facts, not mere conclusory allegations, which establish the existence of an enterprise") (citing Montesano, 818 F.2d 423, citing, in turn, United States v. Bledsoe, 674 F.2d 647, 664-65 (8th Cir.), cert. denied sub nom., Phillips v. United States, 459 U.S. 1040 (1982)); In re Managed Care Litig., 135 F. Supp. 2d 1253, 1322 (S.D. Fla. 2002) ("The existence of an enterprise may be proven 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit'") (quoting Turkette, 452 U.S. at 583); Segreti v. Lome, 747 F. Supp. 484, 486 (N.D. Ill. 1990) ("a plaintiff must identify the enterprise [and] such identification must necessarily include *details about the structure* of the enterprise") (emphasis in original).  Any claim otherwise does more than misrepresent the Court of Appeals' clear guidance: it seem to create a conflict between the above-discussed Court of Appeals' decisions and the Supreme Court's unambiguous statement  that, in order to satisfy Rule 8(a) notice pleading requirements, the plaintiff "must provide the defendant with fair notice of what the plaintiff's claim is and the [factual] *grounds upon which it rests*." Dura, 544 U.S. at 347 (citations and quotation marks omitted, emphasis supplied).  Such suggestion is, however, baseless: the

decisions of the Court of Appeals are in harmony with the Supreme Court's guidance in Dura.

      **B.**    **Pleading the "Structure" Aspect of the "Enterprise" Element**

      To establish a RICO enterprise, a plaintiff must plead factual "evidence that the various associates function as a [single] continuing unit." Turkette, 452 U.S. at 583. One method of interrelating the activities of various associates into a single ongoing unit is by outlining "the superstructure or framework of the group." Riccobene, 709 F.2d at 222-23; accord Seville, 742 F.2d at 789-790. The Court of Appeals unambiguously taught that a RICO plaintiff choosing to allege the existence of a "superstructure" must plead facts indicating the presence of an umbrella "structure . . . for the making of decisions," and the sufficiency of such allegations is unaffected by whether the decision-making structure is "hierarchical or consensual." Riccobene, 709 F.2d at 222-23; Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc., 165 F. Supp. 2d 514, 539 (S.D.N.Y. 2001) (finding that an association-in-fact was not adequately pled where the plaintiff "failed to present specific details of any hierarchy, organization, or unity among the various alleged conspirators").

      While the foregoing "does not mean that every decision must be made by the same person, or that authority may not be delegated" within the unit, Riccobene, 709 F.2d at 222, the sufficiency of plaintiff's structure-related allegations turns on plaintiff's pleading of facts indicating a potential web of "solid lines" that interrelate the entire alleged enterprise rather than on assertions that indicate merely a swarm of dotted and/or vanishing lines, or a multitude of clusters randomly operating within the perimeters of the alleged enterprise. See, e.g., Stachon v. United Consumers Club, Inc., 229 F.3d 673, 676 (7th Cir. 2000) ("The mere fact that the identified defendant had business dealings with a wide assortment of unnamed manufacturers and wholesalers . . . in no way establishes that they [all] function[ed] as a continuing unit or as an ongoing structured organization");

VanDenBroeck, 210 F.3d at 699 (a group consisting of a lender working with various secondary lenders to which it sold customers' loans does not constitute an enterprise because there was no minimal level of organizational structure between these entities); Simon, 208 F.3d at 1083 (health plans and insurance companies did not constitute an enterprise for purposes of RICO because the plaintiff set forth no structure to alleged collusion); Broad, Vogt & Conant, Inc. v. Alsthom Automation, Inc., 200 F. Supp. 2d 756 ( E.D. Mich. 2002) (where plaintiffs' allegations merely delineate strings of entities allegedly comprising an enterprise but lack any facts suggesting that these entities had any type of single organizational structure for decision-making and conducting the group's affairs, such bare allegations are insufficient to state a claim); In re MasterCard Int'l Inc. Internet Gambling Litig., 132 F. Supp. 2d 468 (E.D. La. 2001) (plaintiff's pleading of a "random intersection" of on-line casinos, credit card companies and issuing banks fails to indicate an enterprise); First Nationwide Bank v. Gelt Funding, Corp., 820 F. Supp. 89, 98 (S.D.N.Y. 1993) (allegations that disparate parties were associated by virtue of their involvement in the real estate market are insufficient to maintain a RICO enterprise); Moll, 654 F. Supp. at 1031 (allegations referring to a "group of attorneys . . . abstractors and other individuals and corporations . . . engaged in the real estate settlement industry" are insufficient to establish an enterprise).

### 1.    *Permissive Pleadings*

The Court of Appeals pointed out that a RICO plaintiff may sufficiently outline a potential web of "solid line" links interrelating the entire enterprise by asserting facts that indicate a "mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis, [and causing each associate to] perform a role in the group consistent with [its] organizational structure." Riccobene, 709 F.2d at 223; Stachon, 229 F.3d at 676 (a wholesale

"buying club," its franchisees, manufacturers, wholesalers, and club members comprised merely a "a string of participants lacking any distinct existence and structure" of an enterprise, it merely verified the fact that the members of the alleged group had business dealings with one another over many years); Simon, 208 F.3d at 1083 (9th Cir. 2000) (affirming dismissal where plaintiff "never alleged the existence of a system of authority that guided the operation of the enterprise"). Moreover, since the Supreme Court has interpreted the "conduct or participation" element to require the plaintiff to show that the defendant participated in the operation or management of the enterprise and asserted some control over enterprise through defendant's use of the enterprise structure, see Reves, 507 U.S. at 185; Peat, Marwick, 996 F.2d at 1539; Guar. Residential Lending, Inc. v Int'l Mortg. Ctr., Inc., 305 F. Supp. 2d 846 (N.D. Ill. 2004), the alleged structure should be such to enable the defendant to assert some degree of control over the entire enterprise or, at the barest minimum, somehow direct the conduct of the enterprise.   See Reves, 507 U.S. at 179 (the liability for participating in the conduct of the enterprise extends only to those who "play some part in directing the enterprise's affairs"); United States v. Parise, 159 F.3d 790, 796 (3d Cir. 1998); DeFalco v. Bernas, 244 F.3d 286, 311 (2d Cir. 2001); United States v. Viola, 35 F.3d 37, 43 (2d Cir. 1994).

### 2.   *Invalid Pleadings*

The pleadings setting forth the enterprise structure must be factually descriptive and cannot be simple restatements of the general guidance given by the courts. See Canadian-American Oil Co. v. Delgado, 1997 U.S. App. LEXIS 5120, at *3-4 (9th Cir. Cal. Mar. 14, 1997) ("The . . . complaint alleges that defendants 'associated together' and 'consensually agreed' to commit racketeering activities, and that certain defendants were 'management' while others were 'backers.'   Such conclusory statements . . . do not suffice to avoid dismissal under Rule 12(b)(6)") (quoting Western

Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.), cert. denied, 454 U.S. 1031 (1981)).

For instance, a bare repetition of the terms "hierarchical" or "consensual" used by the Court of Appeals in Riccobene, 709 F.2d at 222-23, without any explanation of how such hierarchy was organized or the continuous consensus obtained, is insufficient. See, e.g., Broad, Vogt, 200 F. Supp. 2d at 760 ("the complaint merely recites the elements of an association-in-fact without providing any factual basis for this allegation. [Such recital, however] will not enable [the] complaint to survive a motion to dismiss"). Similarly, the structure aspect cannot be pled by allegations of the group's conspiracy to perform an underlying criminal offense since, standing alone, conspiracy allegations are insufficient to plead the existence of an enterprise. See Seville, 742 F.2d at 790 n.5; accord Beck v. Prupis, 529 U.S. 494 (2000) (plaintiff cannot file suit under Subsection 1964(c) based on a conspiracy allegations raised under Subsection 1962(d)). Moreover, it is insufficient for the plaintiff to describe "what may appear to be an enterprise from the outside, if the collection of the [allegedly conspiring] entities and individuals contains no organizational structure on the inside." See In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig., 2006 U.S. Dist. LEXIS 35980, at *21-22 (E.D. Pa. June 2, 2006) (concluding that plaintiff's complaint did not permit an inference that there was any organizational structure connected to or controlled by the defendants because the complaint  provided allegations that the defendants played particular roles and were aware of each other's actions but failed to allege how various associates of the enterprise were interrelated amongst themselves through a common decision-making structure.  The plaintiff cannot reduce plaintiff's structure allegations to a mere claim of conspiracy, since participants in any conspiracy always play certain roles and have some idea of what the other participants are doing); accord VanDenBroeck, 210 F.3d at 699-700 (alleged enterprise "too unstable and fluid an entity to constitute a RICO

enterprise" since the complaint failed to show any type of mechanism by which this alleged group conducted its affairs or made its decisions, and allegations that certain parties did business with one another, or even allegations that they conspired together, were "not enough to trigger [RICO liability] if the parties [were] not organized in a fashion that would enable them to function as a racketeering organization for other purposes"); Canadian-American, 1997 U.S. App. LEXIS 5120, at *5 ("Pursuit of goals through illegitimate means does not itself, however, beget a RICO enterprise").

In the same vein, the structure aspect cannot be satisfied by plaintiff's paraphrasing of plaintiff's allegations with respect to the pattern of the underlying racketeering activity, since permitting proof of the enterprise to be inferred from the pattern of racketeering activity would essentially make a circular argument allowing "every pattern of racketeering activity to [become] an enterprise whose affairs are conducted through the pattern of racketeering." Chang, 80 F.3d at 1298; see Bledsoe, 674 F.2d at 664 (An enterprise cannot be proved absent "proof of some structure . . . separate from the racketeering activity and distinct from the organization which is a necessary incident to the racketeering"). The Court of Appeals has taught, and other courts have agreed, that a RICO plaintiff cannot plead the enterprise by pleading the pattern of its activity. See Riccobene, 709 F.2d at 222 (clarifying that "the enterprise must be shown to have an existence 'separate and apart from the pattern of activity in which it engages'" and, thus, indicating that plaintiff's pleading of a claim which, even if proven, is insufficient to state a cause of action cannot suffice as an allegation) (quoting Turkette, 452 U.S. at 583); see also Seville, 742 F.2d at 790; accord Canadian-American, 1997 U.S. App. LEXIS 5120, at *5 ("The . . . complaint . . . alleges no specific facts to show that an ongoing association existed apart from the acts of intimidation that defendants allegedly performed. With no separate ongoing association alleged, the . . . complaint does not state a

cognizable RICO enterprise"); Union Fed. Bank v. Howard, 2005 U.S. Dist. LEXIS 17887, at *12 (N.D. Ind. Aug. 23, 2005) (where a RICO plaintiff attempts to characterize the language that merely describes the alleged enterprise's activities as language which identifies the structure of the enterprise, such allegations are insufficient to plead a RICO claim) (citing Stachon, 229 F.3d at 676; Slaney v. Int'l Amateur Ath. Fed'n, 244 F.3d 580, 600 n. 11 (7th Cir. 2001); ABN AMRO Mortg. Group, Inc. v. Maximum Mortg., Inc., 2005 U.S. Dist. LEXIS 17612, at *10-11 (N.D. Ind. May 16, 2005)).

