**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | |
| | : | MDL Docket No. 1663 |
| **IN RE INSURANCE BROKERAGE** | : | |
| **ANTITRUST LITIGATION** | : | Civ. No. 04-5184 (GEB) |
| | : | |
| | : | |
| _____ | : | |
| | : | |
| | : | |
| **IN RE EMPLOYEE-BENEFIT** | : | |
| **INSURANCE BROKERAGE** | : | Civ. No. 05-1079 (GEB) |
| **ANTITRUST LITIGATION** | : | |
| | : | |
| _____ | : | |
| | : | |
| **This Document Relates To:** | : | **MEMORANDUM OPINION** |
| | : | |
| **ALL ACTIONS** | : | |
| _____ | : | |

**BROWN, Chief Judge**

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.      Standard for a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6). . . . . . . . 5

    II.     Sherman Act.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          A.     Plaintiffs' Particularized Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          B.     Sherman Act, Section 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          C.     Per Se Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

D.    Global and Broker-Centered Conspiracies. . . . . . . . . . . . . . . . . . . . . . . 20

    1.    *Express or Implied Agreements.* . . . . . . . . . . . . . . . . . . . . . . . . . 21

    2.    *Communication Among Members of the Conspiracy.* . . . . . . . . 22

    3.    *Global Conspiracy.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    4.    *Mid-Sized Brokers & Other Defendants' Separate Agreements.* . 25

E.    Plaintiffs' Particularized Statements Do No Sufficiently Allege the

Necessary Facts to Support a Horizontal Conspiracy to Allocate the

Market or Customers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    1.    *Horizontal Conspiracy.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    2.    *Per Se Violation - Market or Customer Allocation.* . . . . . . . . . . 31

    3.    *Leave to Amend the Complaint and/or Revise the Particularized*

       *Statements.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## **INTRODUCTION**

This matter comes before the Court upon the renewed motion of Defendants[1] to dismiss,

pursuant to Federal Rule of Procedure 12(b)(6), Plaintiffs' claims under §1 of the Sherman Act, as

---

[1]  AIG Defendants (Commercial Defendants); Chubb Defendants (Chubb Corp., Federal Ins. Co., Executive Risk Indem., Vigilant Ins. Co.); Fireman's Fund Defendants (Fireman's Fund Ins. Co., Chicago Ins. Co., National Surety Corp.); XL Defendants (Greenwich Ins. Co., Indian Harbor Ins. Co., XL Capital Ltd.); Mid-Size Brokers (Brown & Brown Inc., Brown & Brown Ins. Benefits, Inc., et. al); Berkshire Defendants (Berkshire Hathaway, Inc., General Re Corp., General Reinsurance Corp.); CNA Defendants (CNA Financial Corp., Continental Ins. Corp., American Cas. Co. Of Reading, PA, Continental Cas. Co.); Defendants Axis, Berkshire, Crum & Forster and RLI (Axis Reinsurance Co., Axis Speciality Ins. Co., Axis Surplus Ins. Co., Berkshire Hathaway, Inc., General Re Corp., General Reinsurance Corp., Crum & Forster Holdings Corp., U.S. Fire Ins. Co., RLI Corp., RLI Ins. Co., Mt. Hawley Ins. Co.); BB&T Defendants(BB&T Corp., Branch Banking & Trust Co., BB&T Ins. Services, Inc.).

set forth in Plaintiffs' First Consolidated Commercial Class Action Amended Complaint and First Consolidated Employee Benefits Class Action Amended Complaint (collectively, "Complaints"). Oral argument was held on March 1, 2007.  The Court, having considered the parties' written submissions and oral argument, and for the reasons discussed herein, grants the Renewed Motions to Dismiss without prejudice.

## BACKGROUND

This action involves numerous class actions filed against various insurance brokers and insurers.  The class actions allege violations of federal and state antitrust laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO") and common law.  These class actions have been consolidated into the present action.

Plaintiffs filed an amended complaint on or about August 1, 2005 and a corrected amended complaint on or about August 15, 2005.  Plaintiffs make claims on behalf of a proposed class of insureds who purchased or renewed insurance policies with the Defendant Insurers through the Defendant Brokers.  Plaintiffs allege that the Defendants "engaged in a combination and conspiracy to suppress and eliminate competition in the sale of insurance by coordinating and rigging bids for insurance policies, allocating insurance markets and customers and raising, or maintaining or stabilizing premium prices above competitive levels."  Corrected First Consolidated Amended Commercial Class Action Compl., ¶ 1.  The Complaints asserted six causes of action: (1) RICO violations; (2) violations of Section 1 of the Sherman Act; (3) violations of the antitrust laws of forty-eight states and the District of Columbia; (4) breaches of statutory and common-law-based fiduciary duties; (5) aiding and abetting breach of fiduciary duty; and (6) unjust enrichment.

After these causes of action were aligned and severed into two types of matters (one

involving commercial property and casualty insurance coverages ("Commercial Case") and the other involving employee benefits insurance plans ("Employee-Benefits Case")), the Court consolidated all actions into two accordingly aligned dockets.  See In re Ins. Brokerage Antitrust Litig., 04-5184 (FSH), Docket Entry No. 118 (D.N..J. May 25, 2005); In re Employee-Benefits Brokerage Antitrust Litig., 05-1079 (FSH), Docket Entry No. 20 (D.N.J. Aug. 8, 2005).  Consequently, Plaintiffs filed one consolidated amended complaint per each respective docket, and then altered these two submissions by filing two corrected amended complaints.  See In re Ins. Brokerage Antitrust Litig., 04-5184 (FSH), Docket Entry No. 201 (D.N.J. May 25, 2005); In re Employee-Benefits Ins. Brokerage Antitrust Litig., 05-1079 (FSH), Docket Entry No. 21 (D.N.J. Aug. 8, 2005).

The extensive facts and procedural history in this case have been set forth previously by the Court and are repeated only where relevant to the instant motion.

In the October 3, 2006 Opinion, the Court concluded that the allegations set forth in Plaintiffs' First Consolidated Amended Complaints "have insufficient particularity to demonstrate 'concerted action' by all of the Defendants under the Sherman Act."  In re Ins. Brokerage Antitrust Litig, 04-5184, (FSH), Docket Entry No. 720, at 26 (D.N.J. Oct. 3, 2006).  The Court further stated that in lieu of filing an amended complaint, Plaintiffs were permitted to file a Supplemental Statement of Particularity which "shall set forth, with the degree of particularity required under 9(b), the identity of the conspirators and the role of each Defendant in the alleged conspiracies.  Id. at 29.  The Court further required Plaintiffs to "aver sufficient facts to inform each Defendant of its alleged participation in the conspiracies."  Id.  The Court also concluded that Plaintiffs did not allege sufficient facts to show that an "implied or express agreement existed between the alleged conspirators."  Id. at 26.  Pursuant to the two orders of the Court and accompanying opinion, see In

4

re Ins. Brokerage Antitrust Litig., 04-5184 (FSH), Docket Entries Nos. 123, 720-21 (D.N.J. May 25, 2005 and Oct. 3, 2006), Plaintiffs filed their RICO Case Statement and Plaintiffs' Statements of Particularity supplementing the Complaints.  See, e.g., In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entries Nos. 843, 844, 845.

