<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| _____ : | | |
| : | | MDL Docket No. 1663 |
| **IN RE INSURANCE BROKERAGE** : | | |
| **ANTITRUST LITIGATION** : | | Civ. No. 04-5184 (GEB) |
| : | | |
| : | | |
| _____: | | |
| : | | |
| : | | |
| **IN RE EMPLOYEE-BENEFIT** : | | |
| **INSURANCE BROKERAGE** : | | Civ. No. 05-1079 (GEB) |
| **ANTITRUST LITIGATION** : | | |
| : | | |
| _____: | | |
| : | | |
| **This Document Relates To:** : | | **MEMORANDUM OPINION** |
| : | | |
| **ALL ACTIONS** : | | |
| _____: | | |

<u>**BROWN, Chief Judge**</u>

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      I.      Standard for a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6). . . . . . . . . 6

      II.     Second Amended Complaints & Revised Statements of Particularity. . . . . . . . . . 7

           A.     Plaintiffs' Amended Allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      III.    The McCarran-Ferguson Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      IV.    The Sherman Act, Section 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A.    Sufficiency of Facts: Broker-Centered Conspiracies. . . . . . . . . . . . . . . . . 19

    1.    *Defendants claim that the broker-centered conspiracy allegations lack factual support.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    2.    *Plaintiffs contend that the broker-centered conspiracy allegations are sufficiently supported.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B.    Sufficiency of Facts: Global Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . 22

    1.    *Defendants claim that the global conspiracy allegations lack factual support.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    2.    *Plaintiffs contend that the global conspiracy allegations are sufficiently supported.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.    Per Se Claims and Market Allocation. . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    1.    *Defendants claim that Plaintiffs have not alleged naked restraints that support a per se claim.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    2.    *Plaintiffs contend that the allegations sufficiently support a per se claim.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

D.    Plaintiffs' Second Amended Complaints and Particularized Statements Do Not Sufficiently Allege Facts to Support Section 1 Claims. . . . . . . . . . . . 28

    1.    *Broker-Centered Conspiracies.* . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    2.    *Global Conspiracy.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## INTRODUCTION

This matter comes before the Court upon the motions of Defendants[1] to dismiss, pursuant

---

[1] <u>Commercial Defendants</u>: AIG Defendants (AIG, Inc., American International Specialty Lines Ins. Co., Lexington Ins. Co., Birmingham Fire Ins. Co. of Penn., American Home Assurance Co., National Union Fire Ins. Co. Of Pittsburgh, National Union Fire Ins. Co. of Louisiana, American International Ins. Co., The Ins. Co. of the State of Penn., AIU Ins. Co., Commerce and Industry Ins. Co., New Hampshire Ins.

to Federal Rule of Procedure 12(b)(6), Plaintiffs' antitrust claims in the Second Consolidated Amended Complaint and the Second Consolidated Amended Employee-Benefit Class Action Complaint (collectively, "Complaints"). The Court has read and considered all documents filed and submitted and has decided the motions based upon the parties' submissions and without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendants' motions to dismiss are granted.

## **BACKGROUND**

---

Co., Hartford Steam Boiler Inspection and Ins. Co.); Hartford Defendants (Hartford Financial Services Group, Inc., Hartford Fire Ins. Co., Twin City Fire Ins. Co., Pacific Ins. Co., Ltd., Nutmeg Ins. Co., The Hartford Fidelity & Bonding Co.); Ace Defendants (ACE Limited, ACE INA Holdings, Inc., ACE USA, Inc., ACE American Ins. Co., Westchester Surplus Lines Ins. Co., Illinois Union Ins. Co., Indemnity Ins. Co. of North America); Axis Defendants (AXIS Speciality Ins. Co. and AXIS Surplus Ins. Co.); Chicago Ins. Co., Fireman's Fund Ins. Co., National Surety Corp. Defendants; CNA Defendants (CNA Financial Corp., Continental Ins. Corp., American Cas. Co. of Reading, PA, Continental Cas. Co.); Crum & Forster Holdings Corp., U.S. Fire Ins. Co. Defendants; Liberty Mutual Defendants (Liberty Mutual Holding Co., Inc., Liberty Mutual Ins. Co., Liberty Mutual Fire Ins. Co., Wausau Underwriters Ins. Co.); American Re Defendants (American Re Corp., American Re Ins. Co., Munich American Risk Partners, American Alternative Ins. Corp.); Travelers Defendants (The Travelers Companies, Inc., St. Paul Fire and Marine Ins. Co., Gulf Ins. Co., St. Paul Mercury Ins. Co., Travelers Cas. & Surety Co. of America, The Travelers Indemnity Co., Athena Assurance Co.); Greenwich Ins. Co., Indian Harbor Ins. Co., XL Capital Ltd. Defendants; The Chubb Defendants (The Chubb Corp., Federal Ins. Co., Executive Risk Indem., Vigilant Ins. Co.); Marsh Defendants (Marsh & McLennan Companies, Inc., Marsh Inc., Marsh USA Inc. (Conn.), Mercer Inc., Mercer Human Resource Consulting LLC, Mercer Human Resources Consulting of Texas, Inc., Seabury & Smith, Inc.; Wells Fargo & Co., Accordia, Inc. Defendants; Willis Defendants (Willis Group Holdings Limited, Willis Group Limited, Willis North America Inc., Willis of New York, Inc.); Aon Defendants (Aon Corp., Aon Broker Services, Inc., Aon Risk Services Companies, Inc., Aon Risk Services, Inc. of Maryland; Aon Risk Services, Inc. of Louisiana, Aon Risk Services of Texas, Inc., Aon Risk Services, Inc. of Michigan, Aon Group, Inc., Aon Services Group, Inc., Affinity Ins. Services, Inc., Aon Consulting, Inc.); Hilb Rogal & Hobbs Company Defendants; Münchener Rückversicherungs-Gesellschaft Defendant;XL Defendants (Greenwich Ins. Co., Indian Harbor Ins. Co., XL Capital Ltd.). Employee-Benefits Defendants: Life Insurance Company of North America, Connecticut General Life Ins. Co. Defendants; MetLife Defendants (MetLife, Inc., Metropolitan Life Ins. Co., Paragon Life Ins. Co.); AIG Defendants; Hartford Defendants; Prudential Defendants (Prudential Financial, Inc., Prudential Ins. Co. of America); UnumProvident Defendants (UnumProvident Corp., Unum Life Ins. Co. of America; Provident Life and Accident Ins. Co.); USI Defendants (USI Holdings Corp., USI Services Corp., USI Consulting Group, Inc.).

This action involves numerous class actions filed against various insurance brokers and insurers.  The class actions allege violations of federal and state antitrust laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO") and common law.  These class actions have been consolidated into the present action.

Plaintiffs filed an amended complaint on or about August 1, 2005, and a corrected amended complaint on or about August 15, 2005.  After these causes of action were aligned and severed into two types of matters (one involving commercial property and casualty insurance coverages ("Commercial Case") and the other involving employee benefits insurance plans ("Employee-Benefits Case")), the Court consolidated all actions into two accordingly aligned dockets.  See In re Ins. Brokerage Antitrust Litig., 04-5184 (GEB), Docket Entry No. 118 (D.N..J. May 25, 2005); In re Employee-Benefits Brokerage Antitrust Litig., 05-1079 (GEB), Docket Entry No. 20 (D.N.J. Aug. 8, 2005).  Consequently, Plaintiffs filed one consolidated amended complaint per each respective docket, and then altered these two submissions by filing two corrected amended complaints.  See In re Ins. Brokerage Antitrust Litig., 04-5184 (GEB), Docket Entry No. 201 (D.N.J. May 25, 2005); In re Employee-Benefits Ins. Brokerage Antitrust Litig., 05-1079 (GEB), Docket Entry No. 21 (D.N.J. Aug. 8, 2005).