## C.   Pleading the "Conduct or Participate" Element

Presuming that a RICO plaintiff sufficiently alleged the structure and, therefore, existence of the enterprise, the plaintiff also must allege some facts indicating that the defendant conducted or participated in the operation or management of the enterprise through the enterprise structure.  See Reves, 507 U.S. at 184-85; Peat, Marwick, 996 F.2d at 1539.  It follows that, in order to commit a violation of 18 U.S.C. § 1962(c), defendant must have had some part in directing or conducting the affairs of the enterprise, not just defendant's own affairs.  See id.; United States v. Urban, 404 F.3d 754, 769 (3d Cir. 2005); United States v. Castro, 89 F.3d 1443, 1452 (11th Cir. 1996). Consequently, the Court of Appeals have applied Reves to limit RICO liability under § 1962(c) to those instances where there is "'a nexus between the [defendant] and the conduct in the affairs of an enterprise,'" Parise, 159 F.3d at 796 (quoting Peat, Marwick, 996 F.2d at 1539),  and plaintiffs' allegation would be deemed insufficient

> [i]f the plaintiffs . . . nowhere averred that [the defendant] had any part in operating or managing the affairs of [its alleged enterprise associate, but merely] make much ado about how important and indispensable [defendant's] services were to [to this alleged associate], the same can be said of many who are connected with [the alleged associate]. [P]laintiffs' . . . complaint, when distilled to its essence, is nothing more than an allegation that [the defendant] performed materially deficient . . . services.

> It cannot be said that, by merely performing what are generic . . . services to [the alleged associate], even if they are later found to be deficient, [the defendant] has opened itself to liability under the federal racketeering statute.

Peat, Marwick, 996 F.2d at 1539-40.

Given the many offenses that are classified as "racketeering violations," see 18 U.S.C. § 1961, the substantive limits of § 1962(c) have been rigorously enforced to prevent an explosion of RICO civil strike suits targeting business disputes in which the plaintiff simply pleads the existence of a business relationship between the defendant and some third party.  See Peat, Marwick, 996 F.2d at 1539 ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result"); see also Brittingham v. Mobile Corp., 943 F.2d 297, 301 (3d Cir. 1991) (the enterprise "must be more than an association of individuals or entities conducting the[ir] normal affairs"), overruled on other grounds, Jaguar Cars, 46 F.3d at 258; Howard, 2005 U.S. Dist. LEXIS 17887, at *37 ("The critical distinction is whether the corporation is conducting the distinct affairs of another corporation or some separate new enterprise, or whether the corporation is simply using another organization to assist the corporation in its own affairs, legal or otherwise"); accord Bennett v. Berg, 710 F.2d 1361 (8th Cir.) (defendant's participation must be in conduct of affairs of RICO enterprise, which ordinarily will require some participation in operation or management of enterprise itself), cert. denied, 464 U.S. 1008 (1983); Jubelirer v. Mastercard Int'l, 68 F. Supp. 2d 1049 (W.D. Wis. 1999) (merely having business relationship with and performing services for an enterprise, including financial, accounting, and legal services, does not support RICO liability because performance of such services is not equivalent of participation in operation and management of enterprise, and this is true even though the service provider knows of enterprise's illicit nature or performs improper acts itself); Fidelity Fed. Sav. &

Loan Ass'n v. Felicetti, 830 F. Supp. 257 (E.D. Pa. 1993) (motion to dismiss is granted where allegedly misleading and fraudulent real estate appraisals were provided to savings and loan association, since, even if proven, such influence does not rise to level of participation in management or operation of enterprise required to attach RICO liability to those merely associated with enterprise and not employed by it).

### III.  <u>Pleading a RICO Claim Under Subsection 1962(d)</u>

Subsection 1962(d) makes it unlawful to "conspire to violate any of the provisions of subsections (a), (b) or (c)."[6] <u>See</u> 18 U.S.C. § 1962(d).

The governing precedents for the purposes of this Court's Subsection 1962(d) inquiry are <u>Beck</u>, 529 U.S. 494, <u>Salinas v. United States</u>, 522 U.S. 52 (1997), and <u>Smith v. Berg</u>, 247 F.3d 532 (3d Cir. 2001). The <u>Salinas</u> and <u>Berg</u> cases stand for the rule that a particular defendant need not have violated the substantive provision in order to be liable himself or herself under the conspiracy provision, so long as some other defendant is liable under the substantive provision.[7] <u>See Salinas</u>, 522 U.S. 52; <u>Berg</u>, 247 F.3d 532.  For instance, in <u>Salinas</u>, the Supreme Court held that a defendant need not personally commit the two predicate acts of racketeering activity required by § 1962(c) in

---

[6]

As mentioned above, Subsection 1962(c) makes it unlawful "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

[7]

In other words, a plaintiff could bring a claim against defendant X for violating one of the statute's substantive provisions in Count I of his complaint, and could still bring a claim against defendants X and Y for conspiring to violate that substantive provision, in violation of § 1962(d) under Count II of his complaint without naming defendant Y in Count I.  However, in order to prevail on his conspiracy claim against defendant Y, plaintiff must still prove that defendant X violated one of the statute's substantive provisions.  <u>See Salinas</u>, 522 U.S. 52; <u>Berg</u>, 247 F.3d 532.

order to be held liable for conspiracy under § 1962(d).  See Salinas, 522 U.S. at 56, 66.  However,

because there was a conviction of one of the defendants under one of the substantive provisions of

the statute, the Salinas opinion cannot stand for the proposition that a § 1962(d) conspiracy claim

can be brought without any substantive claim at all.  Similarly, in Berg, the Court of Appeals

identified the issue presented as whether "a RICO conspiracy defendant need not himself commit

or agree to commit predicate acts."[8]  Berg, 247 F.3d at 537.  Describing the standard set forth in

Salinas, the Berg Court explained as follows:

> The plain implication of the standard set forth in Salinas is that one who opts into or
> participates in a conspiracy is liable for the acts of his co-conspirators which violate
> [Sub]section 1962(c) even if the defendant did not personally agree to do, or to
> conspire with respect to, any particular element.

Id. (footnote omitted).

Finally, the Supreme Court explained that, in the event of dismissal of all substantive RICO

claims in the action, a plaintiff cannot bring a § 1962(d) claim based on a non-RICO claim.  See

Beck, 529 U.S. at 505.  "[An] injury caused by an overt act that is not an act of racketeering or

---

[8]

Cases preceding Berg suggested that a § 1962 substantive violation might be an indelible
prerequisite for stating a conspiracy claim.  In Kehr Packages, the Court of Appeals stated, without
analysis, that "because. . . plaintiffs did not state a valid claim under § 1962(c), [the Court] need not
consider whether the dependent § 1962(d) claim has been properly alleged."  Kehr Packages, Inc.
v. Fidelcor, Inc., 926 F.2d 1406, 1411 n.1 (3d Cir. 1991). The court also noted briefly in Lightning
Lube that "any claim under Subsection 1962(d) based on a conspiracy to violate the other
subsections of Subsection 1962 necessarily must fail if the substantive claims are themselves
deficient." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993).  In Rehkop,
however, the Court of Appeals limited the language of Lightning Lube noting that "the problem in
Lightning Lube was that the actions alleged to constitute violations of subsections 1962(a), (b), and
(c) were not violations of these subsections." Rehkop v. Berwick Healthcare Corp., 95 F.3d 285, 290
(3d Cir. 1996). The Rehkop Court explained that, because no action alleged in Lightning Lube could
constitute a substantive violation, the claim "failed to serve as the object of a Subsection 1962(d)
conspiracy."  Id.

otherwise wrongful under RICO . . . is not sufficient to give rise to a cause of action . . . for a violation of § 1962(d)."[9] Id. "[A] RICO conspiracy plaintiff must allege injury from an act. . . that is independently wrongful under RICO." Id. Therefore, any resolution of plaintiff's § 1962(d) claims prior to establishing that the plaintiff plead at least one viable substantive § 1962 claim against at least one defendant in the action is unwarranted as premature. Accord In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at * 97.


## DISCUSSION

### I.   Factual Allegations

The panoply of factual allegations set forth in the Complaints was exhaustively detailed in In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at *40-53, and need not be repeated in the instant Opinion.  It should suffice to repeat only that

> Plaintiffs allege that the Broker Defendants and Insurer Defendants engaged in a combination and conspiracy to suppress and eliminate competition in the sale of insurance . . . .  Plaintiffs contend that the Defendants implemented the conspiracy through two main schemes: (1) the [K]ickback and [S]teering [S]cheme and (2) the [B]id-rigging [S]cheme. [Under the alleged] Kickback and Steering Scheme[,] . . . the Broker Defendants have received undisclosed kickbacks from the Insurers in the form of contingent commissions . . . , and in return, have agreed to steer their clients to purchase insurance from certain "preferred" Insurers with whom the Brokers had the most profitable arrangements.  In addition to contingent commissions, Plaintiffs claim that the Brokers obtained undisclosed compensation from the Insurers [and other] additional income . . . by placing their clients' business with insurers through related wholesale entities purport[ing] to act as intermediaries between the Broker Defendants and the Insurer Defendants. . . . [Under the alleged] Bid-rigging Scheme[,] . . . the Defendants colluded . . . to allocate customers and to deceive Plaintiffs into believing that the Broker Defendants were obtaining competitive

---

[9]

In Beck, the court found that termination of employment was not racketeering activity done in furtherance of respondents' conspiracy. See Beck, 529 U.S. at 499.