The Court stated that Defendants, upon receipt of the Particularized Statements, could file either a subsequent motion to dismiss, a motion for judgment on the pleadings or a motion for summary judgment (after the completion of fact discovery).   In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 720, at 29-30.  Defendants filed the current motions to dismiss on December 21, 2006.

## DISCUSSION

### I.    Standard for a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief.  Oran v. Stafford, 226 F.3d 275, 279 (3d Cir. 2000); Langford v. City of Atlantic City, 235 F.3d 845, 850 (3d Cir. 2000); Bartholomew v. Fischl, 782 F.2d 1148, 1152 (3d Cir. 1986).  The Court may not dismiss a complaint unless plaintiff can prove no set of facts that would entitle him to relief.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir.), cert. denied, 474 U.S. 935 (1985).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

Under Rule 12(b)(6), the Court must "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff. [The motion can be granted] only if

no relief could be granted under any set of facts that could be proved." Turbe v. Government of the Virgin Islands, 938 F.3d 427, 428 (3d Cir. 1991)(citing Unger v. Nat'l Residents Matching Program, 928 F.2d 1392, 1394-95 (3d Cir. 1991)); see also Langford, 235 F.3d at 850; Dykes v. Southeastern Pa. Transp. Auth., 68 F.3d 1564, 1565 n.1 (3d Cir. 1995), cert. denied, 517 U.S. 1142 (1996); Piecknick v. Commonwealth of Pennsylvania, 36 F.2d 1250, 1255 (3d Cir. 1994); Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).  A complaint may be dismissed for failure to state a claim where it appears beyond any doubt "that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)(citation omitted).

A complaint should not be dismissed unless it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the . . . claim . . ." Ransom v. Marazzo, 848 F.2d 398, 401 (3d Cir. 1988).  Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. Papasan v. Allain, 478 U.S. 265, 286 (1986)(citation omitted); see also Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)(stating that "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss.")(citations omitted).

Courts are reluctant to grant motions to dismiss antitrust claims.  See, e.g., Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004) ("In considering a motion to dismiss, a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiffs. (citations omitted).  A court may dismiss the complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."); Todd v. Exxon Corp., 275 F.3d 191, 197-98 (2d Cir. 2001) ("On a motion to dismiss

6

for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.  A complaint should not be dismissed for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'  Thus, '[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to  offer evidence to support the claims.'") (citations omitted).

## II.   <u>Sherman Act</u>

### A.   **Plaintiffs' Particularized Statements**

According to Plaintiffs, the issue before the Court is whether the Particularized Statements allege sufficient facts "to show that an implied or express agreement existed between the alleged conspirators" and "to inform each defendant of its alleged participation in the conspiracies."  <u>See In re Ins. Brokerage Antitrust Litig.</u>, 04-5184, Docket Entry No. 720.  Plaintiffs claim that the Particularized Statements satisfy the requirements set forth in the Court's Opinion.  According to Plaintiffs, the Statements describe the seven broker-centered conspiracies in the commercial case and the three broker-centered conspiracies in the employee benefits case.  Plaintiffs contend that these conspiracies operate as classic "hub and spoke" (plaintiffs describing the "hub" as being the broker and the "spokes" as the strategic partner insurance carriers), and that these participants conspired to allocate customers and reduce competition.  Plaintiffs also contend that the Particularized Statements allege facts from which it may be inferred that an industry-wide global conspiracy arose out of the operation of the broker-centered conspiracies.  Defendants, however, claim that the facts Plaintiffs allege do not support a global conspiracy or any broker-centered conspiracies, and fall short of the pleading requirements set forth in the Court's October Opinion as well as Rule 9(b).

Plaintiffs' Brief sets forth several categories of facts alleged in the Particularized Statements relating to the conspiracies, including: the formation of the conspiracies; the interdependent operation of the spokes of each broker defendant hub; the brokers' anticompetitive and exclusionary practices with their alleged insurance carrier partners; bid-rigging and other direct evidence of the existence of a conspiracy; other evidence of the conspiracies, including circumstantial evidence, plus factors and facilitating devices; actions against interest and facts relating to a plausible global conspiracy.

According to Plaintiffs, the alleged conspiracies began in the early to mid-1990's, when each Broker Defendant, beginning with Marsh, decided to "consolidate their markets." See Plaintiffs' Opposition, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 4. Plaintiffs claim that "consolidating markets" means to "funnel the bulk of their business to a select number of preferred insurers." Id. Plaintiffs allege that insurers were invited to be among a select few to whom a broker's business was directed upon entering contingent commission agreements with brokers. Id. at 4-5. Plaintiffs submit in the Particularized Statements that the brokers' decision to consolidate their markets was a "dramatic change in their method of doing business," and that the brokers changed their practices to steer the bulk of their business to their preferred customers. Commercial Statement ("Comm. St."), ¶¶ 13, 17, 18, 20. According to Plaintiffs' Commercial Statement, the "dramatic consolidation of carrier markets began to be undertaken by most of the Broker Defendants at approximately the same time period . . . ." Comm. St., ¶ 17. Plaintiffs cite to several specific facts to support these allegations. See, e.g., Comm. St., ¶ 17 (an internal document stating that between 1993 and 2001 there has been "[t]remendous consolidation in [the top ten brokers] marketplace. The way they do business is fundamentally different than in years past . . . .");

8

Comm. St., ¶ 18 ("brokers, including USI, Wells Fargo/Acordia, Aon, all consciously trying to limit their preferred carriers in order to leverage bonus programs); Comm. St., ¶ 18, n.4; ¶ 28. Plaintiffs further contend that "every broker embarked on the same or similar consolidation program" and that "[n]ot one deviated." Plaintiffs' Opposition, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 6.

Plaintiffs also allege that the Broker Defendants communicated their strategy of consolidating the markets to prospective insurance partner carriers and to each other. Id. at 6. More specifically, Plaintiffs contend that the partner carriers were aware of "(1) who the other partner carriers were; (2) all 'tiers' or levels of preferred status, and who was on them; and (3) what level of contingent commission payments was necessary to achieve preferred status or entry to a specific tier." Id. at 6-7; see also Employee Benefits Statement ("EB St."), ¶¶ 261, 71; Comm. St., ¶¶ 71, 141. Further, Plaintiffs claim that the insurers had such details regarding specific arrangements between other insurers and partner brokers including the amount of contingent commissions paid by competitors. Id. at 6; see also Comm. St. ¶¶ 63, 31, 223, 448, 109, 112, 115-16, 117, 119, 120-21, 126, 114. Plaintiffs contend that the details regarding these arrangements were disclosed despite the fact that the agreements contained confidentiality provisions which prohibited the disclosure of their terms. Id. at 8; see also Comm. St., ¶ 84.

Plaintiffs submit that the Broker Defendants disclosed information to insurers relating to the premium volume they delivered to other insurers, citing to examples such as Aon disclosing to CIGNA the premium volume it delivered to Met Life, Unum, Aetna and Prudential. Id., EB St., ¶ 261; see, e.g. Comm. St., ¶ 513 (regarding Wells Fargo disclosing information with Hartford); Comm. St. ¶ 591 (regarding disclosures made by HRH to Hartford); Comm. St., ¶ 513 (regarding

Wells Fargo's disclosures to Chubb). Plaintiffs claim that evidence exists regarding the exchange of information relating to broker agreements directly between insurer partners and that brokers distributed information collectively to a group of insurers. Id. at 9; EB St., ¶ 118; Comm. St., ¶¶ 151, 61, 480-81. Plaintiffs allege that "in each broker-centered conspiracy, the brokers facilitated the exchange of information relating to the identity of the market partners, their level of participation in the brokers' book, and the details of their specific contingent commission arrangements." Id. at 10.