The extensive facts and procedural history in this case have been set forth previously by the Court and are repeated only where relevant to the instant motion.

In the Court's October 3, 2006 Opinion regarding the motions to dismiss, the Court concluded that the allegations set forth in Plaintiffs' First Consolidated Amended Complaints "have insufficient particularity to demonstrate 'concerted action' by all of the Defendants under the Sherman Act."  In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 720, at 26

(D.N.J. Oct. 3, 2006).  The Court further stated that in lieu of filing an amended complaint, Plaintiffs were permitted to file a Supplemental Statement of Particularity which "shall set forth, with the degree of particularity required under 9(b), the identity of the conspirators and the role of each Defendant in the alleged conspiracies." Id. at 29.  The Court further required Plaintiffs to "aver sufficient facts to inform each Defendant of its alleged participation in the conspiracies." Id.  The Court concluded that Plaintiffs did not allege sufficient facts to show that an "implied or express agreement existed between the alleged conspirators." Id. at 26.  Pursuant to the two orders of the Court and accompanying opinion, see In re Ins. Brokerage Antitrust Litig., 04-5184 (GEB), Docket Entries Nos. 123, 720-21 (D.N.J. May 25, 2005 and Oct. 3, 2006), Plaintiffs filed their RICO Case Statement and Statements of Particularity supplementing the Complaints.  See, e.g., In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entries Nos. 843, 844, 845.

On April 5, 2007, the Court granted Defendants' renewed motion to dismiss the consolidated complaints, and permitted Plaintiffs the opportunity to file Second Amended Consolidated Complaints ("SAC") and Revised Statements of Particularity.  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry Nos. 1125-1127; 05-1079, Docket Entry Nos. 597-599.  Plaintiffs filed their Second Amended Complaints on May 22, 2007, accompanied by Revised Particularized Statements.

In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry Nos. 1239-1241; 05-1079, Docket Entry Nos. 675-677.  In the Second Amended Complaints, Plaintiffs make claims on behalf of a proposed class of insureds who purchased or renewed insurance policies with the Defendant Insurers through the Defendant Brokers.  Plaintiffs allege that the Defendants "engaged in a series of unlawful horizontal conspiracies, the purpose and effect of which were to reduce or eliminate competition among members of the various conspiracies described herein, by among other things,

allocating customers to and among members of the conspiracies and protecting those conspirators from competition for those customers' business.  Defendants' customer allocation agreements and other schemes were naked restraints of trade in violation of section 1 of the Sherman Act."  (SAC, ¶ 64).  On June 21, 2007, Defendants filed the current motions to dismiss the Second Amended Complaints in both the Commercial and Employee-Benefits cases.

**DISCUSSION**

I.    **Standard for a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief.  Oran v. Stafford, 226 F.3d 275, 279 (3d Cir. 2000); Langford v. City of Atlantic City, 235 F.3d 845, 850 (3d Cir. 2000); Bartholomew v. Fischl, 782 F.2d 1148, 1152 (3d Cir. 1986).  In a recent decision, the Supreme Court held that to survive a Rule 12(b)(6) motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact."[2]  Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  Twombly, 127 S.Ct. at 1969. "The issue is not

---

[2]  In Twombly, the Supreme Court rejected the language previously used by the Court in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), which provided that "[i]n appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  355 U.S. at 45-46.  In Twombly, the Court held that the Conley "no set of facts" language "has earned its retirement" and "is best forgotten."

whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

## II.    Second Amended Consolidated Complaints and Revised Statements of Particularity

### A.    Plaintiffs' Amended Allegations

According to Plaintiffs, the Second Amended Complaints allege that the Defendants engaged in a series of "hub and spoke" conspiracies, in each of which a Broker Defendant "hub" coordinated an illegal customer allocation scheme among the Insurer Defendant "spokes."    In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1263, at 12 (Pl.'s Opp.).  Plaintiffs also supply facts regarding the formation and operation of an alleged global conspiracy in which the Broker Defendants agreed not to compete for each others' customers by disclosing the existence and adverse premium price impact of their rivals' broker-centered schemes.  Id. at 13 (SAC ¶¶ 64-65).

With regard to the alleged scheme, Plaintiffs claim that the method for minimizing competition was two-fold: (1) in exchange for the payment of contingent commissions, the participants in each Broker-Centered conspiracy agreed that the broker would allocate the bulk of its business to the conspiring insurers, protecting them from having to compete with insurers outside the arrangement; and (2) the participants in each Broker-Centered conspiracy agreed to reduce or eliminate competition among the conspiring insurers as to that secured book of business.  Id. (SAC ¶ 66).  Specifically, Plaintiffs contend that the insurers agreed with each other not to compete for each others' existing customers, and the brokers allegedly facilitated this plan by using various incumbent protection devices.  Id.  Plaintiffs claim that incumbent protection was a crucial element in the conspiracies, and that Broker Defendants shielded their insurer partners from normal

competition by agreeing not to bid renewals competitively or by limiting the circumstances under which renewals could be marketed.  Id. (SAC ¶ 73).  Plaintiffs allege that the Broker Defendants provided competitive advantages to the insurer partners by disclosing other carriers' bids, providing first or last looks and other methods.  Id. at 14 (SAC ¶¶ 110, 169, 221, 288, 337).

Plaintiffs allege that the method of allocation involved incumbent protection.  Id. (SAC ¶¶119-128).  Plaintiffs also contend that the brokers' decision to consolidate their markets was a dramatic departure from their previous business methods and the brokers consolidated their markets to increase their leverage and contingent commission revenue.  Id. (SAC ¶¶ 83, 362, 162, 206, 269, 329, 450).  Plaintiffs insist that the contingent commissions were almost pure profit with no discernable associated costs and that these costs were built into the formulas used to develop premium with the result that the contingent commission arrangements increased premium levels for all purchases, resulting in defendants enjoying supra-competitive profits.  Id. at 14-15 (SAC ¶¶ 360-61, 370-72, SAC EB ¶¶ 310-11).  Plaintiffs allege that the participants in the conspiracies were aware of and agreed to an allocation of customers and business, and expected an unfair competitive advantage and protection from competition, including protection of their renewal business and access to a guaranteed flow of premium volume in return for contingent payments.  Id. (SAC ¶ 133,134, 282, 307; RPS ¶¶61-62).

Plaintiffs claim that the conspiracy was facilitated by the exchange of information to assure the insurers that each was committed to a similar agreement with a broker.  Id.  Plaintiffs allege that the Broker Defendants made sure that each of its partner carriers were aware of who the other partner carriers were, all tiers or levels of preferred status and the requirements for that status, and the details of rival insurer's contingent commission agreements.  Id. at 16 (SAC EB ¶¶ 173, 262, 171, 190.3

8

195; SAC ¶¶ 142, 143, 144, 351; RPS ¶¶ 82, 89, 225; RPS EB ¶¶ 194, 231-232).

Plaintiffs describe several broker-centered conspiracies in both the Commercial and EB complaints.  In the Commercial Complaint, Plaintiffs set forth specific facts describing the Marsh, Aon, HRH, Wells Fargo/Acordia, and Willis broker-centered conspiracies.  See SAC, Counts I - IV, VI -VII; SAC EB Counts I-III, V.  Plaintiffs allege that in the Marsh and Marsh Excess Casualty broker-centered conspiracies, the principal component was an agreement not to compete for the incumbent business of other insurers and an understanding that Marsh would take action to facilitate that agreement.  Id. at 17.  Plaintiffs claim that because most of Marsh's premium volume was renewal business, Defendants' agreement not to compete for existing customers eliminated or minimized competition for the bulk of Marsh's book of business.  Id. (SAC ¶ 96, SAC EB ¶ 113).  Plaintiffs contend that this conspiracy is supported by more than parallel conduct, and there are specific facts that suggest that a scheme to protect incumbent business existed and that the participants engaged in behavior that resulted in the placement of business with their competitors.  Id. at 18 (SAC ¶¶ 105-106, 108-109, 111, 115-17, 119-28, 122-26, 129-30, SAC EB ¶¶ 114-21, 125-128).