> insurance bids from the Insurers on behalf of their clients. . . .  Plaintiffs claim that
> the bid-rigging was facilitated by the Broker Defendants, who solicited and obtained
> fictitious high quotes from the Insurer Defendants to guarantee that certain
> ["]preferred["] insurers would win the bidding competition, and by determining the
> terms of the winning and losing bid. According to the Complaints, the Brokers
> arranged for fictitious quotes . . .  to be submitted to the client[s]. . . . Plaintiffs
> contend that the Insurer Defendants colluded with the Brokers in the [B]id-rigging
> [S]cheme because they were promised protection from competition in other bids
> when their business was up for renewal.  Plaintiffs also maintain that bid-rigging
> enables the Insurer Defendants to keep premium prices high, and allows them to
> recoup the cost of contingent commissions paid to the Brokers.

Id. (citations and quotation marks omitted).

In their Complaint, Plaintiffs allege the existence of two alternative types of enterprises: a "global" enterprise and six "broker-centered" enterprises of another type.  See id. at 86-87, and n.14 (clarifying that, for the purposes of 18 U.S.C. §§ 1962(c) and (d) analysis, Plaintiffs' enterprise-related allegations in the Commercial Case were qualitatively indistinguishable from Plaintiffs' allegations made in the Employee-Benefit Case).  In their RICO Case Statement, Plaintiffs now allege  fourteen enterprises that could roughly be subdivided into three alternative types: (1) the enterprise consisting of the Council of Insurance Agents and Brokers (hereinafter "CIAB"), alleged by Plaintiffs in the Commercial Case only; (2) three "Strategic Partnership Enterprises," each of which is a "global" enterprise (one alleged in the Commercial Case and two in the Employee-Benefit Case); and (3) ten broker-centered enterprises (a series of seven alleged in the Commercial Case, and a series of three, qualitatively indistinguishable, alleged in the Employee-Benefit Case).  See Plaintiffs' Opposition to Defendants' Motions, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850 (hereinafter "Opposition") at 1.  The total list of Defendants named by Plaintiffs as members of all these enterprises has about three dozen brokerage houses and six dozen insurance carriers, depending on Plaintiffs' mode of reference.  See In re Ins. Brokerage Antitrust Litig., 04-

5184, Docket Entry No. 844, at 2-8 (clarifying that certain groups of Defendants are referred to collectively and, thus, offering alternative outcomes of the calculation).

## II.    CIAB as a RICO Enterprise

Adversarial and conclusory rhetoric aside, Plaintiffs summarize their factual arguments to the effect that CIAB, a trade association, constituted an enterprise as follows:[10]

> [CIAB's] members place 80 percent of the country's commercial insurance premiums. [CIAB] represents the largest, most profitable of all commercial insurance agencies and brokerage firms. [CIAB] partners with its members and provides not only vital intelligence on current market conditions and trends, but also solutions to the next challenge before the need arises. CIAB provides Defendants with numerous opportunities to communicate, meet, use vital intelligence on market conditions that is shared with its partner members, and reach agreement on how they will address challenges in the marketplace. . . . CIAB provides . . . Defendants a forum to discuss and reach agreement with each other . . . . CIAB hosts Executive Forums where members can brainstorm and share ideas about business opportunities and challenges. . . . CIAB also conducts Executive Liaison Roundtable meetings [enabling the industry executives and CIAB officials] to discuss critical issues. . . . [I]n 1999, CIAB's members [unsuccessfully] opposed the guidelines issued by the New York Department of Insurance regarding disclosure of compensation arrangements. . . . [On other occasions, CIAB] adopted [a set of] crisis communication plans . .  and [together with] the American Insurance Association . . . draft[ed] . . . a white paper . . .  "The Role of the Intermediary" [the content of which suggested that the insurance] market [was] competitive. . . . [I]n response to a regulator inquiry regarding  contingency commissions, CIAB [issued an opinion that such commissions] have no impact on the amount insureds pay for coverage.

In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 844, at 12-14 (citations and

---

[10]

It appears that Plaintiffs' "CIAB as a RICO enterprise" theory is limited to CIAB, a legal entity (and, perhaps to those performing their duties as officers, employees and elected/nominated official of CIAB), but *excludes* those individuals or entities that have membership in CIAB but do not perform such duties, since Plaintiffs' "Strategic Partnership Enterprise" theory, examined below, see infra, this Opinion, at 44-57, appears to set forth a claim on the basis of CIAB as a legal entity, together with CIAB's officers, employees, officials and membership-holders.  Compare In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850, at 14-17, to id., at 18-21.

quotation marks omitted).

In addition to these--and qualitatively similar--allegations, Plaintiffs carefully detail the organizational structure of CIAB, listing its "Executive Committee, . . . Board of Directors, task forces and committees including the Council of Insurance Company Executives and The Council of Employee Benefits Executives." Id. at 6. This Court concludes that Plaintiffs' statements indicate (and it appears that Defendants agree with this Court's conclusion, see In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 821, at 8) that CIAB (1) has an easily identifiable organizational structure satisfying the Turkette criteria, and (2) certainly constitutes "an" enterprise – but not a RICO enterprise for the purposes of the case at bar. As Defendants correctly observe,

> Plaintiffs never allege [that] Defendants conducted the affairs of . . . CIAB *through* a pattern of racketeering activity. The RICO statute provides that:
> > [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs *through a pattern of racketeering activity* . . . .
> > 18 U.S.C. § 1962(c).
> As interpreted by the [Court of Appeals],
> > [O]ne conducts the activities of an enterprise through a pattern of racketeering when: (1) One is enabled to commit the predicate offenses solely by virtue of his position in the enterprise . . . or control over the affairs of the enterprise; or (2) the predicate offenses are related to the activities of that enterprise.
> United States v. Provenzano, 688 F.2d 194, 200 (3d Cir. 1982).
>
> Thus, [in order to properly assert that CIAB was a RICO enterprise for the purposes of the case at bar,] Plaintiffs must allege facts demonstrating that each [D]efendant was enabled to commit the [alleged acts of fraud] solely by virtue of [Defendant's] position in [CIAB, or that the alleged] mail and wire fraud . . . are related to the activities of [CIAB]. Plaintiffs' [allegations] satisf[y] neither of these tests.

Id. at 9 (also citing Banks v. Wolk, 918 F.2d 418, 424 (3d Cir. 1990)) (emphasis in original).

Plaintiffs' counter-assertion that "CIAB [constituted an] enterprise [for the purposes of the instant case because CIAB] provides Defendants the mechanism whereby Defendants conspire and

make decisions regarding maintenance of scheme as well as concealment of their relationship and

activities," In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850, at 6, is of no avail.

Plaintiffs' above-quoted factual allegations do not indicate any facts supporting Plaintiffs'

conclusion.    Rather, they merely indicate that CIAB provided an internal and external

communication tool for the members of the insurance industry.   No *fact* stated in Plaintiffs'

submissions indicates that Defendants' alleged predicate acts of mail and wire fraud (aimed at

Defendants' clients) were related in any way to the activities of CIAB, or that Defendants committed

the alleged predicate offenses through the means of CIAB, or that CIAB was somehow indispensable

to Defendants in their alleged goal to commit the underlying predicate offenses.   See, e.g., In re Ins.

Brokerage Antitrust Litig., 04-5184, Docket Entries Nos. 843-44, 849-50.

The duly alleged fact that CIAB was Defendants' internal and external communication tool

is of no consequence: were Plaintiffs to allege that Defendants habitually met with each other (and

with the public, or with public officials) in a chain of coffee houses or through an Internet portal such

allegations would not render the corporation owning such chain of coffee houses or the online portal

a RICO enterprise for the purposes of the inquiry at bar.   Neither the CIAB-based, nor the coffee

house- or Internet portal-based alternative provides this Court with a fact drawing "a nexus between

[Defendants' alleged offenses] and the conduct in the affairs" of CIAB, a trade association.[11] Parise,

---

[11]

This is not to say that a trade association can never qualify as a RICO enterprise.  Cf.  Anza,
126 S. Ct. 1991 (addressing a scenario where a RICO violation could have been asserted by a certain
allegedly injured entity but the claims were brought by plaintiffs unrelated to the entity).   For
instance, in the scenario where officials of a trade association use confidential information about the
association members to extort monies from these members, the trade association may qualify as a
RICO enterprise.   Cf. United States v. Local 560, 694 F. Supp. 1158 (D.N.J. 1988) (examining a
comparable scenario with respect to a labor union, a form of trade association).

159 F.3d at 796 (citation and quotation marks omitted); <u>Schwartz v. Hospital of Univ. Pa.</u>, 1993 U.S.

Dist. LEXIS 6108 (E.D. Pa. May 7, 1993) (the mere fact that defendants habitually used the

amenities of a certain entity does not supply a nexus between the entity and defendants' alleged

racketeering activities);[12] <u>Meridian Mortgage Corp. v. Spivak</u>, 1993 U.S. Dist. LEXIS 7452, at *18

(E.D. Pa. June 7, 1993) (The fact "[t]hat the [defendants] agreed to hold . . . meetings at a suite

[belonging to a certain business entity] does not remotely satisfy the relatedness test.  That the

[defendants] may have selected the offices of a law firm for . . . their meetings would not make the

firm a RICO enterprise").[13]  While Plaintiffs choose to read into various statements made by CIAB

---

[12]

Plaintiffs allege that <u>Schwartz</u>, 1993 U.S. Dist. LEXIS 6108, is inapplicable to the instant
case because "the court in <u>Schwartz</u> was considering the fully developed record on a motion for
summary judgment where the plaintiff admitted . . . that he had no knowledge . . . that the [trade
association] participated in the defendants' alleged fraudulent scheme." <u>In re Ins. Brokerage Antitrust
Litig.</u>, 04-5184, Docket Entry No. 850, at 16-17.  Plaintiffs err.  The Rule 56(c) holding of the
<u>Schwartz</u> court that one cannot create a material issue of fact with respect to the existence of a RICO
enterprise by merely identifying an organization in which defendants share membership within is
transferrable to the case at bar since Plaintiffs cannot satisfy Rule 8(a) pleading requirements by
pleading facts that (1) if proven, cannot state a claim; or (2) provide no grounds for any other factual
inference in support of Plaintiffs' claim.  <u>See</u> Fed. R. Civ. P. 12(b); <u>H.J., Inc</u>, 492 U.S. at 249.  The
Court also notices, in passing, that Plaintiffs' pleading of a smorgasbord of RICO enterprises
apparently caused Plaintiffs to confuse their own claims and arguments, since the circumstances and
claims in <u>Schwartz</u> mimic, on a much smaller scale, Plaintiffs' allegations with respect to the
"global" Strategic Partnership Enterprises and have no relevance to Plaintiffs' claims alleging that
CIAB was a free-standing and independent RICO enterprise, except for the narrow issue of nexus
discussed herein.