Plaintiffs claim that the agreements at issue were motivated by anticompetitive and exclusionary conduct and were not procompetitive. See Plaintiffs' Opposition, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 11 (stating that, for example, brokers agreed with insurers to "shift" or "roll" entire blocks of business to preferred insurers without the benefit of any competitive bidding); see also Comm. St., ¶¶ 157, 488, 44; EB St., ¶ 88. Plaintiffs also allege that brokers shielded insurer partners from competition by agreeing not to bid renewals competitively or limited the circumstances of renewals. Id.; see, e.g., Comm. St., ¶ 44 (BB&T instructed producers not to move renewals from Travelers); ¶ 170 (Chubb and Marsh discuss strategy to retain renewals without marketing them). Plaintiffs allege that the insurers paid for and expected unfair competitive advantage and protection from competition as a result of their agreements with broker partners. Id. at 12; see also Comm. St., ¶¶ 164-65; 166; 168; 225; EB St., ¶ 243.

Plaintiffs claim that in the Particularized Statements they have put forth direct evidence of a conspiratorial arrangement. Id. at 13. Plaintiffs submit that they have pled particularized facts describing the involvement of Marsh and Insurer Defendants ACE, AIG, Munich/Am Re, Liberty Mutual, St. Paul/Zurich and XL to cooperate in order to protect the business of the designated

insurer.  Id.; see, e.g., Comm. St., ¶ 190 (AIG submitted a predetermined losing bid in order to protect Zurich); ¶ 192 (Munich/Am Re submitted a predetermined losing bid to protect AIG). Moreover, Plaintiffs contend that Marsh employee Kathryn Winters, in her plea agreement with regulators, "admitted that a primary goal of the scheme was to maximize contingent commissions and 'protect the incumbent insurance carrier when their business was up for renewal.'" Id.; Comm. St., ¶ 189.   Plaintiffs also claim, for example, that HRH promised to move existing books of business to certain carriers in return for contingent commission payments.  Id. at 15.  Plaintiffs cite to internal memos from Travelers and Hartford to support this assertion.  Comm. St., ¶¶ 570-72.

According to Plaintiffs, the Particularized Statements also include plus factors or circumstantial evidence, which they claim, if proven, are probative of the existence of the broker-centered and global conspiracies.  Plaintiffs' Opposition,  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 16.  Plaintiffs allege that there was an economic motivation to collude for both insurers and brokers.  Id.; see also Comm. St., ¶¶ 11-14.  For example, Plaintiffs claim that the collusive agreement increased the broker's contingent commission revenue by limiting bidding to a smaller number of insurers.  Id.; Comm. St., ¶¶ 12-13, 15.  Plaintiffs allege that the insurers would have a motive to collude so long as the cost of paying contingent commissions to the brokers was offset by the advantages in paying them.  Id.; Comm. St., ¶ 14.  Plaintiffs also claim that information exchanges and organizational structures within the industry provided mechanisms to facilitate the alleged conspiracy and monitor compliance.  Comm. St., ¶¶ 602-609.  Consequently, Plaintiffs contend that the primary mechanism for monitoring the conspiracy was the exchange of information about the terms of the contingent commission agreements.  Id. at 18; Comm. St., ¶¶ 603-605.  Plaintiffs also cite to industry mechanisms that provided an opportunity for Defendants to

exchange information, for example, a "National Study Group" and participation in LIMRA, which Plaintiff contends conducted surveys on issues relating to broker compensation and Rule 5500 disclosure practices.  Comm. St., ¶ 607; EB St., ¶¶ 318-21.  Plaintiffs claim that the CIAB and the Council of Employee Benefits Executives also provided forums to discuss partnering relationships, broker compensation and contingent commission disclosures.  Comm. St., ¶¶ 610-21; EB St., ¶ 325.

In the Particularized Statements, Plaintiffs allege that there were methods in place to discipline participants who failed to comply with the conspiracy.  Plaintiffs' Opposition, <u>In re Ins. Brokerage Antitrust Litig.</u>, 04-5184, Docket Entry No. 849, at 19.  For example, Plaintiffs claim that brokers stopped placing premium with particular insurers or discontinued their practice of protecting renewal business when insurers did not pay certain contingent commissions.  <u>Id.</u>; <u>see</u>, <u>e.g.</u>, Comm. St., ¶ 73 (XL business plan stating "PSAs are a prerequisite for doing business with Marsh Global Broking, and identify preferred markets for Aon . . . [w]e know [Marsh and Aon] will move even more business away from XL unless we provide them some incentive to continue."); Comm. St., ¶ 179 ("Liberty Mutual lost a renewal account despite having met the terms specified by Marsh because there was 'no PSA.'"); Comm. St., ¶ 174 ("Chubb - we are now being heavily penalized by Marsh for not having new contingent commission agreements signed so that we are being systematically excluded from . . . placements that we would otherwise like the chance to write.").  Plaintiffs allege that Defendants' non-disclosure policies also facilitated the agreement, claiming that "the documents reveal that brokers were concerned that if disclosure of contingent commissions were made, the door would be open for a non-conspiring broker to come in and steal the business." Plaintiffs' Opposition, <u>In re Ins. Brokerage Antitrust Litig.</u>, 04-5184, Docket Entry No. 849, at 20; <u>see also</u> Comm. St., ¶¶ 76-102; EB St., ¶ 176.

Plaintiffs set forth facts in the Particularized Statements which they claim demonstrate "actions against interest." Comm. St., ¶¶ 14, 15. Some of the statements include allegations that it would be irrational in a non-conspiratorial market "for a broker to cut off his own supply outlets *i.e.* restrict its business to those paying the largest contingent commissions, unless the other major brokers went along with the arrangement;" "for insurers to pay contingent commissions for access to a broker's business unless its other major rivals did so as well;" "for a broker to protect an insurer partner (*i.e.*, by not bidding renewals or permitting it to raise a bid), at the expense of a client;" "for the insurers to refuse to bid on business or to submit a falsely inflated bid, in order to protect the business of a rival insurer;" "for insurers to allow their proprietary information to be disseminated to other insurers by the brokers;" and "for insurers to fail to make Form 5500 disclosures at the behest of a broker." See Plaintiffs' Opposition, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 21.

Finally, Plaintiffs claim that all of the above-mentioned facts and categories of facts support the existence of the broker-centered and global conspiracies. Id. 23. Plaintiffs claim that "[b]ecause each broker had relationships with multiple insurers and each insurer had relationships with multiple brokers, and because detailed information about the contingent commission arrangements, and what they bought, were freely available among all, a global conspiracy may be inferred." Id. at 24. Further, Plaintiffs explain that "[r]ather than operating as an amorphous conspiracy with 50 unconnected members, the global conspiracy operated through the interdependence of more organized and controlled subparts - *i.e.* the broker-centered wheels." Id. While Plaintiffs claim that this parallel adoption of anticompetitive business practices by the broker-centered conspiracies may, on its own, support an inference of collusion, Plaintiffs contend that they have put forth facts that

13

demonstrate the participation of many insurers in the conspiracies and mechanisms through which participants shared information and enabled participants to monitor the actions of their co-conspirators.  Id. at 25.