Regarding the Aon broker-centered conspiracy, Plaintiffs allege that Aon altered its business practices by consolidating the bulk of its business with a few insurers, who agreed to pay contingent commissions in exchange for the reduction or elimination of competition for Aon's business.  Id. at 19 (SAC ¶ 158, SAC EB ¶ 140).  The key component of the agreement involved the retention of incumbent business.  Id.  Plaintiffs contend that facts exist to support this conspiracy, for example, internal discussions among the conspiring insurers indicating knowledge of the division of Aon's business, the levels of premium volume promised to insurers, the protection of incumbent accounts

and the steering of business to meet premium threshold levels.  Id. (SAC ¶¶ 161, 170, 171, 174-76, SAC EB ¶¶ 144, 159-62, 169-74).  The HRH broker-centered conspiracy allegedly involved a scheme that consolidated HRH's business by eliminating hundreds of other insurers from competing equally with the three conspiring insurers for almost all of HRH's small business customers and about a third of HRH's total commercial customers.  Id. at 20 (SAC ¶ 237, 239-42).  Plaintiffs claim that the insurers were aware of this allocation and agreed to participate in the allocation scheme.  Id. at 21 (SAC ¶¶ 237, 245-46, 253, 251-52).

Plaintiffs also describe a conspiracy involving Wells Fargo and Acordia, in which certain insurers carried out an alleged arrangement known as the Millennium Partnership Agreement, pursuant to which  specified business was divided among five insurers, each aware of the allocation.  Id. (SAC ¶¶ 201, 203-207).  Plaintiffs allege that this agreement divided a substantial portion of Wells Fargo/Acordia's small business markets among the five insurers and a substantial portion of its small commercial accounts to two insurers.  Id. (SAC ¶¶ 201, 204-208).  Plaintiffs also claim that the arrangement limited competitive bidding of renewals and placed incumbent business at higher prices than needed.  Id. at 22 (SAC ¶¶ 213-15, 218-20, 224-25).  The final Commercial broker-centered conspiracy involved Willis, in which the insurers agreed that each insurer would keep its own incumbent business and that Willis would protect that business from competition using a variety of incumbent protection devices.  Id.  Plaintiffs submit facts that purportedly establish the willingness of insurers to submit losing quotes, that demonstrate the shifting of large blocks of premium volume to co-conspirators and that support Willis' promise to deliver specified volumes of premium to conspiring insurers.  Id. at 23 (SAC ¶¶ 274, 277-78, 281-89, 305, 307; SAC EB ¶ 277).  The ULR broker-centered conspiracy allegedly involved an agreement that more than 90% of

10

ULR's business would be shared by four insurers and that in return for contingent commission payments, ULR would protect the participating insurers from competition for that business.  Id. at 25.  Plaintiffs plead facts regarding ULR's purported standardization of its relationships with its preferred partners, actions against interest including agreements to make contingent commission payments that were not earned under the agreements and insurer approval of higher rates to customers to allow ULR to incorporate its fee in the increased rate, and the protection of incumbent business.  Id. at 26 (SAC EB ¶¶ 181-82, 186-87, 198, 201, 209-11; SAC EB ¶¶ 284-89, 292-95).

Plaintiffs also set forth allegations regarding a global conspiracy, involving the Broker Defendants, not to compete with one another by disclosing the true nature and effect of the parties' contingent commission arrangements and the premium price impact of those arrangements.  Id. at 27; SAC Count VIII, SAC EB Count VI;   (SAC ¶ 354).  Plaintiffs contend that the Broker Defendants expressly or tacitly agreed not to disclose the existence of the contingent commission agreements or strategic partnerships and the resulting supra-competitive profits derived there from, either to their own customers or in an effort to steal the customers of rival brokers.  Id. (SAC ¶¶ 353-56).  The common goal consisted of maintaining an independent anti-competitive scheme and not having a super-competitive profit undermined by truthful price disclosures or advertising.  Id. at 28 (SAC ¶¶ 356, 360-61).  Plaintiffs allege that the co-conspirators accomplished these goals through the CIAB and other means.  Id. (SAC ¶¶ 406-31, 442-470).  In the Employee Benefits Complaint, Plaintiffs allege facts they claim support the coordinated non-disclosure of broker commissions on Form 5500, and that the brokers and insures agreed not to disclose the commissions on these forms.  Id. at 29 (SAC EB ¶¶ 316, 327-38, 372-73).

III.    **The McCarran-Ferguson Act**

In support of the motions to dismiss, Defendants contend that the McCarran-Ferguson Act exemption applies to this matter, and warrants its dismissal.  The Court's October 3, 2006 Opinion addressed this argument, and determined that the McCarran-Ferguson Act did not apply in this case. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 720.  The Court stated that "the alleged bid-rigging and steering activities do not constitute the 'business of insurance.'  Therefore, the McCarran-Ferguson exemption does not apply."  Id.  The Court concluded that the exemption was not applicable because the alleged practices were not sufficiently "related to risk-allocation."

Defendants contend, however, that the Court should re-evaluate its previous decision that the Act does not exempt this matter from litigation.  Defendants submit that Plaintiffs have amended their pleadings twice since the Court's initial ruling on the applicability of the Act, and that "[w]hile neither the basic factual content (or lack thereof) nor the gravamen of plaintiffs' pleadings has changed materially, the manner in which plaintiffs have presented their case has shifted in response to the Court's opinions."  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1228, at 31 (Def.'s Omnibus Reply).  Defendants note that when the Court first considered this issue, Plaintiffs placed heavy emphasis on allegations of bid-rigging and steering based on the payment of contingent commissions.  Id. at 31-32.  In Plaintiffs' amended pleadings, Defendants submit that the allegations stress the market allocation which was allegedly intended to achieve "incumbency protection."  Defendants contend that the Court did not previously consider the legal question whether antitrust claims based on incumbency protection were exempt pursuant to the McCarran-Ferguson Act.  Id. at 32.

Plaintiffs claim that the Court's October 3rd decision regarding the Act is the law of the case,

which can only be reassessed in extraordinary circumstances, which include when "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." Pub. Interest Research Group of N.J. v. Magnesium Elektron, Inc., 123 F.3d 111, 117 (3d Cir. 1997). Defendants claim that all three exceptions apply here. Specifically, that new evidence exists as Plaintiffs' twice amended complaints and particularized statements have shifted the theory of the case from "bid rigging" and "steering" practices to "incumbency protection;" that supervening new law, namely, Credit Suisse Sec.(USA) LLC v. Billing, 127 S.Ct. 2383 (2007), should be considered; and that the Court's prior ruling on the McCarran-Ferguson Act was clearly erroneous. The McCarran-Ferguson Act provides for a limited, conditional exemption from federal antitrust laws. Section 1012(b) of the Act states, in relevant part:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee of tax upon such business, unless such Act specifically relates to the business of insurance . . . .; *Provided* that . . . the Sherman Act shall be applicable to the business of insurance to the extent that such business is not regulated by State law . . . .

15 U.S.C. § 1012(b) (emphasis in original). Section 1013(b) provides that "[n]othing contained in this Chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." Therefore, the Act exempts from federal antitrust liability conduct that (1) is part of the "business of insurance;" (2) is "regulated by state law;" and (3) does not constitute a "boycott, coercion or intimidation." The Supreme Court, in Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129 (1982), enumerated three specific criteria for determining whether particular conduct constitutes the business of insurance. "[F]irst, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice

13

is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." Pireno, 458 U.S. at 129.