[13]

Plaintiffs allege that the findings made in <u>Meridian Mortgage</u>, 1993 U.S. Dist. LEXIS 7452,
at *18, are similarly "inapposite" to the case at bar because "Plaintiffs do not allege that Defendants
coincidentally met at CIAB.  Plaintiffs instead allege that . . . Defendants utilize CIAB as the vehicle
for developing, coordinating and monitoring the scheme . . . ." <u>In re Ins. Brokerage Antitrust Litig.</u>,
04-5184, Docket Entry No. 850, at 17.  Plaintiffs' claim draws a distinction without difference.  It
is irrelevant whether Defendants were coincidently or purposely meeting, using the tables, lamps,
chairs and coffee cups at CIAB or at a coffee house: Defendants' preference of locale cannot make
a public physical site part of Defendants' alleged RICO enterprise.  Any finding otherwise would
create an anomalous regime under which an entity holding a public location either must censor all

officials vague "hints" indicating that CIAB was part of Defendants' alleged conspiracy, Plaintiffs'

creative reading signifies nothing but Plaintiffs' conjecture, perhaps based upon disappointment that

CIAB neither monitored nor censored Defendants' outside-CIAB activities, nor included into

CIAB's official statements any language in support of the negative connotations that Plaintiffs now

surmise. See In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850, at 12-16.

Plaintiffs' conjecture, however, provides this Court with no basis for a single *reasonable factual*

inference in support of Plaintiffs' claims.  See H.J., Inc., 492 U.S. at 249; In re Burlington Coat

Factory Securities Litig., 114 F.3d at 1429-30; Morse, 132 F.3d at 906; accord Doug Grant v. Greate

Bay Casino Corp., 232 F.3d 173, 187 (3d Cir. 2000) (plaintiff's conclusions, patently unwarranted

in view of the alleged facts, cannot indicate that the defendant entity "committed predicate RICO

acts [because such conclusions are] completely insubstantial and border on the frivolous").  Since

Plaintiffs failed to assert any fact indicating the presence of a nexus between CIAB and Defendants'

alleged racketeering activity, Plaintiffs' claims based on CIAB being a RICO enterprise will be

dismissed.  Accord Thornton v. Micrografx, 878 F. Supp. 931, 938 (N.D. Tex. 1995) ("The court

refuses to leave its common sense at the courthouse steps [where] plaintiffs have failed to make the

requisite showing" and submitted nothing but plaintiffs' conclusory allegations).


### III.    Broker-centered Enterprises as RICO Enterprises

Plaintiffs allege that, in the Commercial Case, there are

---

patrons' communications and monitor all patrons' activities, within and outside the location, or risk
being left at the mercy of its patrons who may loop the ignorant entity into their RICO enterprise.

seven separate [B]roker-centered [E]nterprises and . . . three separate [B]roker-centered [E]nterprises [are in the Employee-Benefit Case]. Each [B]roker-centered [E]nterprise is comprised of [an identified] Broker Defendant and all insurers who are strategic insurer partners of the Broker Defendant or who have the ability to be strategic insurance partners and seek to be the strategic partner of the Broker, [inclusive of, but not limited to] the Insurer Defendants. . . . Plaintiffs . . . allege[] that each Broker-centered Enterprise has a largely hierarchical structure for decision making with the Broker Defendant directing and coordinating the affairs of the Enterprise. Plaintiffs . . . allege[] that each Broker-centered Enterprise . . . oversees, coordinates and facilitates the commission of numerous predicate offenses. The Enterprise's oversight and coordination of the various differing portions of the fraudulent scheme, and any number of predicate offenses, is adequate to satisfy the distinctiveness requirement. [Therefore, Plaintiffs conclude that] Plaintiffs have . . . sufficiently alleged [the] structure and distinctiveness [aspects of the enterprise element] for each Broker-centered Enterprise.

In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850, at 22-23 (citing Riccobene, 709 F.2d at 224, and Kearny v. Hudson Meadows Urban Renewal Corp., 829 F.2d 1263, 1266 (3d Cir. 1987), citations to RICO Case Statement omitted).

This Court disagrees with Defendants' counter-conclusion that Plaintiffs' pleadings are wholly stripped of any pertinent factual assertions. See In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 821, at 8 ("Broker-centered Enterprises contain *no* . . . structure [allegations, because] Plaintiffs [merely] describe the structure as 'hierarchical' with [every] Broker Defendant[] . . . directing and coordinating the affairs of [each respective] Enterprise") (emphasis supplied). While Plaintiffs' pleadings are less than exemplary, and Plaintiffs' reference to a "largely hierarchical" structure provides Defendants and this Court with nothing but a repeat of a factless generalized term used by the Court of Appeals in Riccobene, 709 F.2d at 222-23, see Broad, Vogt, 200 F. Supp. 2d at 760 (where "the complaint merely recites the elements . . . without providing any factual basis, [such recital] will not enable [the] complaint to survive a motion to dismiss"), Plaintiffs' allegations contain *some* facts about the enterprise structure since they might be

interpreted as setting forth seminal "hub-and-spoke" relationships.  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850, at 20.  The Steering and Bid-rigging Schemes alleged by Plaintiffs appear to be well in line with such inception point.

> Plaintiffs claim that the [B]id-rigging [Scheme] was facilitated by . . . Broker Defendants[] who solicited and obtained fictitious ["A" or "B"] quotes from . . . Insurer Defendants to guarantee that . . . ["]preferred["] insurers would win the bidding competition . . . by determining the terms of the winning and losing bid. . . . "A quotes" refers to the quotes solicited by a broker when the broker had an incumbent carrier for one of its clients whose insurance policy was up for renewal; if the insurer agreed to make a quote at the targeted premium and policy terms demanded by the broker, the insurer was guaranteed the policy renewal.  "B quotes". . . refers to "phony" quotes solicited from non-incumbent insurers with the understanding that these insurers would not submit a competitive bid; "B quotes" were used to ensure that the incumbent carrier would get its policy renewed, and the "B quote" insurers allegedly knew that "their turn would come later."[14]

In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at * 50.

It appears that the scheme underlying Plaintiffs' alleged Broker-centered Enterprises required three types of participants: (1) a broker, (2) at least one incumbent insurer providing "A quotes" (hereinafter "Incumbent Insurer"), and (3) at least one insurance carrier submitting a "B quotes" that are higher than "A quotes" (hereinafter "Accommodating Insurer").  See id.  Such scheme is in harmony with hub-and-spoke structural links between a Broker Defendant and its Incumbent and Accommodating Insurers.  See id.; accord In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850, at 22.  Since it appears that Plaintiffs now refer to each Broker Defendants' set of culpable Incumbent and Accommodating Insurers under a collective term "strategic partners," see In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850, at 3, the structure linking

---

[14]

In addition, Plaintiffs appear to allege that Broker Defendants also solicited and obtained from insurers, and submitted to clients bona fide quotes "when there was no incumbent insurance carrier 'to protect.'"  In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at *50-51.

Broker Defendants to their respective "strategic partners" (hereinafter "Seminal Associations") might be sufficiently defined for the purposes of Rule 8(a) pleading of the enterprise element.[15]

Plaintiffs, however, do not define their Broker-centered Enterprises in terms of such Seminal Association. Rather, Plaintiffs outline each Plaintiffs' Broker-centered Enterprise in terms of the Seminal Association dissolved in a myriad of unspecified insurance carriers that "have the ability to be strategic insurance partners and seek to be the strategic partner of the Broker" Defendant. Such allegations effectively transform each Broker-centered Enterprise into the sum of the entire national insurance carrier industry and one Broker Defendant: in the fashion of a literary character who (upon learning that "there are regrettably only two forms in which [one] may express [one]self: poetry and prose") discovers that he was "speaking prose for over forty years without ever realizing it," Molière, The Bourgeois Gentleman in The Actor's Molière 62 (Applause Books publ., Albert Bermel trans. 2000), Plaintiffs' allegations, if reasonably construed, do not assert a RICO enterprise but merely inform Broker Defendants of the fact that the latter are members of the insurance industry. Accord In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850, at 19 ("[I]if an insurer [is]

---

15

This Court expressly notes that such conclusion is predicated upon the presumption that the term "strategic partners" refers to *readily identifiable Incumbent and Accommodating Insurers* and those entities, if any, which *participated*, through overt acts, in the activities of such Insurers and the relevant Broker Defendant for the purpose of facilitating or executing the alleged predicate acts. In the same vein, this Court notes its serious concern with the fact that, two years after this matter was transferred to the Court by the Judicial Panel on Multidistrict Litigation, see In re Ins. Brokerage Antitrust Litig., 360 F. Supp. 2d 1371 (J.P.M.L. 2005), and having conducted substantial discovery, see generally In re Ins. Brokerage Antitrust Litig., 04-5184, Docket, Plaintiffs still have not identified all Defendants. See HMK Corp. v. Walsey, 637 F. Supp. 710, 714 n.4 (E.D. Va. 1986) ("John Doe suits are permissible only against 'real, but unidentified, defendants.' . . . In this case, the plaintiff has had more than adequate time to discover the identities of these parties, if they do in fact exist) (quoting Schiff v. Kennedy, 691 F.2d 196, 197-98 (4th Cir. 1982)); see also Roper v. Grayson, 81 F.3d 124, 126 (10th Cir. 1996); Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980).

aware of . . . and indicated a willingness to engage in illegal conduct in order to secure a more advantageous position with the Broker Defendant, the insurer [is] a member of the . . . [e]nterprise"); compare Turkette, 452 U.S. at 583 (defining an "enterprise" as a "group of persons [actually] associated together for a common purpose of engaging [rather than wishing to associate or to engage] in a course of conduct"). Without any factual substantiation linking each Broker Defendant to what potentially might be the entire insurance carrier industry, Plaintiffs' self-serving conclusions are unwarranted and would transform RICO into a legal monster the drafters never envisioned. See Reves, 507 U.S. at 183 ("liberal construction" clause is not without limits and "not an invitation to apply RICO to new purposes that Congress never intended"). If allegations about connections between "A," "B" and "C" can be allowed to stretch so to encompass the entire alphabet on the grounds that all entries from "D" to "Z" are also alphabetic letters, such allegations would: (1) allow an anomalous scenario under which a handful of industry members accused of wrongdoing and connected amongst themselves by traceable interactions could transfer an entire industry into a RICO enterprise on the basis of a plaintiff's alleged clairvoyance as to the abilities and wishful thinking among all industry members; and (2) effectively eliminate the pleading requirement for all practical purposes of Rule 8(a). Compare Dura, 544 U.S. at 347 ("[A]llowing a plaintiff to forgo giving any indication of the [facts] that the plaintiff has in mind would bring about harm of the very sort the [limiting aspects of legal provisions] seek to avoid").