### B.     Sherman Act, Section 1

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared illegal."  15 U.S.C. § 1.  To properly plead a violation of Section 1, a plaintiff must allege "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action."  Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997).

The first element, concerted action, constitutes the "very essence of a section 1 claim." Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 998 (3d Cir. 1994) (noting that "unilateral action, no matter what its motivation, cannot violate [section] 1") (quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 110 (3d Cir. 1980)).  The Third Circuit has stated that "[a] general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action."  Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 182 (3d Cir. 1988).  Only "allegations of conspiracy which are particularized . . . will be deemed sufficient."  Id. at 181 (quoting Garshman v. Universal Resources Holding, Inc., 641 F.Supp. 1359, 1370 (D.N.J. 1986); id. at 182 (stating that, on a motion to dismiss, plaintiffs must "present evidence 'that tends to exclude the possibility that the alleged conspirators acted

14

independently.'") (citations omitted).  To adequately allege concerted activity, Plaintiffs are not required, at this stage of the proceedings, to provide all the details of the alleged conspiracies.  Id. (quoting Black & Yates v. Mahogany Ass'n, 129 F.2d 227, 231-32 (3d Cir. 1941)), but they must, at a minimum, "plead the facts constituting the conspiracy, its object and accomplishment," such as "the date of the alleged conspiracy," or "its attendant circumstances."  Id.; see also Mowrer v. Armour Pharmaceutical Co., Civ. No. 92-6905, 1993 U.S. Dist. LEXIS 18367, at * 8 (E.D. Pa. Dec. 30, 1993) (holding that plaintiffs must plead "the general composition of the conspiracy, some or all of its broad objectives, and [each defendant's] general role in that conspiracy.").

The requirement that conspiracy allegations be pled with adequate specificity is not a mere technicality, but rather, is grounded in considerations of judicial economy and fairness to the defendants.  Zimmerman, 836 F.2d at 182 ("It is simply not fair to the defendants, and it would be an onerous imposition on the judicial process, to permit litigation to go forward on the basis of [] conclusory and speculative allegations."); see also Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1409, at 55 (2003) ("Conspiracy allegations frequently name one or two specific persons or firms and also sweep in other unnamed conspirators.  The openness of the charge invites confusion where only a few of the possible conspirators have engaged in readily proved collaborative conduct."); see finally In re Tower Air, Inc., 416 F.3d 229, 237 (3d Cir. 2005) ("[e]ven at the pleading stage, a defendant deserves fair notice of the general factual background for the plaintiff's claims.').

This requirement is also particularly important where, as here, Plaintiffs' conspiracy claims are predicated on fraud, as previously determined by the Court, and thus are subject to Fed. R. Civ.

P. 9(b).[2]  In <u>Lum v. Bank of America</u>, the Third Circuit held that antitrust and RICO claims based on theories of fraud are subject, like explicit fraud claims, to the heightened pleading requirement of Rule 9(b).  361 F.3d at 228-29.  The Court noted that "generally, the pleading standard for Section 1 claims is the short and concise statement standard of Rule 8(a)," but stated that "[b]ecause plaintiffs allege that the defendants accomplished the goal of their conspiracy through fraud, the Amended Complaint is subject to Rule 9(b)."  <u>Id</u>. at 228 (emphasizing that under Rule 9(b), "*all* averments of fraud . . . shall be stated with particularity.") (emphasis in original).  In the Court's October 3rd Opinion, Plaintiffs were required to submit Statements of Particularity which conformed to the heightened pleading requirements of Rule 9(b).

### C.      Per Se Analysis

In assessing liability under Section 1, courts generally evaluate agreements pursuant to one of three approaches.  <u>Continental Airlines, Inc. v. United Airlines, Inc.</u>, 277 F.3d 499, 508-509 (4th Cir. 2002) ("[T]he Supreme Court has authorized three methods of analysis: (1) per se analysis, for obviously anticompetitive restraints, (2) quick-look analysis, for those with some procompetitive justification, and (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine.").  "Generally, conduct alleged to violate the Sherman Act is scrutinized under the rule of reason rather than the per se rule, and 'departure from the rule-of-reason standard must be based upon demonstrable economic effect.'"  <u>Mid-West Underground Storage, Inc. v. Porter</u>, 717 F.2d 493, 496 (10th Cir. 1983) (quoting <u>Continental T.V., Inc. v. GTE Sylvania, Inc.</u>,

---

[2]  Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

433 U.S. 36, 58-59 (1977)).  "It is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act." United States v. Topco Assoc., Inc., 405 U.S. 596, 607-608 (1972). "Per se rules of illegality are judicial constructs," FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 432-33 (1990), "and are based in large part on economic predictions that certain types of activity will more often than not unreasonably restrain competition." United States v. Brown Univ., 5 F.3d 658, 670 (3d Cir. 1993) (citing Arizona v. Maricopa Cty. Medical Society, 457 U.S. 332, 344 (1982)) ("Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable."); Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 289 (1985) ("[The] per se approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive.").

Plaintiffs claim that the alleged horizontal conspiracies to allocate business in this case should be treated as a *per se* violation of the Sherman Act.  Defendants, however, submit that Plaintiffs have not alleged conduct that is *per se* unlawful.  Defendants insist that Plaintiffs have admitted that there are procompetitive reasons for brokers to seek to consolidate their business with a smaller number of insurers.  During oral argument, however, Plaintiffs claimed that they admit nothing of the sort.  Rather, Plaintiffs contend that while procompetitive justifications for the partnership agreements and contingent commission agreements could exist, none are present here.  Plaintiffs claim that while they do not challenge contingent commission payments or partnership agreements, they do challenge the use of these devices to allocate business, restrict competition and exclude outsiders.  Plaintiffs also argue that no procompetitive justification exists for acts such as

protecting incumbency and giving first and last looks. Plaintiffs claim this conduct is anticompetitive, exclusionary and used as a means to minimize competition and deter efficiency. Plaintiffs claim that just because it is possible that in a different situation an incentive agreement could be used for procompetitive reasons, that does not make the agreements at issue legitimate. In the Particularized Statements, Plaintiffs allege that "the Broker Defendants and Insurer Defendants engaged in a *per se* unlawful scheme to allocate customers and markets through explicit and tacit agreements whereby the brokers would direct the bulk of their business to a limited number of "partner" insurers in exchange for kickbacks paid by the insurers to the brokers, nominally referred to as "contingent commissions." Comm. St., ¶ 1.

Defendants devote a significant portion of their argument in favor of dismissal to the absence of a *per se* violation. Defendants claim that *per se* violations involve conduct so inherently anticompetitive that it is *per se* illegal and so there is no need for a factual inquiry into the anticompetitive effects. Defendants maintain that it is in the unilateral, independent interest of brokers to maximize revenue and thus a horizontal conspiracy cannot be inferred by this conduct.