Defendants claim that Plaintiffs' allegations that policyholder-broker-insurer relationships were corrupted through illegal market allocation and steering, go to the core of the business of insurance. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1228, at 31 (Def.'s Omnibus Reply). Defendants also claim that because the challenged practices involve the payment of contingent commissions to brokers, these practices are integral to the policy relationship between insurers and insureds, and that the conduct alleged is limited to entities within the insurance industry, thus placing the conduct within the purview of the Act. Id. at 32. Defendants claim that the alleged allocation of insureds to incumbent insurers would necessarily implicate the transfer and spreading - here through retention of business - of desirable risks, and goes to the essence of risk-spreading. Id. at 37. Plaintiffs, however, maintain that they have never limited any of their claims to bid-rigging but rather allege that "Defendants conspired to allocate broker business without competition among insurers in exchange for contingent commissions and other fees that were then built into artificially inflated premiums charge to Plaintiffs and the Class." Pl.'s Sur-reply, at 18.

Defendants contend that the Court should re-evaluate the applicability of the Act due to the twice amended complaints and the additional facts supplied to the Court that were not previously considered. However, while Plaintiffs have presented amended complaints with a focus on incumbency protection as a method of allocation, the Court concludes that this is not a significant enough change in theory to satisfy the "new evidence" exception to the law of the case doctrine. Rather, the fundamental allegations raised in the Second Amended Complaints still involve the steering of business to certain preferred insurer partners in the alleged conspiracies. The Court

previously considered whether this type of steering of business constituted the business of insurance, and concluded that the practice itself does not transfer or spread a policyholder's risk, as required by the first <u>Pireno</u> factor.  <u>Pireno</u>, 458 U.S. at 129; <u>see also</u> In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 720, at 18.

Defendants next assert that the Court's prior ruling should be re-evaluated due to new law, specifically, the Supreme Court's decision in <u>Credit Suisse Sec.(USA) LLC v. Billing</u>, 127 S.Ct. 2383 (2007).  Defendants contend that the Court's previous opinion relied on the well-established principle that "exemptions from the antitrust laws are to be narrowly construed."  In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 720.  Defendants assert that the conduct alleged in this action is central to the marketing of insurance and lies at the core of the business of insurance and is actively regulated under state insurance law.  In <u>Credit Suisse</u>, the Court explained that the conduct at issue was exempt from the antitrust laws under the doctrine of implied immunity because that conduct lies "at the core of marketing of new securities" and is regulated by the Securities Exchange Commission.  <u>Id.</u> at 2396.  Further, the Court found that the conduct at issue should be treated as exempt from the antitrust laws because "the threat of antitrust lawsuits, through error and disincentive, could seriously alter underwriter conduct in undesirable ways" and "threaten serious harm to the efficient functioning of the securities markets."  <u>Id.</u> at 2396.  Defendants contend that the same is true for the conduct at issue in the present matter.  Plaintiffs argue that <u>Credit Suisse</u> involved the question of whether and to what extent federal securities laws impliedly preclude the application of federal antitrust law to claims against underwriters for illegally restricting and conditioning the sale of stock in connection with initial public offerings.  Pl.'s Sur-reply, at 19.  Plaintiffs note that a traditional preemption analysis was used by the Court because of the absence

15

of any express statutory bar or preemptive provision like McCarran-Ferguson. <u>Id.</u>  Plaintiffs contend that while new policy arguments may exist in <u>Credit Suisse</u>, the case does not satisfy the "supervening new law" condition required to trigger the exception to the law of the case.  <u>Id.</u>

Despite the recent Supreme Court decision, at this juncture the decision does not impact the set of facts presently before the Court.  The Court's previous ruling, while relying on the principle that exemptions from antitrust laws are to be narrowly construed, took into consideration each aspect of the application of the McCarran-Ferguson Act, and succinctly concluded that the exemption was not applicable in this matter.  The Court does not find the abovementioned case law to have changed the law of this case so as to warrant a reconsideration of that prior ruling.

Finally, Defendants contend that the Court's previous ruling regarding the Act was clearly erroneous. As stated above, the Court concludes that Defendants have not presented a sufficient reason to reassess the law of the case, namely the application of the McCarran-Ferguson Act, and will rely on the previous ruling concluding that the exemption provided by the Act does not apply here.

## IV.   The Sherman Act, Section 1

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared illegal."  15 U.S.C. § 1.  To properly plead a violation of Section 1, a plaintiff must allege "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action."  <u>Queen City Pizza, Inc. v. Domino's Pizza, Inc.</u>, 124 F.3d 430, 442

(3d Cir. 1997).

The first element, concerted action, constitutes the "very essence of a section 1 claim." Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 998 (3d Cir. 1994) (noting that "unilateral action, no matter what its motivation, cannot violate [section] 1") (quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 110 (3d Cir. 1980)).  The Third Circuit has stated that "[a] general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action."  Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 182 (3d Cir. 1988).  Only "allegations of conspiracy which are particularized . . . will be deemed sufficient."  Id. at 181 (quoting Garshman v. Universal Resources Holding, Inc., 641 F.Supp. 1359, 1370 (D.N.J. 1986); id. at 182 (stating that, on a motion to dismiss, plaintiffs must "present evidence 'that tends to exclude the possibility that the alleged conspirators acted independently.'") (citations omitted).  To adequately allege concerted activity, Plaintiffs are not required, at this stage of the proceedings, to provide all the details of the alleged conspiracies.  Id. (quoting Black & Yates v. Mahogany Ass'n, 129 F.2d 227, 231-32 (3d Cir. 1941)).  But they must, at a minimum, "plead the facts constituting the conspiracy, its object and accomplishment," such as "the date of the alleged conspiracy," or "its attendant circumstances."  Id.; see also Mowrer v. Armour Pharmaceutical Co., Civ. No. 92-6905, 1993 U.S. Dist. LEXIS 18367, at * 8 (E.D. Pa. Dec. 30, 1993) (holding that plaintiffs must plead "the general composition of the conspiracy, some or all of its broad objectives, and [each defendant's] general role in that conspiracy.").

The requirement that conspiracy allegations be pled with adequate specificity is not a mere technicality, but rather, is grounded in considerations of judicial economy and fairness to the defendants.  Zimmerman, 836 F.2d at 182 ("It is simply not fair to the defendants, and it would be

17

an onerous imposition on the judicial process, to permit litigation to go forward on the basis of []
conclusory and speculative allegations."); see also Phillip E. Areeda & Herbert Hovenkamp,
Antitrust Law ¶ 1409, at 55 (2003) ("Conspiracy allegations frequently name one or two specific
persons or firms and also sweep in other unnamed conspirators.  The openness of the charge invites
confusion where only a few of the possible conspirators have engaged in readily proved collaborative
conduct."); see finally In re Tower Air, Inc., 416 F.3d 229, 237 (3d Cir. 2005) ("[e]ven at the
pleading stage, a defendant deserves fair notice of the general factual background for the plaintiff's
claims.').

The Supreme Court recently considered whether a Section 1 complaint can survive a motion
to dismiss when it alleges parallel conduct unfavorable to competition, without some factual context
suggesting an agreement, as distinct from identical, independent action.  Bell Atlantic Corp. v.
Twombly, 127 S.Ct. 1955, 1961 (2007).  According to the Court, "'the crucial question' is whether
the challenged anticompetitive conduct 'stems from independent decision or from an agreement, tacit
or express.'" Id. (quoting Theatre Enterprises v. Paramount Film Dist. Corp., 346 U.S. 537, 540
(1954)).  "While a showing of parallel 'business behavior is admissible circumstantial evidence from
which the fact finder may infer agreement,' it falls short of 'conclusively establishing agreement or
. . . itself constituting a Sherman Act offense.'" Id. (quoting Theatre Enterprises, 346 U.S. at 540-41).

The Court held that stating a Section 1 claim, "requires a complaint with enough factual
matter (taken as true) to suggest that an agreement was made.  Asking for plausible grounds to infer
an agreement does not impose a probability requirement at the pleading stage; it simply calls for
enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal
agreement."  Id. at 1966.  The Court concluded that "an allegation of parallel conduct and a bare

18

assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  Id.  In short, the Court found that "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  Id.