While RICO allegations of collaboration between a single entity and an entire industry are rare, allegations somewhat similar to Plaintiffs' claims based on Broker-centered Enterprises were examined and rejected by the Sixth Circuit in VanDenBroeck, 210 F.3d 696. In VanDenBroeck,

> [t]he association-in-fact enterprise alleged [by plaintiffs] include[d a single mortgage lender] and its relationship with the numerous secondary lenders to which it sells

customers' loans. . . .  The district court noted that four steps were undertaken in the [alleged] scheme. First, [the mortgage lender] obtained the borrower.  Second, a secondary lender determined an interest rate at which it would make a loan. Third, [the mortgage lender] made a loan to the borrower at a different rate based on the secondary lender's proposed interest rate.  Fourth, the loan was sold to the secondary lender and [the mortgage lender] collected a "backend" fee. . . . [T]here were dozens of secondary lenders purchasing the loans [from the mortgage lender].  There [was] no allegation that there were a discreet number of secondary lenders that were used, which means that this [scheme] could have transpired with any lender in the secondary lending market [hence, implicating the entire secondary lending industry]. The district court found that these facts [did] not show any type of mechanism by which this "group" ([consisting of the mortgage lender] and the entire secondary lending market) [could have] conducted its affairs or made decisions. [The Court of Appeals for the Sixth Circuit affirmed the district court's decision] due to the fact that the enterprise [allegedly consisting of one entity plus an industry was] too unstable and fluid an entity to constitute a RICO enterprise [on the basis of the facts alleged].

Id. at 699-700.

Another set of claims somewhat resembling Plaintiffs' Broker-centered Enterprise theory was examined and similarly rejected in <u>Moore</u>, 897 F. Supp. 378.  In <u>Moore</u>, a car purchaser alleged three alternative RICO enterprises, one of which consisted of a bank and unspecified automobile dealers with which the defendant bank had or might have had relationships, thus implicating the entire car dealership industry.  See <u>id.</u> at 379.  The <u>Moore</u> court held that, where a plaintiff

does not name any specific [member of the car dealership industry, and] the only factual allegation . . . is that [the defendant] prescribes the printed form . . . which [could have been used by the members of the car dealership industry alleges an enterprise consisting of] defendant plus unnamed car dealers,. . . such a nebulous, open-ended description of the enterprise does not sufficiently identify this . . . an enterprise . . . .

Id. at 379 (citation and quotation marks omitted).

As <u>VanDenBroeck</u> and <u>Moore</u> suggest, Plaintiffs' claims are <u>per se</u> deficient if a RICO plaintiff attempts to stretch a handful of actual interactions into an industry-wide RICO enterprise or tries to assert an industry-wide enterprise by pointing to aspirations and abilities of the industry

members rather than to concrete facts interlinking the entire industry.  See also, Moll, 654 F. Supp. at 1031-32 (dismissing a RICO complaint that asserted an enterprise consisting of an insurance company, a group of attorneys and all members of "the real estate settlement industry [of] Rockland County, New York."  The Court agreed with defendants' argument that plaintiffs failed in their attempt to "mold an amorphous group" into a RICO enterprise by not showing that the members of the alleged enterprise "were associated in some fashion"); Wichita Federal Sav. & Loan Ass., 657 F. Supp. at 1190 ("'Collectivizing defendants in the alleged pattern of racketeering activity . . . will not suffice'") (quoting H. G. Gallimore, Inc. v. Abdula, 652 F. Supp. 437, 440 (N.D. Ill. 1987)).

Moreover, while Plaintiffs are correct in their legal conclusion that a RICO defendant's oversight of the affairs of the alleged enterprise suffices to indicate that the alleged enterprise was "separate and apart from the pattern of activity in which it engage[d]," In re Ins. Brokerage Antitrust Litig., 2006 U.S. Dist. LEXIS 73055, at * 50 (citing Riccobene, 709 F.2d at 222), Plaintiffs' legal conclusion is not supported by the facts underlying Plaintiffs' opinion that "each Broker-Centered Enterprise is distinct from the pattern of racketeering activity [because] each . . . Enterprise . . . oversees, coordinates and facilitates the commission of numerous predicate offenses."  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850, at 22-23 (citing Riccobene, 709 F.2d at 224, and Kearny, 829 F.2d at 1266).

While Plaintiffs' might have alleged a scheme under which a Broker Defendant or Incumbent/Accommodating Insurers, or their designees (hereinafter, collectively, "Seminal Association") may oversee, coordinate and direct, the operations within such a Seminal Association, this Court is not clear--and Plaintiffs do not enlighten the Court--as to the mechanism that the Seminal Association  developed and operated in order to oversee, coordinate and direct the actions

of the remainder of insurance carriers industry, which merely "ha[d] the ability to be strategic insurance partners and [sought] to be the strategic partner of the Broker" Defendant but did not act as one.  Being provided with no facts indicating the presence of a realistic mechanism for such coordination of unmanifested intent, this Court finds that Plaintiffs failed to satisfy the distinctiveness requirement.  See Bonner v. Henderson, 147 F.3d 457, 459 (5th Cir. 1998) ("An association-in-fact consists [only] of personnel who . . . collectively form a decision making structure"); Chang, 80 F.3d at 1300 (a RICO complaint must plead "the existence of a system of authority that guided the operation of the [entire] alleged enterprise"); Stachon, 229 F.3d at 676 (plaintiff "failed to offer the slightest sign of a command structure"); Richmond, 52 F.3d at 647 (a RICO complaint failed to show how the defendants conducted the affairs of the alleged enterprise).

Moreover, if (due to the lack of any facts identifying industry-wide actions) this Court were to construe Plaintiffs' claims asserting an "understanding" among insurance carriers of what their expected roles would be if the insurance carriers engaged in Broker Defendants' scheme as a unifying course of conduct, that would yield nothing but a bare industry-wide conspiracy and be of no legal consequence since it is well established that no allegations of the enterprise element can be based on a bare conspiracy among the associates to commit the predicate offenses.[16] See Seville, 742 F.2d at 790 n.5; accord Beck, 529 U.S. 494; Reves, 507 U.S. at 184 ("liability depends on showing that the defendants *conducted or participated* in the conduct of the enterprise's affairs") (emphasis

---

[16]

The Court notes, in passing, that Plaintiffs' allegations with respect to insurance carriers "who have the ability to be strategic insurance partners and seek to be the strategic partner of any Broker Defendant" do not amount even to a claim of conspiracy, since Plaintiffs' definition indicates merely a "desire to conspire" or, at the most, an "attempt to conspire," a non-existent double-inchoate offense. See, e.g., United States v. Riddle, 44 M.J. 282, 288 (C.A.A.F. 1996) (expressing amazement at "the nonsensical charge of attempted conspiracy").

supplied).  Accordingly, this Court concludes that a RICO plaintiff can neither assert nor stretch the perimeters and the structure of the alleged enterprise by claiming that all alleged associates were conspiring to assist the very enterprise, the perimeters and the structure of which the plaintiff is aspiring to establish, in order to include these very associates into such alleged enterprise: this type of pleading is per se deficient since the underlying argument presents nothing but an impermissible tautology.  Accord Seville, 742 F.2d at 790.  For the foregoing reasons, Plaintiffs' claims based on the Broker-centered Enterprises will be dismissed.


IV.     **Strategic Partnership as a RICO Enterprise**

Plaintiffs outline the perimeter and content of the Strategic Partnership Enterprise as follows:

> [T]he Strategic Partnership Enterprise is an association in fact comprised of the Broker Defendants and all insurers, including the Insurer Defendants, who are strategic insurance partners of the Broker Defendants or who have the ability to be strategic insurance partners and seek to be the strategic partner of any Broker Defendant. . . . Until discovery is completed, Plaintiffs cannot identify all of the specific members of the Strategic Partnership Enterprise.

In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 844, at 18-21 (citations and quotation marks omitted).[17]

_____

[17]

This Court is seriously concerned with Plaintiffs' promise to "identify all of the specific members of the Strategic Partnership Enterprise" upon conclusion of discovery. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 844, at 19.  Defendants have the right to a fair notice as to the enterprise in which operations Defendants are allegedly illegally involved, see Dura, 544 U.S. at 347 (plaintiff's "statement must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests") (citation and quotation marks omitted), much as this Court has the right to rule intelligibly on Defendants' Rule 12(b) Motions examining Plaintiffs' presently known facts.  See  Fed. R. Civ. P. 12(b); accord In Re Silicon Graphics Sec. Litig., 183 F.3d 970 (9th Cir. 1999) (observing that, without examination of the facts pled, the court has no way of distinguishing a sufficient complaint from a boiler-plate "fishing expedition").  Plaintiffs' promise to enlighten Defendants and this Court effectively in the pretrial order as to the content of the alleged

Plaintiffs maintain that they sufficiently plead the structure aspect of the enterprise element as to the Strategic Partnership Enterprise because "Plaintiffs' allegations establish that [(1) CIAB . . . has a structure, [(2)] Defendants utilized CIAB's structure for decision-making [and (3) the] Strategic Partnership Enterprise oversees, coordinates and facilitates the commission of numerous predicate offenses."[18]  Id.  Plaintiffs' allegations, however, do not exactly establish that.

Rather, Plaintiffs' allegations appear to be a three-step inference--which is one part fact and two parts Plaintiffs' conjecture--and could be stated as follows:  First, as in their above-discussed claim based on the theory of "CIAB as a RICO enterprise," Plaintiffs point to the fact that CIAB has an easily identifiable organizational structure.  Id. at 20.  Second, as in their above-discussed claim

_____

enterprise abrogates the very purpose of Rule 8(a).  See Dura, 544 U.S. at 347.