The *per se* approach "permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive. Courts can thereby avoid the 'significant costs' in 'business certainty and litigation efficiency' that a full-fledged rule-of-reason inquiry entails." Northwest Wholesale Stationers, 472 U.S. at 289 (quoting Maricopa Cty. Medical Society, 457 U.S. at 343-44). "Per se rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." Id. at 290 (quoting National Collegiate Athletic Ass'n v. Board of Regents of Univ. Of Oklahoma, 468 U.S. 85, 103-104 (1984)). Defendants claim that the conduct Plaintiffs challenge,

the alleged steering by brokers of the bulk of their business to preferred insurers in exchange for contingent commissions, is not *per se* unlawful.  Defendants contend that the "strategic partnerships" are a type of preferred provider agreement, and are commonplace throughout the economy and have consistently held not to be *per se* illegal.  Defendants' Brief,  <u>In re Ins. Brokerage Antitrust Litig.</u>, 04-5184, Docket Entries Nos. 823, 846, at 18; citing <u>Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.</u>, 373 F.3d 57, 62 (1st Cir. 2004); <u>Quality Auto Body, Inc. v. Allstate Ins. Co.</u>, 660 F.2d 1195, 1202-1203 (7th Cir. 1981).  Defendants claim that preferred provider agreements may have procompetitive effects and so courts do not treat them as *per se* unlawful.

A classic example of a *per se* violation of Section 1 is "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition . . . This Court has reiterated time and time again that 'horizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.'  Such limitations are per se violations of the Sherman Act."  <u>Palmer v. BRG of Georgia, Inc.</u>, 498 U.S. 46, 49 (1990) (citations omitted).  "The essence of a market allocation violation, however, is that competitors apportion the market among themselves and cease competing in another's territory or for another's customers." <u>Mid-West Underground Storage</u>, 717 F.2d at 497.

Because Plaintiffs have alleged the Section 1 claim as a *per se* violation, even at the pleading stage Plaintiffs must set forth sufficient facts evidencing a horizontal conspiracy involving market or customer allocation in order for their claim to survive a motion to dismiss.  The Court will examine Plaintiffs' particularized facts to determine whether the global conspiracy and/or the broker-centered conspiracies adequately allege Section 1 claims in light of the Court's previous order and the limitations of a *per se* violation.  <u>See</u> Garot Anderson Agencies v. Blue Cross & Blue Shield

United, 1993-1 Trade Cas. (CCH) ¶ 70, 235, at 70, 161 (N.D. Ill. 1993) ("Characterization of an agreement as horizontal or vertical is important because certain horizontal agreements have been declared *per se* illegal while vertical agreements covering the same subject matter have not.").

### D.    Global and Broker-Centered Conspiracies

In the October 3rd Opinion, the Court concluded that the allegations regarding the "global conspiracy" lacked sufficient particularity to demonstrate "concerted action" by all of the Defendants under the Sherman Act.  The Court stated that "[w]hile the conduct of bid-rigging has been stated with particularity, the pleadings must identify the purported subset of conspirators in this conduct and the nature and scope of each alleged conspirator's role." In re Ins. Brokerage Antitrust Litig, 04-5184, Docket Entry No. 720, at 26.  Further, the Court determined that Plaintiffs failed to "explain how such a large and diverse group of Defendants acted, combined or conspired as part of a single conspiracy." Id.  The Court stated that even at the dismissal stage, Plaintiffs must aver sufficient facts to make the existence of the pleaded conspiracy among so great a number of alleged co-conspirators plausible.

The Complaints also allege the existence of a series of "separate but parallel" conspiracies, "each involving a Defendant Broker and the insurance companies with which each had Contingent Commission Agreements."  Comm. Compl., ¶ 429; EB Compl., ¶ 338.  The Court concluded that Plaintiffs did not specifically identify the entities which allegedly conspired with each Broker Defendant, rather referred to "the insurance companies with whom [the Broker Defendant] had Contingent Commission Agreements." The Court also concluded that the Plaintiffs did not adequately allege the role of each Defendant in the conspiracy.  According to the Court, Plaintiffs

did not challenge the legality of contingent commissions, and did not put forth evidence to show that these contingent commissions were more than business relationships. The Court determined that the Plaintiffs did not plead sufficient facts to adequately allege a Section 1 contract, combination or conspiracy.

### 1.   *Express or Implied Agreements*

Defendants contend that Plaintiffs have still not alleged facts that show an express or implied agreement existed among the conspirators, and thus have failed to show how the alleged conspiracy among so many Defendants is plausible. Defendants claim that the Complaint and the Particularized Statements consist of allegations "about individual brokers communicating with individual insurers about contingent commission agreements, their purposes, and their effects." Defendants' Brief, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entries Nos. 823, 846, at 7. Defendants also submit that Plaintiffs have failed to establish concerted action, and that Plaintiffs do not allege that any broker agreed with another broker or that any insurer agreed with another insurer to distribute policyholders or placements in any identifiable way. Id. at 8. Defendants claim that Plaintiffs' allegations are devoid of a method for the market allocation, and only allege a few isolated examples of bid-rigging in individual placements. Defendants contend that it is implausible that insurers would agree and pay for an uncertain scheme and that unilateral "steering" by brokers does not constitute a customer or market allocation. Id. at 9.

Plaintiffs rely on Petruzzi's IGA Supermarkets, Inc. v. Darlington-Delaware Co. and In re Flat Glass Antitrust Litigation in support of their position that the facts they have alleged, if proven, support an inference of a horizontal conspiracy. 998 F.2d 1224 (3d Cir. 1993); 385 F.3d 350, 356-61 (3d Cir. 2004). Plaintiffs claim that the facts alleged cannot be viewed in a compartmentalized

manner, but rather must be viewed in their totality.  Further, Plaintiffs contend that Defendants cannot simply defeat their claims by proffering a plausible rationale for their conduct.  Plaintiffs claim that the Particularized Statements allege sufficient facts to show that each of the Defendants in each of the broker-centered conspiracies was "aware that its contract was not an isolated transaction but part of a larger arrangement" the "necessary consequence of which . . . is restraint of interstate commerce."  United States v. Masonite Corp., 316 U.S. 265, 275 (1942).

### 2.    *Communication Among Members of the Conspiracy*

Defendants also claim that Plaintiffs have not alleged any communications between brokers or between insurers that show a collusive agreement to allocate customers or markets.  Defendants' Brief, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry Nos. 823, 846, at 7.  Defendants claim that Plaintiffs have not alleged any method for the market allocation (by specific line of insurance, customer, geographic area), and have not alleged that any broker agreed with other brokers or insurers agreed with other insurers to competitive constraints.  Plaintiffs maintain that proof of direct communication among the "spokes of the wheel" is not necessary to establish the existence of a "hub and spoke" conspiracy.  Plaintiffs' Opposition, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 29. Plaintiffs rely on Masonite, which states "[i]t is not clear what precise point of time each appellee became aware of the fact that its contract was not an isolated transaction, but part of a larger arrangement.  But it is clear that as the arrangement continued, each became familiar with its purpose and scope."  Masonite, 316 U.S. at 274-75.  Plaintiffs also note the Supreme Court's decision in Interstate Circuit, which found that "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators . . . [a]cceptance by competitors without previous

22

agreement of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." Id. (citing Interstate Circuit v. United States, 306 U.S. 208, 227 (1939)).