A.    **Sufficiency of Facts: Broker-Centered Conspiracies**

1.    *Defendants claim that the broker-centered conspiracy allegations lack factual support*

In the April 5th Opinion, this Court concluded that "while it might have been plausible that the Defendants agreed to engage in some sort of behavior, [this claim] cannot survive as a horizontal conspiracy unless what the competitors agreed to do was unlawful."  In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 1126.  Accordingly, the Court dismissed the First Amended Complaints, but permitted Plaintiffs a chance to cure the defects in their pleadings by filing amended complaints and particularized statements.

Defendants contend that Plaintiffs' Second Amended Complaints do not allege facts sufficient to support the claims of multiple horizontal conspiracies.  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1232, at 7 (Def.'s Omn. Br.).  Defendants submit that despite two years of discovery, Plaintiffs have not identified any communications reflecting an agreement among the insurers in the broker centered conspiracies, nor any basis to infer an agreement.  Id. at 10. Defendants note that Plaintiffs' theory of market allocation consists of a horizontal agreement among the insurer defendants pursuant to which they agreed to pay contingent commissions to brokers in exchange for the brokers consolidating the bulk of their business with those carriers, however,

19

Defendants claim there are no facts alleged to support this alleged scheme.  Id.  Defendants claim that once a broker decided to consolidate, it was in the independent business interest of each insurer to compete to be one of those select insurers.  Id.

Defendants argue that the second part of the conspiracy, the agreement among the strategic partner insurers not to compete for each other's existing customers, also lacks factual support.  Id. at 11.  Defendants claim that the "incumbent protection" devices allegedly used by the brokers and insurers to further the agreement, can be explained by "the obvious independent economic self-interest of each individual insurer."  Id. at 11.  Defendants explain that an incumbent insurer is already familiar with the risks posed by an existing customer, which enables it to expend less money and resources to underwrite the risk.  Id.  Defendants claim it is "natural (and sensible) for an insurer to pay contingent commissions that reward renewal of exiting accounts."  Id.

### 2. *Plaintiffs contend that the broker-centered conspiracies are sufficiently supported*

Plaintiffs, however, contend that the broker-centered conspiracies are adequately alleged. Plaintiffs assert that they need not plead or prove an express agreement or direct communication among the insurers in order to establish a horizontal conspiracy.  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1263, at 31 (Pl.'s Opp.).  As noted in the Court's April 5th Opinion, "if the 'spokes' on the wheel have . . . accepted the alleged practices based on the participation of others in the scheme, a common conspiracy may be inferred."  In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 1126, at 29; see also Masonite, 316 U.S. at 274-75 ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators . . . . Acceptance by competitors without previous agreement of an invitation

to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."). Plaintiffs claim there is enough evidence to conclude that each broker was the "ringmaster" of a horizontal arrangement, involving the insurers as co-conspirators, to allocate premium and reduce competition among members of each conspiracy. In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1263, at 32 (Pl.'s Opp.).

Plaintiffs claim that the members of the conspiracy were aware of each others' involvement as partners, were aware of each others' arrangements with the broker, and were aware that they and their partners were protected from competition. Id. The alleged conspiracy was dependent on a mechanism by which the insurers could check for deviation from the scheme, as participation of all insurers to whom a broker was directing a substantial share of its business was necessary. Id. Plaintiffs allege facts that they claim support this theory, and that information was demanded and shared amongst the participants, specifically, the insurers own confidential information was shared with the partners to ensure the participants were cooperating. Id. at 33.

Plaintiffs contend that participants in the Marsh Broker-Centered conspiracy actually admitted that the bid-rigging conduct of the insurers was in furtherance of a scheme to protect insurers' incumbent business, and insurer participants in the scheme admitted that they engaged in practices to protect a rival's incumbent business so that their own business would be protected in return. Id. at 34; see e.g., SAC ¶ 115 (Marsh employee admitted that "the primary goal of th[e] scheme was to maximize Marsh's profits by controlling the market, and protected incumbent insurance carriers when their business was up for renewal"); SAC ¶ 119 (AIG employee admits that AIG provided false quotes "to pretend to show competition where there is none" so that AIG would

21

not face competition on its own renewals); SAC ¶ 106 (Marsh employee admits that if an incumbent meets Marsh's target price and provided the coverage it wanted then Marsh would protect them and make sure they get the business); SAC ¶¶ 115-117 (the agreement between Marsh and co-conspirators was to protect the incumbent by providing "artificial" quotes that were non-competitive); SAC ¶ 126 (Fireman's Fund renewal business was protected from competition by false quotes provided by AIG, ACE, Liberty Mutual, and Zurich).  Plaintiffs claim that internal insurance company documents reflect that the insurers were aware of and agreed to the arrangement, for example, of the HRH Conspiracy, to divide HRH's business among the "Big 3" insurance partners. Id. at 36; SAC ¶¶ 245, 252-53.

### B.    Sufficiency of Facts: Global Conspiracy

#### 1.    *Defendants claim that the global conspiracy allegations lack factual support*

With respect to the global conspiracy, Defendants claim that the Second Amended Complaints are devoid of facts to support the allegations of a global conspiracy among the Broker Defendants.  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1232, at 12 (Def.'s Omn. Br.).  Defendants contend that the brokers consolidated the markets over a period of several years, which undercuts the inference of a global conspiracy.  Id.  Defendants claim that the global conspiracy is implausible because brokers disclosed their own contingent commission income to customers.  Id. at 13 (citing Third RICO Statement, 21-22).  Defendants maintain that the non-disclosure of the commission agreements occurred because each broker recognized that it was in its own unilateral economic self-interest not to disclose other brokers' contingent commissions.  Id. Defendants also note that the Court previously concluded that "Plaintiffs' general assertions that the

22

Defendants have communicated and shared information through various trade groups and conferences" are insufficient to support an inference of "actual concert of action."  In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 720, at 26-27.

  **2.**   ***Plaintiffs contend that the global conspiracies are sufficiently supported***

  Plaintiffs contend that they have alleged adequate facts to support the global conspiracy claims, and that Defendants enjoyed supra-competitive profits as a result of their anti-competitive scheme.  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1263, at 37 (Pl.'s Opp.). Plaintiffs claim that the Broker Defendants realized billions of dollars in additional revenue due to the payment of contingent commissions, which is allegedly pure profit for the brokers.  Id. (SAC ¶¶ 81, 90, 360, 369-72).  Plaintiffs allege that Defendants agreed not to disclose the existence of the contingent commission payments, and the resulting impact on premium levels to their own clients or the clients of another broker, in an effort to steal that broker's client.  Id. (SAC ¶ 356).  Plaintiffs allege that the Broker Defendants adopted collective and inadequate disclosure policies through CIAB and LIMRA to prevent inquiry rather to inform; adopted similar confidentiality provisions in contingent commission agreements; and the Insurer Defendants failed to disclose the payments in Form 5500 although required by ERISA.  Id. at 37-38 (SAC ¶¶ 442-48, 462; SAC EB ¶¶ 449-57; SAC ¶¶ 439, 443-58, 462-66, 404-13; SAC EB ¶¶ 389-448, 327-38).

  Plaintiffs claim that horizontal agreements restricting the nature of price disclosures to customers are a form of output restriction, and are naked restraints of trade.  Id. at 38.  Plaintiffs contend that by making similar vague and incomplete disclosures regarding the contingent commissions, the Broker Defendants, aided by the Insurer Defendants, insulated themselves from competition from one another on the basis of these commissions and protected the resulting profits.

Id. at 38 (SAC ¶¶ 360-61).  Plaintiffs assert that unlike Twombly, the global conspiracy claims here

do not rest on allegations that the brokers operated the same way in failing to make these disclosures,

but rather are based on evidence of agreements to collectively implement similar disclosure (or non-

disclosure) policies.  Id. at 39.  Plaintiffs claim that the crux of the global conspiracy is a horizontal

agreement among brokers not to disclose the nature and effect of the contingent commission

arrangements, and the creation and implementation of disclosure policies that were designed to hide

the scheme.  Id.