　　While it appears that Plaintiffs justify lack of clarity in their pleadings by complexity of the alleged Strategic Partnership Enterprise, see In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 844, at 19-21, nothing in the language of Rule 8(a), or cases analyzing the Rule, indicates that a plaintiff may escape or even lessen the pleading requirements by alleging that the circumstances of plaintiff's claim are too complex to distill the facts.  See Fed. R. Civ. P. 8(a).  It is well established that "the plaintiff [is] the master of [his] claim," Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987), and if Plaintiffs choose to allege that the entire insurance industry might be implicated as a single RICO enterprise, Plaintiffs' facts in support of such allegation should be presented to Defendants.  See Dura, 544 U.S. at 347 ("[I]t should not prove burdensome for a plaintiff . . . to provide a defendant with some indication of the [pertinent facts] that the plaintiff has in mind").  Conversely, if Plaintiffs have no such facts, Plaintiffs should not assert claims based on conjecture.  See In re Burlington Coat Factory Securities Litig., 114 F.3d at 1429-30 (rejecting plaintiff's "unsupported allegations," "bald assertions," or "legal conclusions").

18

　　In the Employee-Benefit Case, Plaintiffs allege the existence of two alternative Strategic Partnership Enterprises.  Specifically, one Strategic Partnership Enterprise alleged by Plaintiffs includes CIAB, while the other includes Life Insurance Marketing and Research Association (hereinafter "LIMRA"), another industry trade association.  Since, for the purposes of the instant Opinion, Plaintiffs' allegations in the Employee-Benefit Case with respect to the Enterprise that included LIMRA are qualitatively indistinguishable from Plaintiffs' allegations with respect to the Enterprise that included CIAB, or from Plaintiffs' Strategic Partnership Enterprise allegations in the Commercial Case, this Court examines all Plaintiffs' Strategic Partnership Enterprise allegations collectively and refers to them as "Strategic Partnership Enterprise."

based on the theory of "Broker-centered Enterprises," Plaintiffs point to the relationships that each

Broker Defendant allegedly had with specified and unspecified Incumbent or Accommodation

Insurers, and also to the relationships that Plaintiffs surmise as existing between Broker Defendants

and those unidentified insurance carriers that had the ability and wished to be the strategic partners

of Broker Defendants. See In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850,

at 18-19. Third, Plaintiffs allege that the acquaintances that Broker Defendants developed or could

have developed amongst themselves on the basis of their memberships in CIAB indicate that Broker

Defendants and Insurer Defendants, plus all unidentified Incumbent or Accommodation Insurers of

all Broker Defendants, as well as all other "able and willing" unidentified insurance carriers,

comprise a unified "global" Strategic Partnership Enterprise,

> with CIAB providing the primary structure and mechanism for decision-making
> [within this Strategic Partnership Enterprise, although] certain matters[,] such as
> decisions regarding the specific [Incumbent and Accommodating Insurers, were
> reached through] the structure [which was] hierarchical with [every] Broker
> Defendant[] directing the activities of their [strategic partners].

Id. at 19-20.

These allegations mix apples and oranges, and many other fruits as well.

To start, Plaintiffs bring into their Strategic Partnership Enterprise theory the same flaw that

plagues Plaintiffs' claims with respect to each Broker-centered Enterprise, that is, the inclusion of

those insurance carriers that, allegedly, had the ability and wished to be strategic partners of Broker

Defendants.[19]  This tag-along is problematic in two respects.

---

[19]

Plaintiffs' allegations neither provide any facts indicating the "ability" and "wishes" of any
"wishing and able" insurers nor even indicate a test for such determination.  Since Plaintiffs can
neither substitute Plaintiffs' opinion for actual facts nor plead such facts as "detectible" through
expert witnesses, see Fed. R. Evid. 702 (stating that an expert should be basing the expert's opinion

First, such allegations transform the Strategic Partnership Enterprise into a "curiouser and curiouser" Wonderland where insurance carrier A, an entity allegedly able and wishing to be a strategic partner of Broker Defendant X, is made an associate-in-fact of insurance carrier B, an entity allegedly able and wishing to be a strategic partner of Broker Defendant Y, even though *neither A nor B is aware of their "association"* or even of the existence of the RICO enterprise in the affairs of which both A and B must be participating under the standards set by Reves, 507 U.S. at 185, Peat, Marwick, 996 F.2d at 1539, and their progeny.   Second, while such allegations only *may* transform each of the Broker-centered Enterprises into the sum of a broker and the entire insurance carrier industry, under the Strategic Partnership Enterprise theory, Plaintiffs' allegations (multiplied either three or seven times--depending on whether the claims pertain to the Commercial Case or to the Employee-Benefit one--to account for inclusion of multiple Broker-Centered Enterprises into the "global" enterprise) implicate the entire insurance carrier industry with a very substantial degree of certainty, since one presumes that every insurer in the nation wishes to be a business partner of at least one of the nation's top insurance brokerages.   Perhaps it is because Plaintiffs' allegations are so expansive, there is a scarcity of relevant precedent to which this Court may turn for guidance.   In fact, it appears that only one court has squarely addressed a claim that an entire national industry could be a RICO enterprise.   See In re Managed Care Litig., 135 F. Supp. 2d at 1261 ("[Plaintiffs' first theory is that the health care delivery system in the United States is an enterprise [because] health care providers must be associated and must function as at least an informal organization to provide health care services to residents of the United States.  The [other] theory is simply that the

---

on the facts provided to the expert rather than discovering those facts in order to piece together elements of the litigant's claim; accord Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), this Court is not entirely clear as to how Plaintiffs could plead such "ability" and "wishful thinking."

health care systems within each geographic region constitute enterprises") (citations omitted). Rejecting such claims as patently unwarranted, the District Court for the Southern District of Florida observed that

> Plaintiffs' . . . theories are . . . troubling.  The [p]laintiffs did not suggest that any court has ever held that an entire nationwide or regional industry or profession may constitute an enterprise. *[Such] enterprises lack a distinct structure; one cannot easily identify who comes within the ambit of these enterprises, or where they begin and end.*  Plaintiffs' [Nationwide] Enterprise and Regional . . . Enterprise theories are located on the periphery of an already extremely broad definition of enterprise [and should not be expanded any further].

Id. at 162 (emphasis supplied).

This Court agrees.  Because of the inclusion of an infinite number of unidentified and potentially unidentifiable entities into the Strategic Partnership Enterprise, Plaintiffs' allegations as to a nationwide industry being a RICO enterprise are unduly amorphous per se and should be dismissed.  See Turkette, 452 U.S. at 583 (a plaintiff must plead "evidence that the various associates function as a [single] continuing unit"); Riccobene, 709 F.2d at 222-23; accord Seville, 742 F.2d at 789-790.

However, there is another crucial flaw in Plaintiffs' pleading of the Strategic Partnership Enterprise.  This flaw ensues from Plaintiffs' failure to state any fact indicating that there is an enterprise structure interrelating Broker Defendants.  Addressing this issue, Plaintiffs merely allege that "CIAB provid[ed] the primary structure and mechanism for decision-making."  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850, at 19-20.  However, CIAB's so-called "primary structure" consists--according to Plaintiffs--of CIAB's "Executive Committee, . . . Board of Directors, task forces and [various] committees."  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 844, at 6.  The detailed allegations adduced by Plaintiffs in support of this fact

Page 48 of  60

indicate that CIAB's structure exists to (1) execute CIAB's *internal* business operations and management; and (2) produce CIAB's product, that is, conferences, round tables, publications, white papers and so on.  See In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 844, at 12-14.  As this Court already explained, Plaintiffs' theory based on "CIAB as a RICO enterprise" is invalid since it fails to allege any *fact* indicating that CIAB's *internal* structure has a nexus with the racketeering activities allegedly committed by Defendants.  See supra, this Opinion, at 32-37.  Although Plaintiffs' attempt to create a pertinent fact out of Plaintiffs' allegations that: (1) the similarities between the insurance topics frequently addressed in CIAB's products and the legal topics underlying Plaintiffs' RICO claims, and (2) the topics of business profitability and preference for internal supervision of the industry frequently addressed in CIAB's products/advertizement materials and Broker Defendants' apparent interest in increasing their profitability, as well as in what Plaintiffs define as maintaining the operations of Broker Defendants secret, see In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 844, at 12-14, Docket Entry No. 850, at 12-16, such allegations cannot save Plaintiffs' deficient claim.

Needless to say, neither CIAB nor Defendant could be held liable for the similarities between the topics of their interest and the legal claims that any plaintiff chooses to allege.  Moreover, no similarities in such a general matter as topics of interest of Defendants and those of CIAB can create a cognizable nexus between an industry association and the wrongs allegedly committed by members of the industry.  The nexus is created by facts alleging an actual management or control of the association by the wrongdoers, see Provenzano, 688 F.2d at 200, and such nexus can be neither amplified nor decreased by the fact that the alleged wrongdoers are also public supporters of--or

display acute interest in the very same topics as--the industry association.[20]  A relevant conclusion

was reached by the District Court for the Eastern District of Louisiana in In re Mastercard Int'l Inc,

132 F. Supp. 2d 468.

> In that case, a purported class of plaintiffs-Internet gamblers alleged that
>
> the RICO enterprise include[d] the credit card companies and the issuing banks who were . . . associated with Internet casinos and directed, guided, conducted and/or participated directly or indirectly, in the conduct of the enterprise. . . . [P]laintiffs state[d] that [the credit card companies] allowed their names and emblems to be used for Internet gambling [with] a goal to promote Internet gambling on a worldwide basis. . . . [T]he complaints allege[d that defendants'] employees attended an Internet gambling seminar and conducted an impromptu presentation on how to most effectively use [defendants' financial] system . . . .

Id. at 488 (citations, quotation marks, parenthetical and brackets omitted).

> The Court in In re Mastercard dismissed plaintiffs' complaint concluding that
>
> [n]owhere is there an allegation that any defendant exercised actual control over the enterprise.  . . .  Although the [Supreme] Court explained that a defendant need not have primary responsibility for directing an enterprise, it must have some part in directing the enterprise's affairs. . . . [T]he Court acknowledged that an enterprise might also be operated or managed by [those who are] associated with the enterprise [because they] exert control over it, for example, by bribery. . . . [By contrast,] RICO liability does not always arise even when the defendant has influence in the enterprise . . . even when the defendant has substantial persuasive power to induce certain actions by the enterprise, or . . . offers consultation on important . . . decisions.