Plaintiffs point to Toys "R" Us v. Federal Trade Comm'n, 221 F.3d 928 (7th Cir. 2000) for guidance regarding the inferences that can be made when establishing a horizontal conspiracy. "[T]he critical question here is whether substantial evidence supported the Commission's finding that there was a horizontal agreement . . . It acknowledges that such an agreement may be proved by either direct or circumstantial evidence." Id. at 935. Plaintiffs claim that they have put forth sufficient evidence to conclude that each broker was the "ringmaster" of a horizontal arrangement to allocate premium and reduce competition among members of each broker-centered conspiracy and that the members of each broker-centered conspiracy had a connection with one another and were aware of each others involvement. Plaintiffs also contend that they have supplied sufficient facts to describe the facilitation of communications among the participants and that the formation of "strategic partnerships" entailed a dramatic departure from past business practices. Plaintiffs claim that there is direct evidence in the Marsh and Willis broker-centered conspiracies of collusive arrangements such as submission of bids to protect the business of one another. See Plaintiffs' Opposition, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 33.

### 3.    *Global Conspiracy*

Plaintiffs claim that they have set forth adequate evidence to support an inference of a global conspiracy. Plaintiffs claim that the alleged broker-centered conspiracies operated in a parallel fashion. Plaintiffs' Opposition, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 34-35. Plaintiffs also claim that "the partnership arrangements were created out of a motive

by the broker to increase its contingent commission revenue at the expense of the interests of its clients" and that "the brokers sacrificed their clients' interests in the best product at the best price, for the interests of their co-conspirators, in order to increase their short-term profits."  Plaintiffs' Opposition, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 37.  Defendants contend that "strategic partnerships" are a type of preferred provider agreement.  Plaintiffs, however, maintain that "while it may be true that some preferred provider agreements have procompetitive effects, these agreements, as detailed in the Statements did not." Id. at 39.  Plaintiffs cite to several cases which they claim support their theory that lawful acts may be utilized for an unlawful purpose. See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 707 (1962) ("Acts which are themselves legal lose that character when they become constituent elements of an unlawful scheme.").

Plaintiffs claim that it was not in the economic self-interest of the insurers to pay for access to a broker's book of business in the absence of an understanding that their major rivals were making similar payments.  Plaintiffs' Opposition,  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 38.   Plaintiffs claim that while it is "possible that an insurer would provide economic incentives to a broker so as to encourage the delivery of certain types of quality of business in order to meet its strategic objectives, that is not what is alleged here.  Here, the Statements allege that insurers made those payments because they were *required to do so* in order to access a broker's book of business." Id. (emphasis in original).  Plaintiffs claim that "the evidence shows that insurers were reluctant to pay contingent commissions, at least at the level demanded, and if they could have secured premium volume without making the payment, they would have done so." Id. (citing In re Brand Name Prescription Drugs Antitrust Litigation, 123 F.3d 599, 615 (7th Cir. 1997) ("reluctant

accomplices" are not less liable for that fact).

4.      *Mid-Sized Brokers and Other Defendants' Separate Arguments*

While certain Defendants[3] join the Commercial Defendants' Omnibus Motion to Dismiss, they also write separately regarding particular reasons why Plaintiffs' claims should be dismissed against them.   The Chubb and Fireman's Fund Defendants claim that the Complaint and the Particularized Statements are devoid of allegations that constitute bid-rigging against them.   XL claims that there are only a few allegations against them contained in Plaintiffs' pleadings, and these allegations fail due to a lack of specificity as to any fraudulent conduct by XL.   XL also contends that Plaintiffs lack standing since Plaintiffs fail to allege that any one of the named Plaintiffs was defrauded by them and the action is "merely a *proposed* class action."   XL's Brief,  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 814, at 3 (emphasis in original).   The Mid-Sized Brokers claim that Plaintiffs have again failed to sufficiently plead claims against them regarding the global and broker-centered conspiracies, and that Plaintiffs lack standing to assert allegations against them since there are no allegations that any of the named Plaintiffs were their customers.   The Berkshire Defendants contend that there is no factual basis for their liability as their direct activities with brokers were not unlawful and they are not liable for their subsidiaries' actions.   CNA Defendants submit that the allegations against them do not constitute bid-rigging claims or implicate CNA in the customer or market allocation scheme or the Willis-centered conspiracy.   Defendants AXIS, Berkshire, Crum & Forster and RLI argue that Plaintiffs have expressly made no claim of bid-rigging against them and there are no facts to suggest any horizontal coordination aside

---

[3]  Chubb Defendants, Fireman's Fund Defendants, XL Defendants, Mid-Sized Broker Defendants, Berkshire Defendants, CNA Defendants, AXIS, Berkshire, Crum & Forster and RLI Defendants and BB&T Defendants.

from the alleged bid-rigging. They contend that the allegations against them are based solely on the steering of business to certain of the insurers, which is not unlawful, and that there are no allegations that they declined to compete. BB&T Defendants contend that there are no bid-rigging claims against them, and that the steering of business is the only activity plead to implicate them in the alleged conspiracies. BB&T Defendants also contend that if the federal claims are dismissed against them, that the state claims should follow due to a lack of standing.

Plaintiffs claim that despite these certain brokers' supplemental briefs which assert that no facts are alleged to tie them to the global conspiracy, each of the mid-sized brokers is "alleged to have participated in broker-centered arrangements that operated in a similar manner to the described broker-centered conspiracies, even if a specific broker-centered conspiracy has not been alleged." Plaintiffs' Opposition, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 46. Plaintiffs also address the arguments submitted on behalf of AXIS, Berkshire, Crum & Forster and RLI, in which Defendants claim there is no evidence of horizontal coordination among any insurers. Plaintiffs claim that each of these Defendants is alleged to have entered into strategic partnerships with one or more of the Broker Defendants to receive guaranteed access to business and protection from competition.[4] Id. at 47. Plaintiffs claim that the "slight evidence rule" applies here with regard to these Defendants. Plaintiffs cite to United States v. Consolidated Packaging Corp., 575 F.2d 117, 126 (7th Cir. 1978), which states "[o]nce the conspiracy has been established, slight evidence is needed to connect a particular participant . . . Even a single act may be sufficient to draw a defendant

---

[4] Plaintiffs claim that RLI and Berkshire are alleged to be participants in the Marsh broker-centered conspiracy and that Crum & Forster participated in four conspiracies (Aon, Gallagher Marsh and Willis) and Axis in three conspiracies (Aon, Marsh and Willis). Plaintiffs' Opposition, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 47, n. 52.

within the ambit of a conspiracy where the act is such that one may infer from it an intent to participate in the unlawful enterprise." Plaintiffs also claim that the Statements allege that the mid-sized brokers engaged in the same conduct with respect to their strategic partners as the other members of the conspiracy, and that an inference that they joined the conspiracy is warranted. Id. at 48.

Regarding the standing arguments set forth by certain Defendants, Plaintiffs claim that they allege that all of the Defendants participated in the global conspiracy that harmed all of the Plaintiffs and the members of the proposed class, regardless of whether they had direct dealings with each of the Defendants. Plaintiffs recognize that the "Defendants' standing arguments are relevant only if the Court concludes that the Statements do not adequately allege a horizontal conspiracy." Plaintiffs address HRH's contention that the Court should not consider the HRH-centered conspiracy because there are no allegations that any of the named plaintiffs retained HRH. Id. at 49. Plaintiffs, however, contend that the "allegations concerning the HRH broker-centered conspiracy are properly considered in connection with the global conspiracy that HRH is alleged to have participated in, regardless of whether any of the plaintiffs dealt directly with HRH." Id. Plaintiffs also contend that they have sufficiently alleged that Berkshire is responsible for its participation in the Marsh-centered conspiracy as a preferred carrier. Additionally, Plaintiffs claim that Berkshire may be held indirectly liable under an agency theory for the conduct of its subsidiaries.