### C.    Per Se Claims and Market Allocation

The *per se* approach "permits categorical judgments with respect to certain business practices

that have proved to be predominately anti-competitive.  Courts can thereby avoid the 'significant

costs' in 'business certainty and litigation efficiency' that a full-fledged rule-of-reason inquiry

entails."  Northwest Wholesale Stationers, 472 U.S. 284, 289 (1985) (quoting Arizona v. Maricopa

Cty. Medical Society, 457 U.S. 332, 343-44 (1983)).  "Per se rules are invoked when surrounding

circumstances make the likelihood of anti-competitive conduct so great as to render unjustified

further examination of the challenged conduct."  Id. at 290 (quoting National Collegiate Athletic

Ass'n v. Board of Regents of Univ. of Oklahoma, 468 U.S. 85, 103-104 (1984)).  A classic examples

of a *per se* violation of Section 1 is "an agreement between competitors at the same level of the

market structure to allocate territories in order to minimize competition . . . . This Court has

reiterated time and time again that 'horizontal territorial limitations . . . are naked restraints of trade

with no purpose except stifling of competition.'  Such limitations are per se violations of the

Sherman Act."  Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49 (1990) (citations omitted).  "The

essence of market a market allocation violation, however, is that competitors apportion the market

among themselves and cease competing in another's territory or for another's customers."  Mid-West Underground Storage v. Porter, 717 F.2d 493, 497 (1983); see also Garot Anderson Agencies v. Blue Cross & Blue Shield United, 1993-1 Trade Cas. (CCH) ¶ 70, 235, at 70, 161 (N.D. Ill. 1993) ("Characterization of an agreement as horizontal or vertical is important because certain horizontal agreements have been declared *per se* illegal while vertical agreements covering the same subject matter have not.").

### 1.   *Defendants claim that Plaintiffs have not alleged naked restraints that support a per se claim*

Defendants contend that even if the Second Amended Complaints adequately alleged a horizontal agreement, they still fail to allege an agreement amounting to a naked restraint of the type necessary to sustain a *per se* claim.   In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1232, at 15 (Def.'s Omn. Br.).  Defendants claim that the conduct alleged describes a variety of practices, such as the development of strategic partnerships with insurers, use of last looks and other bidding-related practices that allegedly favor incumbents.  Id.  Defendants claim that on their face, these practices are pro-competitive.  Id. at 16 (citing Broadcast Music, Inc. v. CBS, 441 U.S. 1, 19-20 (1979) (to be *per se* illegal a practice must "facially appear[] to be one that would always or almost always tend to restrict competition," rather than "one designed to increase economic efficiency and render markets more, rather than less, competitive")).

Defendants also claim that Plaintiffs have not alleged a plausible market allocation method. Id.  Defendants contend that because Plaintiffs allegations involve contingent commissions based on either renewal business, volume or growth, with different payment thresholds and rates which changed over time, these variations created multiple, conflicting incentives that caused brokers to

sometimes seek to place risks with the incumbent, while other times move clients among strategic partners.  Id. at 17.  Defendants submit that the allegations show that insurers used contingent commissions to compete with one another for the services of brokers, and that any alleged steering of business in exchange for lucrative commissions does not constitute a horizontal conspiracy to allocate the market.  Id. at 18.  Defendants also note that incumbent protection devices such as first and last looks would be unnecessary if there was an agreement in place among insurers that the incumbent would retain its accounts without facing competition.  Id.

Defendants contend that the conduct alleged by Plaintiffs does not constitute a naked restraint of trade.  Id. at 20.  Defendants argue that there are many legitimate pro-competitive reasons for a broker to consolidate its business and form strategic partnerships with certain insurers.  Id.; see also In re Ins. Brokerage Antitrust Litig., 05-1079, Docket Entry No. 664, at 8 (EB Insurers' Br.).  For example, Defendants claim that improved organizational efficiency and increased leverage in negotiating with insurers are both legitimate business objectives, both achieved by utilizing strategic partnerships.  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1232, at 21 (Def.'s Omn. Br.).  According to Defendants, the strategic partnerships alleged in the Second Amended Complaints are akin to the "preferred provider" arrangements that are common throughout the economy, which Defendants contend have been held not to be *per se* illegal.  Id. at 23 (citing Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 62 (1st Cir. 2004)).  Defendants also contend that the Second Amended Complaint is riddled with examples of competition among the Insurer Defendants.  In re Ins. Brokerage Antitrust Litig., 05-1079, Docket Entry No. 664, at 9 (EB Insurers' Br.) (SAC EB ¶¶ 211, 282, 285, 176, 205, 220, 239, 242).

2. *Plaintiffs contend that the allegations sufficiently support a per se claim*

According to Plaintiffs, "many horizontal market division agreements cover something less than, or different from, absolute bans on selling in one another's designated territory or to one another's designated customers . . . The case law is clear that a market division need not be an agreement that each firm will stay completely out the assigned territory of another." In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No. 1263, at 41 (Pl.'s Opp. Br.) (quoting XII Herbert Hovenkamp, *Antitrust Law*, ¶ 2030).   Plaintiffs also note that it is "clear that an agreement between rivals is not saved [from *per se* condemnation] merely because it is not 'airtight' . . . . The fact that the two firms are competing in part of their output does not change the status of the agreement pertaining to the other part." Id. (quoting XII Herbert Hovenkamp, *Antitrust Law*, ¶ 2030); see also Petruzzi's IGA Supermarkets v. Darling-Delaware Co., 998 F.2d 1224, 1243 (3d Cir. 1993) ("While it may be true that the defendants did not use the same prices or run their internal operations identically, the evidence shows that they acted similarly by refraining from competing on existing accounts, while at the same time competing actively for new accounts.")).

Plaintiffs contend that the insurers within each Broker-Centered conspiracy agreed with each other to gain an undue competitive advantage for new customers by participating as preferred partners in the broker's consolidation scheme. Id. at 42. Plaintiffs contend that the conspiring insurers paid the brokers large contingent commissions in exchange for the benefit of having to compete only against a few other Insurer Defendants rather than the entire insurance industry. Id. Plaintiffs maintain that variations in the specific terms of the contingent commission agreements does not mean that any incumbent protection scheme premised on contingent commissions would be implausible. Id. at 43. Plaintiffs explain that the method of allocation was generally through the

27

delivery of premium volume (*i.e.*, the combined premiums paid by "books" or other combinations of customers) rather than the delivery of specific customers or specific lines of business to the participating insurers.  Id. at 44.  Plaintiffs contend that because premium dollars are fungible, it did not matter which customers' business or which lines of insurance were delivered to achieve the desired volume thresholds.  Id.  Plaintiffs claim that the retention of incumbent business was the easiest way to achieve the required premium volume, and incumbent business was the most profitable for the insurers, thus an agreement not to compete for each other's incumbent business was consistent with the allocation scheme.  Id.

Plaintiffs also note that Defendants' contention that the conduct such as book rolls, bid disclosure and last looks is "manifestly pro-competitive" is undercut by the fact that the practice of collecting contingent commissions has been curtailed.  Id. at 51.  Plaintiffs also explain, for example, that Defendants have agreed to refrain from "first looks, last looks, rights of first refusal or limiting the number of quotes sought from insurers for insurance placement."  Id. at 51 (citing Gallagher Assurance Discontinuance of Illinois, p. 15, ¶ 9; Chubb Assurance of Discontinuance, p. 31, ¶¶ 22, 24).