Id. at 489-90 (citing and quoting Reves, 507 U.S. at 184; Goren v. New Vision International Inc.,

---

[20]

    It would indeed be anomalous for an industry association *not* to be interested in the matters similar or identical to those in which the industry members express interest, and it would be a rhetorical question to ask how long such uninterested-in-its-members association could survive, let alone proliferate.  For instance, while Plaintiffs appear to allocate great importance to the fact that both CIAB and Broker Defendants were interested in maintaining and increasing their profitability, see In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 844, at 10, 13 ("Defendants experienced a decrease in profits [and] set out to do something about it. . . .  An internal . . . CIAB document notes that CIAB members want 'dollars'"), such correspondence of interests is logical, expected to exist and cannot indicate that "CIAB plus the industry" are RICO enterprise.

156 F.3d 721, 728 (7th Cir. 1998); <u>Peat, Marwick</u>, 996 F.2d 1534; <u>Amsterdam Tobacco, Inc. v.</u>

<u>Philip Morris, Inc.</u>, 107 F. Supp. 2d 210, 217 (S.D.N.Y. 2000); <u>Wilson v. Arch-Air Freight, Inc.</u>,

1997 U.S. Dist. LEXIS 827, 1997 WL 35279 (E.D. La. 1997); <u>Succession of Wardlaw v. Whitney</u>

<u>National Bank, 1994 U.S. Dist. LEXIS 15215, at *5 (E.D. La. 1994); Bowdoin Construction Corp.</u>

<u>v. Rhode Island Hospital Trust National Bank, N.A.</u>, 869 F. Supp. 1004, 1009 (D. Mass. 1994); <u>In</u>

<u>Re Taxable Municipal Bond Securities Litigation</u>, 1993 U.S. Dist. LEXIS 17978, *14 (E.D. La.

1993)) (quotations marks omitted); <u>see</u> <u>also</u> <u>Jubelirer v. MasterCard International, Inc.</u>, 68 F. Supp.

2d 1049, 1053 (W.D. Wisc. 1999) (a companion case of <u>In re Mastercard</u>, where the court found that

plaintiff failed to assert a decision making unit and noted that, "to apply RICO to plaintiff's claims

would . . . result[] in absurd circumstances . . . negatively affect[ing] millions of merchants").

Therefore, Plaintiffs' attempt to stretch CIAB's *internal* structure into the industry is entirely

unwarranted and cannot be reasonably interpreted as yielding any pertinent facts to the inquiry at bar.

<u>Compare</u> <u>H.J., Inc.</u>, 492 U.S. at 249.

Plaintiffs appear to try counterbalancing such lack of nexus by alleging that CIAB "provid[es

only] the primary structure and mechanism for decision-making," <u>In re Ins. Brokerage Antitrust</u>

<u>Litig.</u>, 04-5184, Docket Entry No. 850, at 19-20, implying that there is some unstated "secondary"

structure that creates the necessary nexus.   While Plaintiffs do not clarify what is such secondary

structure, Plaintiffs' submissions create an impression that Plaintiffs deduce, from the "dotted lines"

of membership connecting CIAB with all CIAB's members, a certain web of industry-wide

confederation, which Plaintiffs allege to be a cognizable RICO enterprise structure unifying, <u>inter</u>

alia, CIAB with all Broker Defendants.[21]   See In re Ins. Brokerage Antitrust Litig., 04-5184, Docket

Entry No. 844, at 12-16, and Docket Entry No. 850, at 19-20.

    If this Court is correct to surmise that Plaintiffs' allegations mean to assert such "secondary"

structure as a nexus connecting CIAB to Defendants, Plaintiffs' allegations are of no avail.  The

social and business acquaintances ensuing from Broker Defendants' CIAB memberships cannot

amount to a cognizable structure.  Moreover, Plaintiffs err in their apparent belief that Plaintiffs can

transform these vague acquaintances into a cognizable RICO enterprise structure by merely labeling

these relationships as "largely consensual" and, thus, justifying such a vagueness.   See In re Ins.

Brokerage Antitrust Litig., 04-5184, Docket Entry No. 850, at 20.  Plaintiffs' amorphous term

"largely consensual" provides this Court with nothing but a catch-word generality indicating only

one fact: that Plaintiffs are misreading of the meaning of the term "consensual" used by the Court

of Appeals as a guideline in Riccobene, 709 F.2d at 222-23.

    Consensual form of enterprise means neither a "structureless" casual association nor that

where participants come and go at any time and do what they please.  While the term "consensual

structure" implies a consensual rather than hierarchical form of management, the former means a

firm commitment nonetheless.  See, e.g., Michael Maccoby, Why People Follow the Leader: The

Power of Transference (Harv. Bus. Rev. Sept. 2004); Victor H. Vroom, Arthur G. Jago, The New

Leadership: Managing Participation in Organizations (Prentice Hall publ., 1988) (discussing three

---

[21]

    To complete this vague diagram of "secondary" structure, Plaintiffs appear to attach to each
Broker Defendant a constellation of the Broker-Defendant's Incumbent and Accommodating
Insurers, which is then immersed into a galaxy of those insurance carriers who, allegedly, are able
and wishing to become the Broker-Defendant's strategic partners.  See In re Ins. Brokerage Antitrust
Litig., 04-5184, Docket Entry No. 850, at 19-20.

types of contingency leadership theories, namely, autocratic, consultative and group-oriented).  In

a purely hierarchical business structure, there is typically a ladder of authorities, each directing the

conduct of subordinates without enabling the subordinates to meaningfully participate in the process

of decision making.  See id.  By contrast, a consensual business structure--typical to many modern

legitimate business entities--allows for a meaningful mutual feedback between the supervisory and

subordinate personnel and envisions a much "flatter" business structure.  See id., see also Robert

Tannenbaum, Warren H. Schmidt, How to Choose a Leadership Pattern (Harvard Business Review

publ., 2007) (introducing the theory of leadership continuum of developing consensual business

structure).  Such form of structure, however, is neither ambiguous as to the roles and duties of the

members nor allows for their ad hoc renegotiation.  See, e.g., David Nadler, Michael Tushman,

Competing by Design: The Power of Organizational Architecture (Oxford University Press publ.,

1997) (examining various forms of formal and informal business structure).

        In view of the foregoing, it would be anomalous to conclude that Plaintiffs' mere repeat of

the guideline word "consensual" is equal to a bona fide factual assertion of an actual mechanism by

which all participants within the enterprise could manage, direct, control or, at the very least,

palpably affect each other's actions or decisions.  See Canadian-AMOCO v. Delgado, 1995 U.S.

Dist. LEXIS 19132, at *5-6 (N.D. Cal. Dec. 13, 1995) ("While plaintiff makes the conclusory

allegation that the enterprise used consensus to make decisions and that the enterprise had an

informal structure, plaintiff fails to allege any facts showing an ability to control the organization on

a continuous or ongoing basis.  The. . . complaint contains several conclusory statements

characterizing the enterprise as "on-going" and "continuous."  These statements are not adequate

substitutes for factual allegations identifying the alleged enterprise's structure") (citations omitted),

aff'd, <u>Canadian-American Oil Co. v. Delgado</u>, 1997 U.S. App. LEXIS 5120.  As one court noted,

> [o]rganizational structure exists where there is evidence of some sort of chain of command . . . . [If the plaintiff] sets forth the alleged association-in-fact [by stating that the defendants], operating as an association-in-fact, constituted an enterprise . . . as the term . . . is defined in 18 U.S.C. § 1961 in that the enterprise was at all times an ongoing organization and [the defendants] functioned as a continuing unit [such allegations are insufficient because they] merely recite[] the elements of an association-in-fact without providing any factual basis for this allegation. . . . [Such allegations] do not set forth any facts which would suggest that this group . . . functioned as an ongoing organization, the first element of an association-in-fact [or that the group] had any type of organizational structure,  hierarchy for decision-making, or mechanism for conducting the group's affairs. Rather, these allegations simply delineate a string of entities [and] . . . a string of supposed racketeering activities in which the enterprise purportedly engages.

<u>Broad, Vogt</u>, 200 F. Supp. 2d at 759-61.

In view of the foregoing, Plaintiffs' claim that Broker Defendants' mere membership in CIAB

qualifies as a fact establishing that Broker Defendants operated as a single coherent and ongoing unit

is a crucial flaw in Plaintiffs' argument. True, this Court can reasonably infer from the fact of such

membership that Broker Defendants maintain social and business communications and regularly use

the same amenities, as well as CIAB's products.  This Court, however, cannot reasonably infer from

the mere fact of Broker Defendants' CIAB membership that they were interrelated in a fashion

enabling them to affect, non-marginally, each other's decisions or actions or to affect the conduct of

each other's Incumbent and Accommodating Insurers,[22] much less the conduct of any other insurers

---

[22]

Defendants assert that because

Plaintiffs [stated that] "as to certain matters, such as decisions regarding the specific strategic [partner, which is an insurance] carrier to which a piece of business is steered and the need for 'B' quotes, the structure for decision making is hierarchical[,] with . . . Broker Defendants directing the activities of their [strategic] partners [insurance] carriers."  This [Plaintiffs' statement] is just tantamount to alleging that placement decisions are made on <u>ad hoc</u> rather than group basis.

in the industry that were, allegedly, able and wishing "candidates" of the enterprise. See Seville, 742

F.2d at 790 n.5 (rejecting plaintiff's "attempts to argue that it properly pleaded [many] enterprises

. . . , and that its complaint should be read to allege as an enterprise any possible combination of the

. . . named enterprises," and indicating that a RICO plaintiff has to allege an actual enterprise rather

than to express willingness to assert whatever enterprise the court approves).

    In that respect, Plaintiffs' claims setting forth the Strategic Partnership Enterprise are similar

to those examined by the District Court for the Southern District of New York in  First Nationwide,

820 F. Supp. 89.  The plaintiff in First Nationwide brought two RICO claims, one against a mortgage

---

In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 821, at 4.