### E.    Plaintiffs' Particularized Statements Do Not Sufficiently Allege the Necessary Facts to Support a Horizontal Conspiracy to Allocate the Market or Customers

While courts are reluctant to dismiss antitrust claims, Plaintiffs are still required to make a sufficient showing that the behavior alleged falls within the purview of prohibited behavior under

27

the Sherman Act.  In re K-Dur Antitrust Litig., 338 F.Supp. 2d 517, 529 (D.N.J. 2004) ("While courts should be reluctant to grant dismissals in antitrust cases, it is axiomatic that a plaintiff asserting an antitrust claim must plead a quantum of facts sufficient to survive a Rule 12(b)(6) motion to dismiss.").  Courts have held that because "[t]he existence of an agreement is 'the very essence of a section 1 claim,'" a plaintiff is required to prove "'some form of concerted action.'" In re Flat Glass, 385 F.3d at 356-57 (quoting Alvord-Polk, 37 F.3d at 999).  "In other words, there must be a 'unity of purpose or a common design and understanding or a meeting of minds' or a 'conscious commitment to a common scheme.'" Id. (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984).

### 1.   *Horizontal Conspiracy*

The first question confronted by this Court is whether the challenged conduct involves a "horizontal" restraint among competitors.  The Court is satisfied, at this stage in the proceedings, with the level of specificity contained in the Particularized Statements which identify the majority of the conspirators and their roles in the conspiracy.  In re Elec. Carbon Prods. Antitrust Litig., 333 F.Supp. 2d 303, 311-12 (D.N.J. 2004) ("if 'inferences can be fairly drawn from the behavior of the alleged conspirators' which indicate that they participated in the conspiracy, the Court should construe the Complaint 'liberally in the plaintiffs' favor' at the motion to dismiss stage and allow the case to proceed.  Indeed, 'in the antitrust context, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'"(quoting Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 746 (1976))).

Plaintiffs have roughly identified time periods of the alleged conspiracies, the participants

and some of the behavior which Plaintiffs claim show a concerted agreement to collude.  As noted in Interstate Circuit, if the "spokes" of the conspiracy have communicated and agreed with one another or accepted the alleged practices based on the participation of others in the scheme, a common conspiracy may be inferred.  306 U.S. at 222-23; see also Monsanto Co., 465 U.S. at 764 ("[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."); American Tobacco Co. v. U.S., 328 U.S. 781, 810 (1946) (evidence must show "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.").

In this case, Plaintiffs have alleged that in the 1990's, brokers decided to consolidate their markets, which they contend was a radical change in the way they previously did business.  Plaintiffs allege that the Broker Defendants communicated this strategy to prospective insurance partner carriers and to each other.  Plaintiffs claim that the partner carriers knew who the other carriers were, the tiers or levels of preferred status and who was on them and what level of contingent commission payments were necessary to reach that status.  Plaintiffs claim the insurers had such details regarding these arrangements between insurers and brokers such as the amount of contingent commissions paid.  Plaintiffs also allege these arrangements were disclosed despite confidentiality provisions and that brokers disclosed information to the insurers regarding premium volume they delivered to the other insurers.  Plaintiffs submit that they have put forth facts regarding the exchange of information regarding broker agreements directly between the insurer partners and collective information distribution from the brokers to a group of insurers.  Plaintiffs assert that the insurers knew the identity of the market partners, the level of participation and the details of the arrangements.

Plaintiffs allege some instances of bid rigging among the insurers.  Plaintiffs put forth facts that they claim demonstrate mechanisms to facilitate the conspiracy, including organizational structures, contingent commission agreements, a national study group and surveys.  Plaintiffs also assert that there were methods to discipline members of the conspiracy such as brokers stopping placements or ceasing to protect renewal business.  Plaintiffs assert actions against interest, including that it was not in the insurers interest to pay contingent commissions for access to a broker's business unless other insurers were participating as well.

Based on the Complaint and Particularized Statements, viewing all of the allegations as true, Plaintiffs have established facts which could show, if proven, that a horizontal collusion among the insurers was plausible in the broker-centered conspiracies.  Plaintiffs are not required, at this stage, to allege *all* facts supporting a horizontal conspiracy, however, there is a threshold showing that must be satisfied in order for Plaintiffs to move forward.  "The question of whether a combination in restraint of trade is illegal per se or subject to the 'rule of reason' is influenced by whether the restraints are horizontal or vertical, that is, whether they stem from an agreement among competitors or are the result of an agreement between parties at different levels of the distribution system." Shulton, Inc. v. Optel Corp., 1986 U.S. Dist. LEXIS 19775, *69-70 (D.N.J. 1986).  The Court's prior order required Plaintiffs to set forth facts that show the alleged horizontal conspiracy was plausible.  At this stage, it appears that the communications among the competitor insurers and the mechanisms in place to exchange information and police the alleged conspiracy, could have made this relationship plausible when viewing the facts as true.  However, while it might have been plausible that the Defendants agreed to engage in some sort of behavior, it cannot survive as a horizontal conspiracy unless what the competitors agreed to do was "unlawful." Monsanto Co., 465 U.S. at

764; American Tobacco Co., 328 U.S. at 810.  While the allegations are sufficient at this stage to infer that the Insurer Defendants agreed to participate in the contingent commission agreements with the Broker Defendants and exchanged information regarding those agreements, the allegations regarding the common, unlawful scheme is unclear.  There are not sufficient allegations that it was the Insurer Defendants, at the same level of competition, who participated in the division of the market or customers or agreed to such an unlawful scheme as initiated by the Broker Defendants.  While there was an exchange of information about these contingent commission agreements, which Plaintiffs allege were a method by which the market or customers were allocated among the insurers, Plaintiffs have not shown that the insurers colluded to allocate business.

> ## 2.    *Per Se Violation - Market or Customer Allocation*

While Plaintiffs have set forth particularized facts that support the possible existence of a horizontal relationship among the Defendant Insurers, the Court must assess whether the alleged restraint is anticompetitive.  Northwest Wholesale Stationers, 472 U.S. at 298 ("A plaintiff seeking application of the per se rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects.").  The allegations supporting the horizontal market or customer allocation scheme are lacking.  The Court is not persuaded that the showing of a *per se* violation, *i.e.* a horizontal conspiracy to allocate the market or customers, has been set forth in the pleadings or the Particularized Statements.  Due to the nature of their allegations, and the fact that Plaintiffs forgo a rule of reason analysis, they must allege activity which has been designated *per se* illegal.  In the Complaint and Particularized Statements there is an absence of a common plan or scheme to divide the market among the alleged conspirators in some unlawful manner.  Plaintiffs claim that Defendants utilized legitimate practices, such as contingent

commission agreements, to facilitate an anticompetitive and exclusionary scheme. However, the scheme that Plaintiffs allege is not apparent. In this case, it appears that there were, in some instances, "tiers" of defendants who received benefits for providing certain contingent payments to brokers. The allegations, however, are devoid of how the markets were divided or customers allocated to further this scheme, and that the Insurer Defendants agreed to participate or further this particular allocation of the brokers' business. While Plaintiffs will not, at this stage or perhaps ever, possess all of the details of how this alleged operation was executed, it would appear that there should be some sort of method of allocation of the customers or market of which insurers were aware to make the alleged broker-centered conspiracies plausible.