**D.    Plaintiffs' Second Amended Complaints and Particularized Statements Do Not Sufficiently Allege Facts to Support Section 1 Claims**

**1.    *Broker-Centered Conspiracies***

The Court has already determined that "Plaintiffs have established facts which could show, if proven, that a horizontal collusion among the insurers was plausible in the broker-centered conspiracies."   In re Ins. Brokerage Antitrust Litig, 04-5184, (GEB), Docket Entry No. 1126. However, this Court also concluded that "while it might have been plausible that the Defendants

28

agreed to engage in some sort of behavior, it cannot survive as a horizontal conspiracy unless what the competitors agreed to do was 'unlawful.'" Id.; see also Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984); American Tobacco Co., 328 U.S. at 180.  Plaintiffs' First Amended Complaints lacked sufficient facts to demonstrate that it was the Insurer Defendants, at the same level of competition, that participated in the division of the market in some way or agreed to an unlawful scheme initiated by the Broker Defendants.

In the Second Amended Complaints, Plaintiffs allege the Broker-Centered Conspiracies as two-fold.  Specifically, in the first part of the alleged scheme Plaintiffs claim that the Insurer Defendants agreed with the Broker Defendants to pay contingent commissions in exchange for the allocation of a certain amount of premium volume.  This was supposedly accomplished through the formation of strategic partnerships among "preferred insurers" who received the benefit of a smaller competitive market for the broker's business in exchange for higher commissions paid for that business.  Plaintiffs allege that the Insurer Defendants agreed to and colluded with fellow Insurer Defendants and the Broker Defendants to curb competition and allocate the market to a select few insurers.  Plaintiffs assert that this allocation of the business was accomplished by agreements among the Defendants.

Keeping in mind the standard for a motion to dismiss an antitrust claim, this Court concludes that Plaintiffs have not established a plausible scheme for the first part of the alleged conspiracy, namely, the consolidation of the Broker Defendants' business with a few preferred partner insurers.  Plaintiffs have not set forth facts to support the theory that the Insurer Defendants agreed with each other, either expressly or impliedly, to pay the Broker Defendants contingent commissions in order to receive the benefit of lessened competition by some discernable method.  Plaintiffs' explanation

of this purported conspiracy has not significantly changed since the Court initially dismissed the First Amended Complaints. The allocation of premium volume in exchange for contingent commission payments consists of a vertical relationship among the Broker Defendants and the Insurer Defendants. Plaintiffs have not set forth facts to demonstrate that these relationships involved a horizontal agreement, either express or implied, among the Insurer Defendants to divide the brokers' business and refrain from competition. Plaintiffs attempt to explain this horizontal agreement by stating that the Insurer Defendants, by agreeing to pay these contingent commissions, conspired to restrain competition between the preferred partner insurers and all other insurers not privy to the arrangement. However, there is no indication that the Insurer Defendants agreed to such a plan. Rather, the facts as alleged demonstrate an attempt by the Broker Defendants to consolidate their markets and drive up their own revenue by eliciting increased payments by a select few insurers. That these insurers, individually, decided to pay the brokers higher commissions in order to gain access to a much narrower pool of competition is not in and of itself a horizontal conspiracy to restrain trade. Plaintiffs need something more to tie this behavior together and demonstrate an agreement amongst the insurer-competitors in order to establish the required horizontal element. Thus, this Court cannot conclude, as is required by the Sherman Act, that what the defendants agreed to do was *per se* unlawful.

Additionally, while Plaintiffs insist that this consolidation of business and these partnerships were the trappings of an illegal conspiracy, their logic and facts fall short of satisfying the requirements set forth by Section 1 and relevant case law due to the market allocation alleged. In addition to a lack of agreement among the insurers, Plaintiffs theory is devoid of a plausible market allocation as required by this Court. Plaintiffs insist that the market was divided based on premium

volume, and that no discernable method of allocation apart from dollar amounts was necessary. However, Plaintiffs' theory fails, as there is no basis for this Court to infer that an agreement existed among the competitors, the Insurer Defendants, to divide the broker's business in such a way. As noted in the Court's previous opinion, more facts supporting a discernable division of the brokers' business are necessary in order to sustain the allegations that the market was divided amongst these participants in an illegal manner.

The second part of the conspiracy occurred after the market was initially consolidated, and according to Plaintiffs, involved the protection of incumbent business. Plaintiffs contend that once the business was allocated to the preferred partners, the Insurer Defendants conspired with each other and the Broker Defendants to ensure that each participant retained their renewal accounts. Plaintiffs presented a panoply of facts to this Court which allege that certain actions were taken by the Insurer Defendants at the request of the Broker Defendants, such as first looks, last looks, and some instances of protective bidding and bid-rigging, purportedly in order to protect their own renewal accounts. Plaintiffs cite to facts which indicate that the Insurer Defendants were aware of the preferred partnership agreements among Insurer Defendants and Broker Defendants, including details of the arrangements. Plaintiffs also offer facts which suggest that the Insurer Defendants understood that if they complied with the Broker's demands, then their business would be protected upon renewal.

The Court recognizes Plaintiffs' argument that the incumbent protection devices, *i.e.* first looks, last looks, bid-rigging, etc., were the devices by which Defendants allegedly advanced the conspiracy and protected insurers from losing renewal business. Defendants argue that these devices offer potential pro-competitive benefits and are not *per se* unlawful, but rather enhance competition.

Consequently, Defendants claim that these practices cannot be used to infer a horizontal agreement among the Defendant Insurers to engage in a conspiracy to curb competition. Defendants contend that it is in the independent self-interest of each individual insurer to retain existing customers, explaining that an incumbent insurer is already familiar with the risks of an existing customer, which enables it to expend less money and resources to underwrite the risk. Thus, Defendants claim that it is natural and logical for an insurer to pay contingent commissions that reward renewal of existing accounts. Plaintiffs, however, explain that just because the practices could have a pro-competitive use in this industry, that does not eliminate the possibility that they were used as a means to further this alleged unlawful conspiracy. As noted in American Tobacco Co., "[i]t is not of importance whether the means used to accomplish the unlawful objective are themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. 328 U.S. at 801. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition." Plaintiffs cite to facts that demonstrate, if true, that brokers demanded this behavior of each insurer participant - specifically, that the Insurer Defendants were directed to submit a false quote or give a fellow competitor a first or last look on renewal, upon the instruction of the broker. No communications are alleged to have occurred directly among the insurer competitors, as the exchange of information was purportedly done through the broker as an intermediary.

The fact that Broker Defendants demanded or expected certain behavior from the Insurer Defendants does not necessarily amount to a horizontal agreement amongst the Defendant Insurers. Plaintiffs claim that each insurer conspirator accepted and agreed to engage in the broker-centered business allocation scheme based on, and because, each of the other Insurer Defendants also agreed

to participate in the scheme.  Plaintiffs claim that in this way, the Broker Defendants orchestrated

a horizontal agreement among rival insurers not to compete for each others' customers.  It was the

hub, the broker, that Plaintiffs claim was the means by which the Insurer "spokes" received the

information about the alleged conspiracy.  Plaintiffs claim that it was this knowledge that the other

insurers had agreed to participate in the scheme which indicates a horizontal conspiracy among the

Insurer Defendants.

Plaintiffs rely on U.S. v. Masonite Corp., in which the Court noted that "[i]t is elementary

that an unlawful conspiracy may be and often is formed without simultaneous action or agreement

on the part of the conspirators. . . . Acceptance by competitors, without previous agreement, of an

invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of

interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." 316

U.S. 265, 275 (1942) (quoting Interstate Circuit v. United States, 306 U.S. 208, 227 (1939)).

Plaintiffs contend that they need not plead or prove an express agreement or direct communication

among the "spokes of the wheel."  In re Ins. Brokerage Antitrust Litig., 04-5184, Docket Entry No.