    This Court disagrees.  The fact that a Broker Defendant was in charge of certain decisions
with respect to that Broker Defendant's Incumbent and Accommodating Insurers is *not necessarily*
"tantamount to [the fact] that placement decisions are made on ad hoc rather than group basis."  It
is well established that certain decision making within a RICO enterprise may be delegated to certain
entities.  See Riccobene, 709 F.2d at 222.  Therefore, an allegation of a RICO enterprise cannot be
affected if the entire *enterprise* delegates certain functions to a certain associate within the enterprise.
See id.  However, it is axiomatic that, in order to plead a valid delegation, one needs to plead *both*
a delegatee and a delegator.  See, e.g., Apprendi v. New Jersey,, 530 U.S. 466, 561 (2000).  Plaintiffs
in the instant case validly pleaded Broker Defendants as delegatees, but omitted to plead the
delegator-enterprise, thus eliminating the possibility of a reasonable inference of delegation, which
could be interpreted as a sign of structure underlying the grand design of the alleged enterprise.
    This Court notes, in passing, that the logic behind Plaintiffs' allegation as to the grand design
of the Strategic Partnership enterprise is not immediately apparent to the reader in view of Plaintiffs'
simultaneous assertions that: (1) CIAB encompasses most of the nation's insurance brokerage
industry, with all Broker Defendants included; (2) CIAB mandates disclosure of both non-secret *and*
*secret* business information amongst it members, threatening the non-compliant ones with ejection
from CIAB's forums; and (3) an absolute secrecy about the business models employed by
Defendants was essential to the success of Defendants' scheme of racketeering, see In re Ins.
Brokerage Antitrust Litig., 04-5184, Docket Entry No. 844, at 12-13, 14, 17-18, since one would
logically presume that the best recipe for leakage of any secret information would be a mandatory
disclosure of such information to an audience as large as a national industry.

Page 55 of  60

brokerage and its president, and another one against the brokerage, its president and unspecified

borrowers.  See id. at 92.  The Court in First Nationwide summarized the allegations as follows:

> Plaintiff's second RICO claim differs from its first RICO claim only in that it includes [the borrowers], not just the [brokerage and its president].  Plaintiff's allegations of an enterprise with respect to all defendants [read as follows: "At] various times the [defendants] were associated in fact for the common purpose. . . of defrauding [the plaintiff].  This association in fact was an enterprise [because all] defendants were employed by or [somehow] associated with the [enterprise].

Id. at 97.

> Finding the allegations deficient, the First Nationwide Court dismissed the claim noting that,

> [f]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and *work together to achieve such purposes*. . . . Plaintiff [in the instant case] has not specified how all defendants, including various borrowers, joined together as a group to perpetrate the frauds alleged  . . . . Plaintiff merely asserts that . . . defendants shared common fraudulent purposes and plans. Conclusory allegations that disparate parties were associated in fact by virtue of their involvement in [a certain] industry . . . are insufficient to sustain a RICO claim, absent allegations as to how the members were associated together in [a single] enterprise.  Nor does common sense support the existence of such an enterprise.  Rather, it appears at worst that several borrowers each committed a similar but independent fraud with the aid of a particular lender, and that each such borrower acted on a particular occasion to benefit himself or herself and not to assist any other borrower.  That series of discontinuous independent frauds is no more an enterprise than it is a single conspiracy. . . . Accordingly, plaintiff's second RICO claim [should be] dismissed.

Id. at 97-98 (emphasis supplied).

This Court finds the reasoning of First Nationwide highly pertinent.  As drafted, Plaintiffs'

pleading as to the Strategic Partnership Enterprises depicts, at most, a pernicious industry practice

that spread throughout the industry by word of mouth, since Plaintiffs fail to allege any facts

indicating that Broker Defendants and their Incumbent and Accommodating Insurers, as well as the

remainder of the insurance carrier industry, acted as a *single unit*, regardless of Plaintiffs' claim that

CIAB membership could have provided the glue to hold this amorphous mass together, and

notwithstanding Plaintiffs' other line of allegations, namely, that Defendants employed analogous illegal operation models and disclosed their "tricks of trade" to each other.  See In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 844, at 12-14, Docket Entry No. 850, at 12-16.

Plaintiffs' allegations based on the mere similarity of Broker Defendants' operation models fail in the same way a claim alleging that all armed robbers in the nation comprise a RICO enterprise would fail, even if the plaintiff alleges that these criminals say the same phrase, "Your money or your life," and secretly share their evil "know-how" when, courtesy of national legal and correctional systems, they obtain residence in the nation's penitentiaries. Cf. Morales, 185 F.3d at 80; Canadian-American, 1997 U.S. App. LEXIS 5120, at *5 ("With no separate ongoing association alleged, the . . . complaint does not state a cognizable RICO enterprise"); Lockheed Martin Corp. v. Boeing Co., 357 F. Supp. 2d 1350 (M.D. Fla. 2005) (concluding that the presence of similar goals, strategies and business models, legal or illegal, employed by various members of the industry does not, on its own, indicate that these entities comprise a RICO enterprise.  The presence of such similarities does not preclude a competition among these entities for their share of the market, but the presence of such competition precludes finding of a RICO enterprise).  Rule 8(a) does not allow a RICO plaintiff to plead conjecture instead of actual facts.  See Dura, 544 U.S. at 347 ("It would permit a plaintiff with a largely groundless claim to simply take up the time of a number of other people [without even a] hope that the discovery process will reveal relevant evidence") (citation, quotation marks and brackets omitted); In re Burlington Coat Factory Securities Litig., 114 F.3d at 1429-30.

## V.    **Leave to Amend**

Having thoroughly examined Plaintiffs' Complaint, this Court now turns to the question of

whether Plaintiffs should be given leave to replead their claims for the third time.  Ordinarily, the plaintiff may be granted "leave [to amend,] . . . when justice so requires."  <u>See</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962); <u>Lorenz v. CSX Corp.</u>, 1 F.3d 1406, 1414 (3d Cir. 1993).  However, "[a]llowing leave to amend where 'there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA,' would frustrate Congress's objective in enacting this statute of 'provid[ing] a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis.'"  <u>Chubb</u>, 394 F.3d at 164 (quoting <u>GSC Partners CDO Fund</u>, 368 F.3d at 246); <u>see</u> <u>Cybershop.com Sec. Litig.</u>, 189 F. Supp. 2d at 237 ("[T]he Reform Act would be 'meaningless' if judges liberally granted leave to amend on a limitless basis") (citing <u>Champion Enter., Inc., Sec. Litig.</u>, 145 F. Supp. 2d 871, 872 (E.D. Mich. 2001)).  For instance, where the plaintiff has previously amended the complaint and yet still failed to allege sufficient facts, a court may find that "[t]hree bites at the apple is enough," and conclude that it is proper to deny leave to replead.  <u>Salinger v. Projectavision, Inc.</u>, 972 F. Supp. 222, 236 (S.D.N.Y. 1997) (citing <u>Olkey v. Hyperion 1999 Term Trust, Inc.</u>, 98 F.3d 2 (2d Cir. 1996); <u>American Express Co. Shareholder Litig.</u>, 39 F.3d 395, 402 (2d Cir. 1994); and <u>Fisher v. Offerman & Co., Inc.</u>, 1996 U.S. Dist. LEXIS 14560 (S.D.N.Y. 1996)).

In the case at bar, even after having filed original and then amended consolidated complaints and having supplemented them by statements of particularity and a RICO Case Statement, Plaintiffs still did not meet their pleading burden as to the enterprise element of their RICO claims since: (1) with respect to Plaintiffs' RICO claim based on CIAB as a RICO enterprise, Plaintiffs' allegations fail to draw a nexus between CIAB's identifiable structure and the alleged pattern of racketeering

activity; (2) with respect to Plaintiffs' RICO claim based on Broker-centered Enterprises as RICO enterprises, Plaintiffs suggested a structure mixing initial identified relationships into the web of unidentified and potentially unidentifiable traces vanishing into an oblivion; (3) with respect to Plaintiffs' RICO claim based on Strategic Partnership Enterprises, Plaintiffs failed to allege any structure; and (4) Plaintiffs failed to assert existence of a RICO enterprise through means other than identification of structure related to the pattern of racketeering activity alleged by Plaintiffs. Compare Seville, 742 F.2d at 789-790 (discussing a pleading mode alternative to that based on the Turkette factors).

Since Plaintiffs did not meet their pleading burden under Rule 8(a) as to an indispensable element of their Subsection 1962(c) claims by failing to identify a cognizable RICO enterprise, Plaintiffs' 18 U.S.C. § 1962(c) claims will be dismissed without evaluation as to whether Plaintiffs met their pleading burdens with respect to any other element of their Subsection 1962(c) claims. See 18 U.S.C. § 1962(c); Turkette, 452 U.S. at 587.  Plaintiffs' 18 U.S.C. § 1962(d) claims will similarly be dismissed without further evaluation since this Court cannot reach the issue as to whether Plaintiffs properly pled their Subsection 1962(d) claims without first assessing Plaintiffs' claims under Subsection 1962(c).  See Salinas, 522 U.S. 52; Berg, 247 F.3d 532.  However, in view of multiple ambiguities apparent from the face of Plaintiffs' Complaints, RICO Case Statement and statements of particularity, this Court grants Plaintiffs leave to replead their RICO claims within 30 days from the date of entry of this Opinion and accompanying Order, see Foman, 371 U.S. at182; Lorenz, 1 F.3d at 1414, notwithstanding the fact that this action was initially filed in 2004, and

Plaintiffs have still failed to state a claim upon which relief may be granted.[23]


## **CONCLUSION**

For the foregoing reasons, Defendants' Motions to Dismiss will be granted.  Plaintiffs' claims alleging violations of 18 U.S.C. §§ 1962(c), (d) will be dismissed without prejudice.  The Court will permit Plaintiffs one final opportunity to amend these claims and/or revise their Particularized Statements and RICO Case Statements within thirty days of the entry of this Opinion.   An appropriate form of Order accompanies this Opinion.


Dated: April 5, 2007


                                                s/Garrett E. Brown, Jr.
                                             GARRETT E. BROWN, JR., U.S.D.J.

---

[23]

Certain Defendants in this consolidated MDL action (hereinafter "Mid-size Brokers") filed a supplementary motion (hereinafter "Mid-size Brokers' Motion") urging this Court to dismiss Plaintiffs' claims as to the Mid-size Brokers with prejudice on the grounds that Plaintiffs' submissions failed to implicate the Mid-Sized Brokers in any of Plaintiffs' claim.  See, e.g., In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entries Nos. 816, 867.  However, since this Court finds that dismissal of Plaintiffs' Complaints with prejudice is not warranted with respect to the matters examined in the instant Opinion, as well as those examined in the companion Opinion on the antitrust claims, this Court denies the Mid-size Brokers' Motion with respect to all issues raised in this MDL action.