Without some sort of anticompetitive conduct, this claim cannot survive, regardless of how Plaintiffs characterize the relationship between the brokers and the insurers. Facts have been alleged to indicate a contingent commission program being conducted by the brokers who received certain amounts of commissions from a fixed number of insurers who allegedly paid higher commissions to receive more of the brokers' business. That alone is not a horizontal conspiracy to allocate the market. Horizontal conspiracies allocating territories or dividing up customers have been held to be *per se* illegal. See, e.g., Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 734 (1988); Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984); Topco Assoc., Inc., 405 U.S. at 608. Here, Plaintiffs have alleged that the participants in each broker-centered conspiracy "agreed and understood that members of the conspiracy purchased a flow of premium and protection from competition in return for contingent commission payments." Plaintiffs' Opposition, In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 849, at 2. But the Plaintiffs have failed to allege that what was purchased constitutes a market or customer allocation scheme.

Plaintiffs allege that the brokers funneled the bulk of their business to a select number of preferred insurers, and insurers were invited to be among a select few to whom a broker's business was directed once they entered into contingent commission agreements and agreed to make the payments in exchange for the business. Id. at 4-5. Plaintiffs claim that the aim of the conspiracy was "the allocation of premium volume to preferred insurers and the protection of insurers from competition." Id. at 13. Plaintiffs have set forth an alleged instance of a "customer allocation scheme" among "Broker Defendant HRH and Insurer Defendants CNA, St. Paul/Travelers and The Hartford to divide HRH's portfolio of 'select commercial' accounts among its three partner insurers." Id. at 15 (referring to Comm St., ¶ 568). Plaintiffs claim that documents exist which describe these insurers' understanding of the amount of business to be divided among these three carriers as well as the arrangements each carrier made with the broker. Id. (referring to Comm. St., ¶¶ 570-572). Specifically, Plaintiffs cite to the Assurance of Discontinuance entered into by St. Paul/Travelers with the State of New York, which states that "in return for hidden contingent commissions to HRH, the Big Three carriers would split among themselves more than 80% of HRH's select commercial accounts nationwide . . . [the insurers] understood . . . that HRH offered available books of business to only one Big Three Carrier at a time. Only if the chosen carrier chose not to take a large enough share of the book would the business be offered to another Big Three carrier. Travelers knew who the other members of the Big Three were and all agreed not to compete for available books of business on the basis of commission paid to HRH." Id. at 15-16 (citing St. Paul AOD at 19). Defendants respond to Plaintiffs reliance on these facts as improper, as they contend "[t]he Assurance contains no facts that support an inference of any Sherman Act violation, i.e., any horizontal agreement among Travelers, CNA and/or The Hartford to refrain from competing

33

with each other for policyholders."  Defendants' Reply,  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 875, at 5, n. 3.  Defendants maintain that Plaintiffs have not alleged facts to establish that the "strategic partnerships" with individual brokers constituted an agreement to "allocate policyholders or placements in any identifiable way, to exclude any insurer or broker from the market, to refrain from competing with one another for any business, or to adopt any other competitive restraints."  Id. at 5.  The Court is not satisfied that Plaintiffs have set forth sufficient allegations that the conduct alleged, *i.e.* the consolidation of the insurance markets and the steering of certain customers based on contingent commission payments, constitutes a *per se* illegal horizontal customer or market allocation scheme.  While the Court will not assess the merits of Plaintiffs' allegations at this juncture, it is necessary for Plaintiffs to adequately allege conduct which constitutes market or customer allocation and not just the steering of business to preferred partners.

### 3.    *Leave to Amend the Complaint and/or Revise the Particularized Statements*

While Plaintiffs claim it is clear that the brokers were the "ringmasters" of the alleged conspiracies, it is not clear whether the insurers themselves were collaborating or agreeing in some way to further this *per se* illegal market or customer allocation scheme.  Instances of bid-rigging may show that there was collusion among the insurers, however, these allegations are limited to the Marsh and Willis broker-centered conspiracies.  In terms of a global conspiracy, the Court is permitted to make an inference as to its existence if Plaintiffs show that the conspiracy is plausible. To allege such a conspiracy, Plaintiffs may set forth allegations of parallel anticompetitive behavior which was the "product of collusion rather than coincidence, and may also set forth "plus factors" at the summary judgment stage to strengthen the plausibility of the conspiracy pleading.  Twombly v. Bell Atl. Corp., 425 F.3d 99, 114 (2d Cir. 2005) (citing In re Pressure Sensitive Labelstock

<u>Antitrust Litig.</u>, 356 F.Supp. 2d 484, 492 (M.D. Pa. 2005) (noting that "a plaintiff need not allege the existence of . . . plus factors in order to plead an antitrust cause of action")(quoting <u>Lum</u>, 361 F.3d 230)).

The Plaintiffs must allege that the behavior of Defendants is anticompetitive and indicative of a *per se* violation of the Sherman Act to establish the broker-centered conspiracies.  If and when Plaintiffs are able to amend their Complaints and/or revise their statements to set forth the alleged anticompetitive market or customer allocation scheme, the Court will assess the plausibility of a global conspiracy.  <u>See</u>, <u>e.g.</u>, <u>In re Elec. Carbon Prods. Antitrust Litig.</u>, 333 F.Supp. 2d at 312 ( "Simply using the 'global term 'defendants' to apply to numerous parties without any specific allegations' that would tie each particular defendant to the conspiracy is not sufficient.  However, it is also true that, if '[i]nferences can be fairly drawn from the behavior of the alleged conspirators' which indicate that they participated in the conspiracy, the Court should construe the Complaint 'liberally in the plaintiffs' favor at the motion to dismiss stage and allow the case to proceed.'") (citations omitted).

Because so much time has been invested in this case by all parties, and because courts should construe Plaintiffs' allegations liberally at this stage of the proceedings, this Court  grants Plaintiffs leave to amend their Section 1 claims and further revise the Particularized Statements setting forth the alleged market or customer allocation scheme and Defendants' agreement to engage in such a scheme in order to comply with the pleading requirements as set forth above.  The Court recognizes that many of the Mid-Size Broker Defendants and others wrote separately regarding bid-rigging allegations and standing.  Many of these arguments are dependent upon the revised Particularized Statements and the Court's determination of whether a global conspiracy may be inferred.  Thus,

Plaintiffs are also permitted to set forth additional facts or allegations regarding the aforementioned Defendants and their roles in the alleged scheme.  Defendants may file a subsequent motion to dismiss, motion on the pleadings or motion for summary judgment (after the completion of fact discovery).


## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are granted.  Plaintiffs' claims alleging violations of 15 U.S.C. § 1 are dismissed without prejudice.  The Court will permit Plaintiffs one final opportunity to amend these claims and/or revise the Particularized Statements within thirty days of the entry of this Opinion.  An appropriate form of Order accompanies this Opinion.


Dated:  April 5, 2007

 s/Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.