1263, at 31 (Pl.'s Opp.) (citing Phillip E. Areeda and Herbert Hovencamp, Antitrust Law Vol. VI,

¶ 1426 (2002 ed.) ("This is the meaning of the 'hub and spoke' or 'hub and wheel' conspiracy

metaphor.  Interstate Circuit at the hub converses along a spoke with each distributor out at the wheel

end of each spoke.  Through the medium of the hub, each distributor communicates with other

distributors and thus forms a conspiracy along the wheel's outer circumference.").  However, by

alleging this hub and spoke conspiracy, Plaintiffs face the problem of the "rimless wheel" - a

situation in which various defendants enter into separate agreements with a common defendant, but

where the defendants have no connection with one another, other than the common defendant's

involvement in each transaction.  Dickson v. Microsoft Corp., 309 F.3d 193, 204 (4th Cir. 2002);

Kotteakos v. United States, 328 U.S. 750, 755 (1946) ("The pattern was that of separate spokes

meeting at a common center, though we may add without the rim of the wheel to enclose the

spokes."); ABA Section of Antitrust Law, Antitrust Law Developments 25 (6th ed. 2007) ("What

makes the series of agreements an actionable conspiracy, however, is some set of facts that shows

a connecting agreement among the horizontal competitors that form the spokes; this is the 'rim' of

the wheel.").  The Court in Kotteakos determined that the rimless wheel conspiracy amounts to

multiple conspiracies between the common defendant and each of the other defendants.  Id. At 768-

69, 772.  "Although some of the earlier hub-and-spoke cases have suggested at least the theoretical

possibility that an actionable conspiracy might be found where there were hub and spokes but no rim,

more recent cases require that a plaintiff must present evidence sufficient to allow the inference of

an agreement constituting the rim of the conspiracy." Brunson Communs., Inc. v. Arbitron, Inc., 239

F. Supp. 2d 550, 562 (D. Pa. 2002).

   While this Court previously held that the conspiracy allegations were faulty because they

failed to show some sort of recognizable allocation of the market (a way for the insurers to

understand what they were actually agreeing to divide), it appears that the allegations as presently

drafted suffer from a more serious defect.  This hub and spoke conspiracy is devoid of a factual basis

for this Court to infer that an agreement existed among the competitors - in this case, the Insurer

Defendants.  Plaintiffs want this Court to view the specific facts regarding the "incumbency

protection racket" through their lens - which colors each demand from a broker to an insurer as being

part of an agreement to restrain competition that already exists.  However, when stepping back and

viewing these facts in the aggregate, there is nothing in this record to suggest that there was any sort

34

of express agreement among the insurers. While it is not necessary for the agreement to be explicit, the facts are simply too tenuous to intimate an implied agreement - a rim to this hub and spoke conspiracy. The brokers demanded certain behavior of the insurers, but that does not constitute a horizontal agreement among insurers to collude.

In a recent decision by the Supreme Court, it was determined that "[a] statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." Twombly, 127 S.Ct. at 1966. "An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. Plaintiffs discount the relevance of Twombly in the present case, contending that the facts set forth in the pleadings provide this "something more" than merely parallel conduct. However, the Court concluded that § 1 claims "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." Id. Twombly is instructive in the case at hand, as Plaintiffs have set forth various facts which they contend clearly indicate an agreement among the Insurer Defendants. However, this Court, is not persuaded that the facts, as alleged, satisfy the requirement that the alleged conspiracy be plausible and not just a series of vertical agreements between brokers and insurers, or a series of acts taken without a common scheme in place.

As noted in Twombly, "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be

expensive." Id. at 1967.  Here, Plaintiffs have engaged in a plethora of discovery to date, and have

been given several chances by this Court to craft the deficient complaints in a manner that complies

with the appropriate pleading requirements.  The large number of participants in these alleged

conspiracies, along with the difficulty of detecting cheating by an insurer with a broker and the

temptation of the insurers to pursue an independent profit-maximizing course with a broker detracts

from the plausibility of the broker-centered conspiracies.  See Antitrust Analysis, Phillip Areeda,

Louis Kaplow, Aaron Edlin (6th ed. 2004).  Despite the hard work and effort set forth by the

Plaintiffs, the Second Amended Complaints fall short of the pleading requirements.  Accordingly,

this Court concludes that Plaintiffs have not sufficiently stated a claim for a § 1 violation of the

Sherman Act relating to the Broker-Centered conspiracies, and those claims are hereby dismissed.

### 2.    *Global Conspiracy*

Plaintiffs also claim that the Broker Defendants engaged in a global conspiracy not to

disclose the existence of the contingent commission payments and the resulting impact on premium

levels to their own clients, or the clients of another broker in an effort to steal that broker's clients.

Plaintiffs claim the Broker Defendants adopted collective and inadequate disclosure policies to

prevent inquiry and failed to disclose payments.  Through industry studies and communications with

each other, Plaintiffs allege the Broker Defendants knew they had each consolidated their markets

and allocated business in exchange for contingent commissions.  Plaintiffs allege that each broker

knew the details of these arrangements, and that exposing these agreements would threaten a

broker's own contingent commission profit.  Based on this threat of exposure, Plaintiffs claim that

the brokers expressly or tacitly agreed among themselves not to disclose the existence of the

agreements to rival brokers' customers.  Plaintiffs claim that the arrangements were not revealed to

customers by competing brokers can only be explained by the existence of a horizontal conspiracy. Plaintiffs claim that all of the Insurer Defendants also agreed, with their respective hubs and each other, not to disclose the existence of the arrangements. Plaintiffs claim that this conspiracy was furthered by the adoption of confidential provisions which kept the details of the arrangement from the insureds.

As explained above, the Court in <u>Twombly</u> requires more than parallel conduct to allege a conspiracy, particularly one in which so many conspiring, competing parties are involved. Defendants claim that the non-disclosures occurred because it was in the brokers own unilateral self-interest not to disclose the details of the contingent commission agreements. Plaintiffs contend that the basis for the global conspiracy is not simply that each broker did not divulge the information about the arrangements, but rather that the brokers cooperated in the creation and implementation of disclosure policies that were designed to hide the scheme. Plaintiffs explain that the similar operation of each broker centered conspiracy is just one piece of evidence to support the existence of a global conspiracy.

This Court is still not satisfied that Plaintiffs have supplied sufficient facts to establish a global agreement among these competitor-brokers. Plaintiffs claim that this conspiracy is unlike <u>Twombly</u> because there the brokers actually agreed to and implemented policies to designed to hide their schemes. Defendants, however, note that the plausibility of a global scheme is undercut by the lack of facts alleged to explain how this conspiracy was possible when the consolidation of markets for each broker occurred during various time periods. This Court previously concluded that Defendants' membership in various trade groups and the sharing of information are insufficient to support an inference of actual concert of action. Plaintiffs have failed to provide facts for this Court

37

to base an inference of an agreement among the Broker Defendants.  While Plaintiffs present facts to support the possibility of inadequate disclosures by the brokers to the insureds, the Complaints are bereft of allegations to demonstrate that this was more than brokers adopting sub-par disclosure methods to protect their own, lucrative agreements.  The issue before this Court is whether a conspiracy among competitors restrained trade in violation of the Sherman Act.  Whether these disclosures were appropriate does not assist this Court in its determination of whether some common plan was implemented.  The adoption of similar disclosure policies and the opportunity to collude through various industry methods is not enough to infer that such a large group of participants engaged in a conspiracy.  Further, the lack of support for the broker-centered conspiracies also cuts against the Plaintiffs' claims that a larger agreement existed.  Plaintiffs have not shown that the Insurer Defendants colluded among themselves in the broker centered conspiracies, and thus it is improbable that they colluded to further this global agreement as well.  Accordingly, Plaintiffs' antitrust claims with regard to the global conspiracy are dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motions to Dismiss are granted.  Plaintiffs' claims alleging violations of 15 U.S.C. § 1 are dismissed.  An appropriate form of Order accompanies this Opinion.


Dated: August 31, 2007

__s/ Garrett E. Brown, Jr._____

GARRETT E. BROWN, JR., U.S.D.J.
